ANDREW HAWLEY, OSB No. 09113
Northwest Environmental Defense Center
10015 SW Terwilliger Blvd
Portland, OR 97219
(503) 768-6673
(503) 768-6671 (fax)
hawleya@nedc.org

ALLISON LAPLANTE, OSB No. 02361
laplante@lclark.edu
TOM BUCHELE, OSB No. 081560
tbuchele@lclark.edu
Pacific Environmental Advocacy Center
10015 SW Terwilliger Blvd.
Portland, OR 97219
(503) 768-6894 (LaPlante)
(503) 768-6736 (Buchele)
(503) 768-6642 (fax)

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

**NORTHWEST ENVIRONMENTAL
DEFENSE CENTER,**

Case No.: 10-1129-AC

Plaintiff,

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR A
TEMPORARY RESTRAINING ORDER
and/or PRELIMINARY INJUNCTION**

v.

**UNITED STATES ARMY CORPS OF
ENGINEERS; NATIONAL MARINE
FISHERIES SERVICE,**

Defendants

## TABLE OF CONTENTS

**INTRODUCTION** ............................................................................................................ 1

**STATEMENT OF FACTS** ............................................................................................. 1

   A. Instream Gravel Mining ............................................................................................ 1

   B. The Chetco River Coho Salmon ............................................................................... 2

   C. Instream Gravel Mining on the Chetco ................................................................... 4

   D. Issuance of the Regional General Permit ............................................................... 5

   E. Current Plans of Operation ...................................................................................... 5

**OVERVIEW OF THE LAW** ......................................................................................... 7

   A. Endangered Species Act ........................................................................................... 7

   B. Clean Water Act ....................................................................................................... 8

   C. National Environmental Policy Act ....................................................................... 11

**STANDARD OF REVIEW** ......................................................................................... 12

**ARGUMENT** ................................................................................................................ 13

   A. Plaintiff Raises Substantial Questions and is Likely to Succeed on the Merits. .............. 13

      1. NEDC is Likely to Succeed in Showing that NMFS's Incidental Take
         Statement Violates the Endangered Species Act ........................................ 14

         a. *NMFS fails to establish a surrogate with a causal link to the stressors that
            may take coho salmon* ............................................................................... 15

         b. *NMFS's ITS is so indeterminate that it cannot be violated and therefore
            does not act as an appropriate rigger to reinitiate consultation* .................... 18

      2. NEDC is Likely to Succeed in Showing The Corps Failed to Conduct an
         Adequate Analysis of Practicable Alternatives to the Project that Would Have
         Less Effect on the Aquatic Ecosystem ........................................................ 20

      3. The Corps Violated NEPA by Issuing an Invalid Finding of No Significant
         Impact and by Failing to Explain its Choice of Alternatives ........................ 25

         a. *The Corps' Finding of No Significant Impact is Arbitrary and Capricious* .......... 25

         b. *The Corps Failed to Consider a Reasonable Range of Alternatives.* .................. 29

   B. The Gravel Mines Are Likely to Cause Irreparable Harm in the Absence of
      Preliminary Relief .................................................................................................. 31

   C. The Balance of Hardships and Public Interest Tip in Favor of Preliminary Relief .......... 34

   D. No Bond Should be Required and, if One is, It Should be Nominal ................................. 35

**CONCLUSION** ............................................................................................................ 35

# TABLE OF AUTHORITIES

**STATUTES**

5 U.S.C. § 706. ........................................................................................................ 13

5 U.S.C. § 706(2). ..................................................................................................... 14

16 U.S.C. § 1531(b). .................................................................................................. 7

16 U.S.C. § 1532(13). ................................................................................................ 8

16 U.S.C. § 1532(19). ................................................................................................ 8

16 U.S.C. § 1533(d) .............................................................................................. 8, 28

16 U.S.C. § 1536(a)(2). ......................................................................................... 7, 14

16 U.S.C. § 1536(o). ............................................................................................. 8, 15

16 U.S.C. § 1536(o)(2). .............................................................................................. 8

16 U.S.C. § 1538(a)(1)(B). ........................................................................................ 7

16 U.S.C. § 1538(a)(1)(C). ........................................................................................ 7

16 U.S.C. § 1538(a)(1)(G). ..................................................................................... 7, 8

42 U.S.C. § 4321 ...................................................................................................... 11

42 U.S.C. § 4332(2)(C). ........................................................................................... 11

42 U.S.C. § 4332(2)(C)(1)(iii). ................................................................................ 11

42 U.S.C. § 4332(2)(E). ........................................................................................... 29

33 U.S.C. § 1251(a). .................................................................................................. 8

33 U.S.C. § 1311(a). .................................................................................................. 8

33 U.S.C. § 1362(6). .................................................................................................. 8

33 U.S.C. § 1344. ....................................................................................................... 8

33 U.S.C. § 1344(b). .................................................................................................. 9

33 U.S.C. § 1344(e)(1). .............................................................................................. 9

**REGULATIONS**

33 C.F.R. § 320.1(a)(1). ............................................................................................ 9

33 C.F.R. § 320.4(a) ................................................................................................. 10

33 C.F.R. § 320.4(a)(1). ............................................................................................. 9

33 C.F.R. § 320.4(a)(2)(i). .......................................................................................... 9

33 C.F.R. § 320.4(a)(2)(ii). ......................................................................................... 9

33 C.F.R. § 320.4(a)(2)(iii). ........................................................................................ 9

33 C.F.R. § 230.12(a)(3). .......................................................................................... 10

33 C.F.R. § 320.2(f). ........................................................................................................... 9

33 C.F.R. § 323.2(g). ........................................................................................................... 9

33 C.F.R. § 323.2(h). ........................................................................................................... 9

40 C.F.R. § 230.3(q-1). ...................................................................................................... 10

40 C.F.R. § 230.10(a). ........................................................................................................ 29

40 C.F.R. § 230.10(a)(1)(i). ............................................................................................... 11

40 C.F.R. § 230.10(a)(1)(ii). .............................................................................................. 11

40 C.F.R. § 230.10(a)(2). .................................................................................................... 10

40 C.F.R. § 230.10(a)(3). .................................................................................................... 10

40 C.F.R. § 230.12(a)(3)(iv). .............................................................................................. 24

40 C.F.R. § 230.45(a). ........................................................................................................ 10

40 C.F.R. § 1500.1(b) ........................................................................................................ .29

40 C.F.R. § 1502.14(a) ...................................................................................................... .29

40 C.F.R. § 1502.14(d) ...................................................................................................... .29

40 C.F.R. § 1502.22(b) .................................................................................................... 1, 27

40 C.F.R. § 1507.1. ............................................................................................................. 11

40 C.F.R. § 1508.9(a)(1). .................................................................................................... 12

40 C.F.R. § 1508.13. ........................................................................................................... 12

40 C.F.R. § 1508.18 ......................................................................................................... 1, 28

40 C.F.R. § 1508.27 ............................................................................................................ 25

40 C.F.R. § 1508.27(b) ....................................................................................................... 27

50 C.F.R. § 402.02. .......................................................................................................... 7, 14

50 C.F.R. § 402.14(e). .......................................................................................................... 7

50 C.F.R. § 402.14(i)(4). ...................................................................................................... 8

50 C.F.R. § 402.14(g). ........................................................................................................ 14

50 C.F.R. § 402.16(a). ........................................................................................................ 15

50 C.F.R. § 223.102(c)(11). .................................................................................................. 8

50 C.F.R. § 223.203(a). ......................................................................................................... 8

**CASE LAW**

*Alliance for the Wild Rockies v. Cottrell*,
  613 F.3d 960 (9th Cir. 2010). .......................................................................................... 12, 35

*Amoco Prod. Co. v. Village of Gambell*,
  480 U.S. 531 (1987) ........................................................................................................ 13, 31

*Ariz. Cattle Grower's Ass'n v. U.S. Fish & Wildlife Serv.*,
  273 F.3d 1229 (9th Cir. 2001) ................................................................ passim

*Blue Mountains Biodiversity Project v. Blackwood*,
  161 F.3d 1208 (9th Cir. 1998). ................................................ 12, 25, 26

*Center for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
  538 F.3d 1172 (9th Cir. 2008). ............................................................ 25

*Citizens to Preserve Overton Park v. Volpe*,
  401 U.S. 402 (1971)................................................................................ 13

*Davis v. Mineta*,
  302 F.3d 1104 (10th Cir. 2002). .......................................................... 30

*Friends of Yosemite Valley v. Kempthorne*,
  520 F.3d 1024 (9th Cir. 2008). ............................................................ 30

*Forest Serv. Employees for Envt'l Ethics v. U.S. Forest Serv.*,
  726 F. Supp. 2d 1195 (D. Mont. 2010)................................................ 25

*Grand Canyon Trust v. U.S. Bureau of Reclamation*,
  No. CV-07-8164-PHX-DGC, 2010 WL 2643537 (D. Ariz. June 29, 2010). .................... 19, 20

*Greater Yellowstone Coalition v. Flowers*,
  359 F.3d 1257 (10th Cir. 2004). .......................................................... 21

*High Sierra Hikers Ass'n v. Blackwell*,
  390 F.3d 630 (9th Cir. 2004). .............................................................. 32

*Humane Soc'y of United States v. Hodel*,
  840 F.2d 45 (D.C. Cir. 1988)................................................................ 34

*Klamath-Siskiyou Wildlands Center v. U.S. Forest Serv.*,
  373 F. Supp. 2d 1069 (E.D. Cal. 2004).............................................. 26

*Kootenai Tribe of Idaho v. Veneman*,
  313 F.3d 1094 (9th Cir. 2002). ............................................................ 34

*Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2009). .............................................................. 13

*Latino Issues Forum v. EPA,*
    558 F.3d 936 (9th Cir. 2008). ................................................................. 13

*Miccosuke Tribe of Indians of Florida v. FWS,*
    566 F.3d 1257 (11th Cir. 2009). ........................................................ 16, 17

*Monsanto v. Geertson Farms,*
    --- U.S. ---, 130 S. Ct. 2743 (2010) ...................................................... 31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .................................................................................. 14

*Nat'l Wildlife Fed'n v. Babbitt,*
    128 F. Supp. 2d 1274 (E.D. Cal. 2000) ................................................... 28

*Nat'l Wildlife Fed'n v. Burlington N. R.R.,*
    23 F.3d 1508 (9th Cir. 1994). ................................................................. 13

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
    235 F.Supp.2d 1143 (W.D. Wash. 2002) ................................................ 15

*Nat'l Wildlife Fed'n v. Norton,*
    332 F.Supp.2d 170 (D.D.C. 2004). ......................................................... 14

*Native Ecosystems Council v. Tidwell,*
    599 F.3d 926 (9th Cir. 2010). ................................................................. 12

*Neighbors of Cuddy Mt. v. United States Forest Serv.,*
    137 F.3d 1372, 1380 (9th Cir. 1998) ...................................................... 27

*Ocean Mammal Institute v. Gates,*
    546 F. Supp. 2d 960 (D. Haw. 2008). ..................................................... 30

*Or. Natural Resources Council v. Allen,*
    476 F.3d 1031 (9th Cir. 2007). ........................................... 15, 16, 19, 20

*People ex rel. Van de Kamp v. Tahoe Regional Plan,*
    766 F.2d 1319 (9th Cir. 1985) ................................................................ 35

*Public Citizen v. Dept. of Trans.,*
    316 F.3d 1002 (9th Cir. 2003). ............................................................... 26

*Rep. of the Phillipenes v. Marcos*,
   862 F.2d 1355 (9th Cir. 1988). .......................................................... 12

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989)............................................................................ 11

*San Luis Valley Ecosystem Council v. U.S. Fish and Wildlife Serv.*,
   657 F. Supp. 2d 1233 (D. Colo. 2009)........................................... 32, 34

*Save Our Sonoran, Inc. v. Flowers*,
   408 F.3d 1113 (9th Cir. 2005). ......................................................... 34

*Sierra Club v. Bosworth*,
   510 F.3d 1016 (9th Cir. 2007). ......................................................... 35

*Sierra Club v. U.S. Army Corps of Engineers*,
   --- F.3d ---, 2001 WL 2718144 (8th Cir. 2011). ............................ 32, 34

*Sierra Club v. Van Antwerp*,
   719 F. Supp. 2d 58 (D.D.C. 2010). ................................................... 21

*Simmons v. Army Corps of Engineers*,
   120 F.3d 664 (7th Cir. 1997). ........................................................... 29

*S. Yuba Citizen's League v. NMFS*,
   723 F.Supp. 2d 1247 (E.D. Cal. 2010).................................... 16, 17, 18

*TVA v. Hill*,
   437 U.S. 153 (1978)........................................................................ 7, 13

*Thomas v. Peterson*,
   753 F.2d 754 (9th Cir. 1985). ........................................................... 31

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982)........................................................................... 13

*Wilderness Soc'y v. U.S. Forest Serv.*,
   630 F.3d 1173 (9th Cir. 2011). ......................................................... 34

*Winter v. NRDC*,
   129 S.Ct. 365 (2008)................................................................... 12, 31

**Other Authority**

70 Fed. Reg. 37,160 (June 28, 2005). ........................................................................................ 3

70 Fed. Reg. 52,630 (Sept. 2, 2005). ........................................................................................ 3

71 Fed. Reg. 17,757 (Apr. 7, 2006) ........................................................................................... 3

75 Fed. Reg. 13,012 (Mar. 18, 2010). ....................................................................................... 3

74 Fed. Reg. 52,300 (Nov. 9, 2009). ......................................................................................... 3

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff Northwest Environmental Defense Center ("NEDC") seeks a temporary restraining order and preliminary injunction to prevent the unlawful destruction of the Chetco River.

On July 15, 2011, Defendant United States Army Corps of Engineers ("Corps") issued a Regional General Permit ("RGP" or "Permit") under the Clean Water Act ("CWA") authorizing commercial instream gravel mining on the Chetco River.  Previously, the National Marine Fisheries Service ("NMFS") issued its Biological Opinion ("BiOp"), dated June 28, 2011, pursuant to the Endangered Species Act ("ESA"), addressing the impacts of the proposed mining on the critically imperiled coho salmon.

With these final agency actions, the framework was in place to allow gravel extraction from the lower Chetco River. Indeed, on August 9, 2011, NEDC was notified that gravel mining could likely begin under the RGP as early as August 22, 2011.  Subsequently, on August 10, 2011, NEDC learned that one operator covered under the RGP intends to begin mining this week in a manner intended to evade regulation under the RGP.

Now, NEDC respectfully moves this Court for a temporary restraining order and preliminary injunction under the ESA, CWA, and NEPA to enjoin the Corps from implementing the RGP, and to enjoin NMFS from issuing the Incidental Take Statement. Absent preliminary relief, the proposed mining operations will cause irreparable harm to both the environment and to NEDC and its members.

## STATEMENT OF FACTS

### A.    Instream Gravel Mining

The Corps has long acknowledged that instream gravel extraction may have significant

impact on river geomorphology and attendant adverse impacts on anadromous species and their habitats. *See generally* Declaration of Andrew Hawley, Plaintiff's Exhibit ("Pl.'s Exh.") 6 (Sediment Removal From Active Stream Channels In Oregon: Considerations For Federal Agencies For The Evaluation Of Sediment Removal Actions From Oregon Streams (2006)). The Corps further states that while the recovery from some effects can occur quickly once disturbance ceases, "other effects require longer periods for restoration, and *some effects are not recoverable*." *Id.* at 19 (emphasis added).[1]

Specifically, the impacts to these species may include but are not limited to direct harm to salmonids; loss or degradation of spawning, rearing, resting, and staging habitat; and migration delays and/or blockages. These impacts can result from changes to the waterways including channel widening, shallowing, or ponding; loss of channel stability; loss of pool/riffle structure; increased turbidity and sediment transport; increased bank erosion and/or stream bed downcutting; and loss or degradation of riparian habitat.

Bar skimming, the method of gravel mining at issue here, in particular, "can significantly impact aquatic habitat." Pl.'s Exh. 7 at 5 (NMFS, National Gravel Extraction Guidance)). This type of mining "creates a wide, flat cross section" in the river that leads to problems including increased sediment deposition, channel instability, and changes in upstream and downstream channel hydraulics. *Id.* The operation of heavy equipment associated with mining within the stream or river can destroy spawning and rearing habitat and can kill juvenile fish.

**B.    The Chetco River Coho Salmon**

The RGP authorizing mining activities on exposed gravel bars within the Chetco River.

---

[1] All exhibits referenced in this brief are attached to the Declaration of Andrew Hawley (filed herewith).

The Chetco River, in the southwest corner of Oregon, flows from within the Kalmiopsis Wilderness 57 miles to the Pacific Ocean at Brookings, Oregon.  The upper 28 miles of the Chetco River is located within the Kalmiopsis Wilderness Area; the lower 29 miles of the river is surrounded by active forestlands, some ranch and rural residential areas, and urban areas.

The Chetco River provides vital spawning, rearing, and migration habitat for several federally protected species, including the Southern Oregon/Northern California Coasts ("SONCC") coho salmon, southern eulachon, and the North American green sturgeon. Each of these species is listed as threatened under the ESA. *See* 70 Fed. Reg. 37,160 (June 28, 2005) (SONCC coho); 75 Fed. Reg. 13,012 (Mar. 18, 2010) (eulachon); 71 Fed. Reg. 17,757 (Apr. 7, 2006) (sturgeon). The River is also designated critical habitat for both SONCC coho and for green sturgeon. *See* 70 Fed. Reg. 52,630 (Sept. 2, 2005) (SONCC coho); 74 Fed. Reg. 52,300 (Oct. 9, 2009) (sturgeon).

Here, the RGP and gravel mining will negatively impact the Chetco population of SONCC coho salmon. The Chetco population is an "important link" between other SONCC populations in the Rogue River and Northern California, BiOp at 13, and is already critically imperiled. That population is estimated to be a mere 50 to 100 annual spawners, roughly 0.01% of its historic size. *See* Pl.'s Exh. 1 at 12 (Biological Opinion for the Regional General Permit for Gravel Mining in the Chetco River Curry County, Oregon (Corps No.: NWP 2008-00071) (June 28, 2011) ("BiOp")). At this level, the Chetco population is at or under its depensation threshold of 135 individuals. *Id*. As NMFS explained previously, the depensation threshold represents the level at which "per capita growth rates decrease due to density dependent factors such as failure to find mates." Pl.'s Exh. 8 at 10 (NMFS, Biological Opinion for the Regional General Permit for Gravel Mining in the Chetco River Curry County, Oregon (Corps No.: NWP 2008-00071)

(September 3, 2010)). This "results in a negative feedback loop that accelerates a population towards extinction." *Id.* As a result of its precariously low numbers, the Chetco coho's overall risk of extinction is currently rated as "high." BiOp at 13.

### C.    Instream Gravel Mining on the Chetco

Anthropogenic pressures in and near the Chetco River have significantly degraded SONCC coho habitat. This is the primary reason why the Chetco coho population has decreased to a level at or below its depensation threshold. For example, the Chetco River has suffered unsustainable gravel harvest for the last several decades, beginning in the 1900s, and peaking in the 1970s and 1980s with the extraction of "millions of cubic yards of gravel." BiOp at 10, 16. Over the past 10 years alone, nearly 690,000 cubic yards of material have been removed from the lower reaches of the River.

Past gravel extraction has altered the geomorphic condition of the lower Chetco River. In fact, the bed of the Chetco River and estuary are up to six feet lower today than they were in 1977. BiOp at 18. Of primary concern, extraction has led to channelization and decreased sinuosity, depriving juvenile coho of high-flow refuge during the winter. BiOp at 26. This lack of over-winter refuge in the form of backwaters, alcoves, and side-channels is the primary factor limiting survival and recovery today. *Id*. at 18. Extraction also causes bank erosion, alters sediment transport and sorting processes, and reduces woody debris and riparian cover used to hide from predators. *Id.*

For the first time in more than 100 years, recent periods of decreased extraction may (or may not) have resulted in slight improvements to SONCC coho habitat. *See* BiOp at 19; id at 28 ("monitoring data is not yet available to quantify these trends"). However, even if "the recent trend in habitat is positive, limiting factors in the action area still lead to poor fitness and low

survival of SONCC coho salmon juveniles." *Id*. at 19.

**D.    Issuance of the Regional General Permit**

On July 15, 2011, the Corps issued the Regional General Permit under section 404 of the Clean Water Act, authorizing the commercial instream mining of the lower Chetco River. This permit was the end product of a process beginning as least as early as July 10, 2008, when the Corps entered into an agreement with various federal and state agencies, and the mining industry, to develop a permitting plan for aggregate mining on Oregon's gravel-producing rivers. *See* First Amend. Compl. ¶¶ 71-86. (Dckt. No. 46).

In support of the Permit, the Corps produced a Department of the Army Environmental Assessment and Statement of Findings for Regional General Permit for Commercial Gravel Mining Chetco River, Curry County, Oregon ("Decision Document"). Pl.'s Exh. 3. In addition to serving as the NEPA document for the RGP, the Decision Document also "constitutes the . . . Section 404(b)(1) Evaluation and Determination" pursuant to the CWA. *Id.* The Corps consulted with Defendant NMFS under the ESA. That process culminated in NMFS' Biological Opinion, issued on June 28, 2011, concluding that mining would not jeopardize the continued existence of the SONCC coho salmon or destroy or adversely modify its critical habitat. *See* Pl.'s Exh. 1 at 31.

**E.    Current Plans of Operation**

On August 9, 2011, NEDC learned that Freeman Rock, Inc., one of the mine operators regulated under the RGP, intends to begin mining on or about August 15, 2011. NEDC also learned that one month before the Corps released the RGP and the associated NEPA analysis, on June 14, 2011, Freeman notified the Corps that it intended to operate outside the purview of the RGP without triggering the Corps' Clean Water Act jurisdiction. *See* Pl.'s Exh. 4 at 1. The Corps

agreed: if Freeman "ensures material is not pushed or dragged along the surface of the bar and . . . only a relatively small amount of material is spilled," the CWA may not apply. *Id.*[2]  A determination of whether or not Freeman Rock will operate under the conditions of the RGP---including limiting extraction to a certain percentage above a reserve volume, complying with the in-water work window, and undertaking restoration activities---is critical to the evaluation of whether the RGP complies with applicable federal laws.

Next, on August 10, 2011, Defendants informed NEDC that a second contractor, Tidewater Contractors, Inc., notified the Corps on or around August 4, 2011, of its intent to begin mining *pursuant* to the RGP.  Pl.'s Exh. 5 at 1 (2011 Extraction Plans for the 2nd Bridge Gravel Bar on the Chetco River–Tidewater Contractors, Inc. Regional General Permit NWP-2008-00071).  Tidewater's proposal is to extract approximately 6,000 cubic yards of material from a two acre proposed mine area.  *Id.* at 4.  Pursuant to the terms of the RGP, this mining could not begin before August 22, 2011, thirty days after Tidewater conducted its survey of the proposed extraction area.  *See* Pl.'s Exh. 2 at 5 (Dckt. 41-1); Pl.'s Exh. 5 at 1 (pre-extraction survey was conducted on July 22, 2011).

According to Defendants' counsel, the Corps is currently moving forward with the required site visit of the mining site and evaluation of Tidewater's proposed mining plan. Hawley Dec. at ¶ 7.  It appears that this review will be completed shortly and mining may begin as early as August 29, 2011.  *Id.*

---

[2] The plaintiff finds it extraordinary that after nearly four years of developing a regional permit, including all the time and efforts invested interested citizens, that only now, after the RGP has issued would the question of jurisdiction arise.  It is especially troubling since the Corps was responding to a letter from Freeman Rock dated June 14, 2011, one month before the Corps issued the RGP, in which the Corps asserted CWA jurisdiction over the proposed mining activities.  The plaintiff certainly contends that the Corps has CWA jurisdiction over in-river gravel mining and expects the Corps to so determine, without regard to Freeman Rock's proposed new design for mining.

## OVERVIEW OF THE LAW

**A.      Endangered Species Act**

The ESA provides "a program for the conservation of . . . endangered species and threatened species," as well as "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. §1531(b). The U.S. Supreme Court explained that "[t]he plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *TVA v. Hill*, 437 U.S. 153, 184 (1978).

To facilitate Congress' intent to halt and reverse species extinction, Section 7 of the ESA requires federal agencies to ensure that their actions are not likely to "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species[.]" 16 U.S.C. § 1536(a)(2). To jeopardize a listed species is to reduce appreciably that species' chances of either survival or recovery. 50 C.F.R. § 402.02.

When an agency concludes that a proposed action will adversely affect a listed species, Section 7 requires that agency to consult with NMFS. 16 U.S.C. § 1536(a)(2). In turn, NMFS must prepare a biological opinion assessing whether the action is likely to cause jeopardy or destroy or adversely modify critical habitat. *Id.*; *see also* 50 C.F.R. § 402.14(e). The Services must use the "best scientific and commercial data available" for that determination. 16 U.S.C. § 1536(a)(2).

In addition to Section 7's focus on the status of the species and critical habitat, Section 9 of the ESA prohibits the "take" of any member of any listed species. *See* 16 U.S.C. § 1538(a)(1)(B), (C), (G).[3] To "take" a member of a listed species is, *inter alia*, to harass, harm, or

---

[3]        Section 9 applies directly to species listed as endangered. *See* 16 U.S.C. § 1538(a)(1)(B),

kill that individual. *Id*. § 1532(19). This prohibition applies to private persons as well as to

agents and departments of the Federal Government. *Id*. § 1532(13).  Section 7(o) of the ESA

provides a limited exception to Section 9's blanket prohibition on take. *See* 16 U.S.C. § 1536(o).

This is often referred to as the ESA's "safe harbor" provision. As part of the Section 7

consultation process, Section 7(o) allows NMFS or the FWS to exempt actions that are "in

compliance with a written statement," a so-called incidental take statement, that sets, among

other things, an acceptable level of accidental take. 16 U.S.C. § 1536(o)(2); *see also* 50 C.F.R. §

402.14(i)(4). If this level of take is exceeded, the project must stop and Section 7 consultation

must be reinitiated. 50 C.F.R. § 402.16(a).

## B.    The Clean Water Act

In 1972, Congress passed the Clean Water Act "to restore and maintain the chemical,

physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  To achieve this

objective, Section 301 of the CWA, 33 U.S.C. § 1311(a), prohibits "the discharge of any

pollutant" into "navigable waters" except in accordance with water quality standards

promulgated and permits issued under other sections of the CWA.  "Pollutants" include dredged

spoil, rock, and sand, among other materials.  33 U.S.C. § 1362(6).

Section 404 of the CWA, 33 U.S.C. § 1344, authorizes the Secretary of the Army to issue

permits for the discharge of dredged or fill material into "navigable waters" when certain

conditions are met.  The Section 404 permitting program is administered by the Corps, subject to

---

(C). However, Section 9 also prohibits any person from violating any regulation passed by
NMFS pursuant to Section 4(d), 16 U.S.C. 1533(d), that extends Section 9's blanket prohibition
on take to a threatened species. 16 U.S.C. § 1538(a)(1)(G). By regulation passed pursuant to
Section 4(d), NMFS has extended Section 9 protection to SONCC coho salmon, the species at
issue here. *See* 50 C.F.R. §§ 223.203(a), 223.102(c)(11).

guidelines set by the U.S. Environmental Protection Agency ("EPA").  33 C.F.R. § 320.2(f).

Unless exempted by Section 404(f)(1) under circumstances not relevant to this action, all

discharges of dredged or fill material into waters of the United States must be authorized under a

Section 404 permit issued by the Corps.

The Corps may issue individual permits or general permits.  33 U.S.C. §1344(e)(1).  An

individual permit "is issued following a case-by-case evaluation of a specific project involving

the proposed discharge(s) ... and a determination that the proposed discharge is in the public

interest pursuant to 33 C.F.R. part 320."  33 C.F.R. § 323.2(g).  A general permit "is issued on a

nationwide or regional basis for a category or categories of activities when: (1) [t]hose activities

are substantially similar in nature and cause only minimal individual and cumulative

environmental impacts; or (2) [t]he general permit would result in avoiding unnecessary

duplication of regulatory control exercised by another Federal, State, or local agency provided it

has been determined that the environmental consequences of the action are individually and

cumulatively minimal."  33 C.F.R. § 323.2(h).

In performing its substantive review of an application, the Corps is required to undergo a

"public interest review," which requires a determination of the "extent of public and private need

for the proposed work," "the practicability of using reasonable alternative locations and methods

to accomplish the objective of the proposed ... work," and "the permanence of detrimental

effects."  33 C.F.R. §§ 320.1(a)(1), 320.4(a)(2)(i)-(iii).  In making these determinations, the

Corps must consider "[a]ll factors which may be relevant to the proposal," including "the

cumulative effects" of the project.  33 C.F.R. § 320.4(a)(1).

In reviewing a Section 404 application, the Corps must follow rules developed by EPA

under Section 404(b) of the CWA, 33 U.S.C. § 1344(b), which are known as the "404(b)(1)

Guidelines." 33 C.F.R. § 320.4(a). The 404(b)(1) Guidelines are codified at 40 C.F.R. Part 230.

The Corps is prohibited from issuing any permit if, among other requirements:

(i)   There is a practicable alternative to the proposed discharge that would have less adverse
      effect on the aquatic ecosystem, so long as such alternative does not have other significant
      adverse environmental consequences; or
(ii)  The proposed discharge will result in significant degradation of the aquatic ecosystem … ;
      or
(iii) The proposed discharge does not include all appropriate and practicable measures to
      minimize potential harm to the aquatic ecosystem; or
(iv)  There does not exist sufficient information to make a reasonable judgment as to whether the
      proposed discharge will comply with these Guidelines.

40 C.F.R. § 230.12(a)(3).

Under those guidelines, EPA identifies riffle and pool complexes, such as the proposed

project area on the Chetco River, as "special aquatic sites" that "are generally recognized as

significantly influencing or positively contributing to the general overall environmental health or

vitality of the entire ecosystem of a region."  40 C.F.R. § 230.3(q-1); *see also* Decision

Document at 57-58 ("The lower Chetco River contains a series of riffle/pool complexes.").  The

Guidelines further note that "[r]iffle and pool complexes are particularly valuable habitat for fish

and wildlife."  40 C.F.R. § 230.45(a).

Where a discharge is proposed for a special aquatic site, all practicable alternatives to the

proposed discharge that do not involve a discharge to the special aquatic site "are presumed to

have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise."  40

C.F.R. § 230.10(a)(3).  In addition, if "the activity associated with a discharge to a special

aquatic site does not require access or proximity to or siting within the special aquatic site (i.e., is

not 'water-dependent'), practicable alternatives that do not involve special aquatic sites are

presumed to be available, unless clearly demonstrated otherwise."  *Id*.  Gravel mining is not a

"water dependent" activity.

An applicant for a discharge to a special aquatic site connected with a non-water-dependent

activity must clearly demonstrate, and the Corps must independently verify, that there is no

practicable alternative to the discharge or that any practicable alternative would have greater

environmental impacts.  "Practicable alternatives include but are not limited to: activities that do

not involve a discharge of dredged or fill material into the waters of the United States" [or]

"discharge of dredged or fill material at other locations into the waters of the United States."  40

C.F.R. § 230.10(a)(1)(i),(ii).

C.      **National Environmental Policy Act**

NEPA declares a "national policy" to promote, among other things, "efforts which will

prevent or eliminate damage to the environment." 42 U.S.C. § 4321. To that end, NEPA requires

every federal agency contemplating "major federal action significantly affecting the quality of

the human environment" to prepare and circulate a detailed statement of environmental

consequences. 42 U.S.C. § 4332(2)(C). That statement, known as an Environmental Impact

Statement ("EIS"), must describe the "environmental impact of the proposed action," alternatives

to the proposed action, and any "irreversible and irretrievable commitment of resources which

would be involved if the proposed action should be implemented." 42 U.S.C. §

4332(2)(C)(1)(iii), (iv). This requirement plays two important "action-forcing" roles. First,

preparation of an EIS ensures that agencies will take a "hard look" at environmental

consequences before they decide to act. Second, it ensures "broad dissemination of relevant

environmental information." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349

(1989).

The Council on Environmental Quality ("CEQ") has adopted regulations implementing

NEPA that are binding on all federal agencies. *See* 40 C.F.R. § 1507.1. Under those regulations,

an EIS must be prepared for all actions "with effects that *may* be major and which are potentially

subject to Federal control and responsibility." *Id*. § 1508.18 (emphasis added); *see also Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 936-37 (9th Cir. 2010). This includes, for example, "actions approved by permit or other regulatory decision." *Id*.

To determine whether or not an action "may" have significant effects, thus triggering the need to prepare an EIS, CEQ's regulations allow federal agencies to first prepare a shorter Environmental Assessment ("EA"). The purpose of an EA is to "provide sufficient evidence and analysis for determining whether to prepare and environmental impact statement," 40 C.F.R. § 1508.9(a)(1), and if "substantial questions" remain after preparation of an EA then the agency must prepare an EIS. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998). On the other hand, if an EA demonstrates that the project will *not* have significant environmental impacts, the agency may issue a Finding of No Significant Impact ("FONSI") without preparing an EIS. 40 C.F.R. § 1508.13.**.**

## STANDARD OF REVIEW

Plaintiffs are generally entitled to preliminary injunctive relief when they demonstrate that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. NRDC*, 129 S. Ct. 365, 374 (2008). The Ninth Circuit recently affirmed the use of the "serious questions" approach when considering a motion for a preliminary injunction, under which "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Alliance for the Wild Rockies v. Cottrell*, 613 F.3d 960 (9th Cir. 2010). "Serious questions" are those that are "substantial, difficult and doubtful," requiring a more thorough investigation. *Rep.of the Philippines v. Marcos*, 862 F.2d

1355, 1362 (9th Cir. 1988).

Under the Endangered Species Act ("ESA"), however, Congress afforded endangered species the "highest of priorities," thus limiting the district court's equitable discretion to withhold injunctive relief. *Tennessee Valley Auth. ("TVA") v. Hill*, 437 U.S. 153, 174 (1978). Consequently, the Ninth Circuit has applied injunctive relief to ESA cases differently than in other contexts. *National Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1510–11 (9th Cir. 1994) (noting also that the "traditional test for preliminary injunctions … is not the test for injunctions under the [ESA]").  This is consistent with Supreme Court's holding in *TVA v. Hill*, where the Court held that the balancing of equities and hardships did not apply where Congress, in legislation, "has decided the order of priorities in a given area." 437 U.S. at 194.  As the Court explained, "[t]he plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, *whatever the cost*." *Id*. at 184 (emphasis added).  The Court has affirmed subsequently that Congress intended to foreclose courts' traditional equitable discretion in ESA cases.  *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 543 n.9 (1987) (distinguishing the ESA from the statute at issue and confirming that Congress "had foreclosed the traditional discretion possessed by an equity court" when it enacted the ESA); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313–14 (1982) (noting that "Congress may intervene and guide or control the exercise of the courts' discretion" and that "Congress had foreclosed the exercise of the usual discretion possessed by a court of equity" under the ESA).

## ARGUMENT

### A.    Plaintiff Raises Substantial Questions and is Likely to Succeed on the Merits.

Plaintiffs' claims are reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706; *see also Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008). In reviewing the agencies' decisions at issue here, this Court must engage in a "thorough, probing, in-depth

review," *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971), and set aside

agency determinations that are "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2).

The agency must "articulate a satisfactory explanation for its action including a 'rational

connection between the facts found and the choices made.'" *Motor Vehicle Mfrs. Ass'n v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citations omitted). While this standard

is a deferential one, this Court may "not rubber-stamp . . . administrative decisions" as correct.

*Latino Issues Forum v. EPA*, 558 F.3d 936, 941 (9th Cir. 2009).

1.      **NEDC is Likely to Succeed in Showing that NMFS's Incidental Take Violates the Endangered Species Act.**

In preparing its BiOp, NMFS must use the "best scientific information available" to

determine whether the proposed action is likely to jeopardize the continued existence of a listed

species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g). In conducting this evaluation NMFS

"must (1) review all relevant information, (2) evaluate the current status of the listed species, (3)

and evaluate the effects of the action and cumulative effects on the listed species. *Nat'l Wildlife*

*Fed'n v. Norton*, 332 F. Supp. 2d 170, 176 (D.D.C. 2004) (internal quotations omitted). Here,

NMFS's BiOp rests on a number of questionable assertions rendering its opinion untenable. *See*

First Amend. Compl. ¶¶ 138-145.[4]  As a result, the BiOp is arbitrary and capricious and fails to

---

[4] Of the main short-comings of the BiOp, is the cumulative effects analysis in which NMFS states "[]after examination of the biological assessment and additional queries to the applicant and Corps, the NMFS was unable to identify any future non-Federal activities in the action area." BiOp at 27. This conclusion impossible to square with the fact that on June 14, 2011, Freeman Rock, Inc., informed the government that it had "developed a design that will allow [it] to remove aggregate so any fallback of dredged material is only 'incidental' and thereby does not constitute a discharge that would be regulated under Section 404 of the Clean Water Act." Pl.'s Exh. 4 at 1.  Cumulative effects are "effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area." 50 C.F.R. § 402.02.  Here, Freeman is "confident" it can conduct instream mining activities that "will not result in a regulated discharge under the Clean Water Act" and plans to move ahead with those

comply with the ESA. These legal errors manifest themselves most immediately in NMFS' associated ITS, which if allowed to be issued will likely result in the take of an unacceptable number of coho salmon.

As discussed above, NMFS must issue an Incidental Take Statement ("ITS") under Section 7(o) of the ESA for any project likely to "take" members of a listed species. 16 U.S.C. § 1536(o). The purpose of an ITS is twofold. First, it lifts Section 9's blanket prohibition on take up to a specified limit. *Oregon Nat'l Resources Council v. Allen*, 476 F.3d 1031, 1040 (9th Cir. 2007). Second, an ITS "set[s] forth a 'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision [of the ESA], and requiring the parties to re-initiate consultation." *Id*.; *see also Ariz. Cattle Growers' Ass'n v. United States Fish & Wildlife,* 273 F.3d 1229, 1249 (9th Cir. 2001); *see also* 50 C.F.R. § 402.16(a). Especially relevant in light of NMFS's questionable jeopardy analysis, this automatic trigger "ensure[s] that even if the project is implemented in strict accordance with the plan, it will not result in a level of harm to the protected species that would cause the agency to reconsider its jeopardy determination." *Nat'l Wildlife Fed'n v. NMFS*, 235 F. Supp. 2d 1143, 1161 (W.D. Wash. 2002).

If possible, an ITS must set a numerical cap on the number of protected individuals that may be taken. *Allen*, 476 F.3d at 1038. Where such a cap is not possible, NMFS may use a "surrogate" to gauge the level of take and to trigger reinitiation of Section 7 consultation. *Id*. For example, a surrogate may express the level of take in terms of altered habitat characteristics. For aquatic species, such a surrogate might be triggered when the project causes water temperature to rise above a specified level. *See Ariz Cattle Growers' Ass'n*, 273 F.3d at 1250.

a.     **NMFS fails to establish a Surrogate with a causal link to the stressors**

---

operations this week and the Corps appears ready to allow that action to proceed. As a result, this is a significant, non-federal action, a discussion of which is absent from the BiOp.

**that may take coho salmon.**

If a surrogate is used it must "perform the functions of a numerical limitation." *Allen*, 476

F.3d at 1038. To this end, a surrogate must bear a "causal link" to take. *Ariz. Cattle Growers'*

*Ass'n*, 273 F.3d at 1250. Further, the surrogate must address all stressors that might result in take

of the species. *S. Yuba Citizen's League v. NMFS*, 723 F. Supp. 2d 1247, 1280 (E.D. Cal. 2010);

*Miccosuke Tribe of Indians of Florida v. FWS*, 566 F.3d 1257, 1275 (11th Cir. 2009). And the

surrogate may not merely repeat other conditions in the BiOp intended to minimize, but not to

cap, the level of take. *Allen*, 476 F.3d at 1039.

Here, several stressors may result in take of SONCC coho salmon. These include

decreased over-wintering habitat, changed hydrological conditions due to the volume of

extracted gravel, sedimentation, chemical contamination, and the crushing of juvenile salmon by

heavy equipment. *See* BiOp at 23–25. Gravel pits can also entrap salmon if not dug properly. *See*

*id.* at 3. Yet, NMFS proposes only a *single* surrogate to gauge the level of take caused by Chetco

River gravel mining: no more than .2 acres of gravel bar surface may be disturbed for every

1,000 cubic yards (cy) of gravel removed. *Id.* at 32.   As a result, NMFS wholly fails to establish

the casual link between this surrogate and the causes or level of anticipated take.

The surrogate here fails to address *all* of the stressors that may cause take. The failure to

account for even a single stressor is sufficient grounds for rejecting an ITS.  For example, the

Eastern District of California recently invalidated an ITS for the operation of two dams in

Central California. *See S. Yuba Citizen's League*, 723 F. Supp. 2d at 1280. In *South Yuba*, NMFS

entirely failed to establish a surrogate for a primary cause of take—entrainment in the dam itself.

*Id*. For that reason the court invalidated the ITS, explaining that "surrogates must reflect the take

actually caused by the project, and Federal Defendants have not identified anything in the record

demonstrating that no such take will occur. Accordingly, the BiOp fails to explain the link between the surrogates and take." *Id*.  Similarly, the Eleventh Circuit recently invalidated an ITS for a series of water diversions surrounding the Florida Everglades. *See Miccosuke Tribe of Indians*, 566 F.3d at 1275. In *Miccosuke*, the ITS measured take of the Everglades Snail Kite in terms of surrogate low water levels. *Id*. However, the ITS ignored equally dangerous high-water events that the diversions would cause periodically. *Id*. Because the surrogate only addressed low flow events, the court held there was not a sufficient link between the chosen surrogate and take. *Id*.

Here, NMFS' surrogate ratio of volume of extracted gravel to area of surface disturbance suffers from the same fatal flaw identified in *South Yuba* and *Miccosuke*. That ratio does not address all stressors that may cause take, and therefore does not "reflect the take actually caused by the project." *S. Yuba Citizen's League*, 723 F. Supp. 2d at 1280.

For example, NMFS' surrogate ratio operates "regardless of the level of annual extraction allowed by the proposed action." BiOp at 32.  By ignoring the total amount of gravel removed, the ITS fails to track one of the primary causes of take associated with gravel mining on the Chetco. As NMFS itself explains, "[a] direct relationship exists between the *amount* of gravel removed from a stream and its geomorphic conditions." BiOp at 21 (emphasis added); *id*. at 23, 24 (the amount of gravel transported through the Chetco River system is directly related to the availability of overwintering habitat, the lack of which is the primary limiting factor for SONCC coho salmon recovery).  Further, according to NMFS "[a] *direct* relationship exists between geomorphic conditions within the lower Chetco River, limiting factors, and the carrying capacity of the" river.  *Id*. at 23 (the amount of gravel in the Chetco is also linked to "carrying capacity," the number of juvenile salmon able to reach adulthood and out-migrate to the ocean).  In short,

the *amount* of gravel extracted from the Chetco is directly related to take of SONCC coho salmon. By ignoring that stressor, NMFS' surrogate does not "reflect the take actually caused by the project." *S. Yuba Citizen's League*, 723 F.Supp.2d at 1280.

NMFS's surrogate ratio also ignores harm to SONCC coho salmon caused by heavy machinery crossing the Chetco. The BiOp specifically states that "[t]he project *will result in death and injury* of Juvenile SONCC coho salmon from heavy equipment crossing the stream to install temporary bridges." BiOp at 31 (emphasis added). NMFS *anticipates* that no more than twelve such in-river crossings will be required each year. BiOp at 24. Yet, the ITS simply does not address take caused by in-river crossings. As a result, a mining operation's heavy machinery could cross the river an *unlimited* number of times causing the death or injury of salmon each time, without ever triggering reinitiation of consultation.

Last, the BiOp fails to provide or cite *any* scientific or biological reason why the ratio of surface disturbance to volume extracted *alone* is an indicator of take. *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1251 (agency must "establish a link between the activity and the taking of species *before* setting forth specific conditions.") (emphasis added). If anything, the remainder of the BiOp suggests just the opposite, analyzing several stressors *none* of which even reference bare surface area. Nor does the BiOp offer a single scientific or biological rationale supporting NMFS' chosen ratio. Instead, NMFS explains only that it believes, after reviewing monitoring reports submitted by the mine operators that "no more than 0.2 acres of gravel bar *need to be* disturbed for every 1,000 cubic yards of gravel harvested." BiOp at 32.  Knowing only what miners "need" simply does not help determine the area of impact associated with an acceptable level of take.

> **b.    NMFS's ITS is so indeterminate that it cannot be violated and therefore does not act an appropriate trigger to reinitiate**

**consultation.**

The Ninth Circuit has explained that "Incidental Take Statements set forth a 'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision, and requiring the parties to re-initiate [section 7] consultation." *Arizona Cattle Growers' Ass'n*, 273 F.3d at 1249.  Thus, an ITS is invalid if it lacks "measurable guidelines to determine when incidental take would be exceeded," or fails "to set forth a trigger that would invalidate the safe harbor provision and reinitiate the consultation process." *ONRC v. Allen*, 476 F.3d at 1038–39.  Specifically, an ITS is invalid if it is "too vague for the permit applicant or the [action agency] to measure its performance." *Id*. at 1039 (citing *Arizona Cattle Growers' Ass'n*, 273 F.3d at 1250).

This is precisely the situation here, however.  Again, the ITS states: "The area of gravel bar disturbed per unit of gravel extracted (0.2 acres per 1,000 cubic yards harvested) is a threshold for reinitiating consultation."  BiOp at 32.  Absent from this statement are the appropriate definitions and limitations necessary to determine first, how this calculation is to be made, and second, when it is made.  As a result, there is no assurance that this threshold will serve its role as a trigger for the reinitation of consultation and thus protect the at-risk species.

First, the terms "area of gravel bar disturbed" and "disturbed," the central elements of the ITS, are left undefined.   The ITS is meaningless without definitions of these crucial components.  Certainly the term "disturb" does not have such a commonly understood meaning, particularly in this context, that it is reasonable to expect the term to be consistently interpreted by all three operators, the Corps and NMFS.  For example, some may interpret the area of disturbance to include only the area of extraction, while others may include access points and staging areas on the bars. Furthermore, the potential offsite disturbances, including those required by the mitigation actions, may (or may not) be included in this calculation.  NMFS is derelict in not

defining these terms with precision necessary to allow the Corps, the miners and the public to understand when and if the reinitiation obligation is triggered. *Grand Canyon Trust v. U.S. Bureau of Reclamation*, No. CV-07-8164-PHX-DGC, 2010 WL 2643537 (D. Ariz. June 29, 2010) (the ITS must "identify[] the *point at which* it will be clear that the permitted level of take has been exceeded") (emphasis added).

Second, the scope of the analysis is not established. For example, the ITS does not discuss whether the area of disturbance is calculated on each bar individually, or averaged across the multiple bars to be mined. Again, by failing to describe this important factor, NMFS has left the miners and the Corps unable to determine whether the threshold has been violated.

Finally, NMFS fails to provide sufficient measurement, recordkeeping and reporting requirements to ensure that the calculation is made when reinitiation of consultation can serve some meaningful purpose. One reasonable reading of the vague standard in the ITS is that the determination is made at the end of the permit term, allowing the permittee to compare its cumulative harvest with the cumulative area of disturbance. By allowing this type of calculation, the provisions of the ITS are unlawful. If the threshold triggering reinitiation "cannot be reached until the project itself is complete," the ITS violates the ESA. *ONRC v. Allen*, 476 F.3d at 1039.

For the reasons above, NEDC is likely to succeed in showing that NMFS' incidental take statement is arbitrary, capricious, and not in accordance with law.

> **2.    NEDC is Likely to Succeed in Showing The Corps Failed to Conduct an Adequate Analysis of Practicable Alternatives to the Project that Would Have Less Effect on the Aquatic Ecosystem.**

The Corps' issuance of the RGP violates the CWA and its implementing regulations because the Corps failed to conduct an adequate analysis of practicable alternatives to the project that would have less effect on the aquatic ecosystem.

The Corps' alternatives analysis pursuant to the 404(b) Guidelines is inadequate. To begin with, because the proposed activity is not "water dependant," the Corps must presume that practicable alternatives that do not involve discharge to special aquatic sites exist. When that presumption applies, the Corps bears the burden of providing "detailed, clear and convincing information *proving* that an alternative with less adverse impact is impracticable." *Sierra Club v. Van Antwerp*, 719 F. Supp.2d 58, 69 (D.D.C. 2010) (emphasis in original) (quoting *Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1269 (10th Cir. 2004)). The information identified by the Corps in its Decision Document falls far short of meeting its burden to overcome the presumption.

More specifically, the Decision Document identifies five purported practicable alternatives: (1) No Action; (2) Smaller Project Designs; (3) Larger Project Designs;[5] (4) Upland Quarries; and (5) Other Sources (Rogue River mining and recycling of asphalt and concrete). Decision Document at 53-55. The limited range of alternatives that appear in the Corps' Decision Document is inadequate in scope, lacks specificity, and is inconsistent with the 404(b) Guidelines and the CWA.

The Corps considered one smaller project design that was recommended by the Technical Team, which would have included extraction on a three-year cycle with two mandatory rest years and a percentage cap above the reserve volume of 60%. The Corps rejected its Technical Team's recommendation because:

---

[5] The Corps' inclusion of "Larger Project Designs" in a range of practicable alternatives that are supposed to have less adverse impact on the aquatic ecosystem is irrational on its face and should be rejected outright by the Court. The purpose of the alternatives analysis is not to identify earlier project designs that would have had *more* of an adverse affect on the aquatic ecosystem, but rather to identify practicable alternatives that would have less adverse impacts. 40 C.F.R. § 230.10(a). The Corps' inclusion of these proposed-then-rejected larger projects is not rationally related to the alternatives analysis contemplated by the 404(b) Guidelines.

> [t]he Corps believes these two features of the alternative are overly restrictive in
> that they would not provide a balance between allowing a sufficient amount of
> aggregate to be harvested to support the needs of the community and providing
> protections for the aquatic environment.

Pl.'s Exh. at 54.  In addition to rejecting the Technical Team's recommendation, the Corps

rejection of this alternative is arbitrary because it does not analyze in any meaningful way the

community's need for aggregate from the Chetco River mining.  In the purpose section of the

Decision Document, the Corps describes the "community" this way:  "A number of projects in

various stages of the planning process have been identified within southern Oregon and northern

California coastal communities."  Decision Document at 11.   Other than referencing some

"possible" needs for aggregate in a broad geographic area, the Decision Document does not

provide any information regarding the "community's" need, if any, for aggregate from the

Chetco River.  Without knowing more specifics about the community's need for aggregate,

currently and in the foreseeable future, it is impossible to evaluate whether or not those needs

may be fulfilled by the smaller project design alternative recommended by the Technical Team.

The Corps' discussion of the upland quarries alternative is fatally flawed for several

reasons.  First, even though the Corps, when describing the community's need for aggregate,

broadly defined the geographic scope of the community as including "southern Oregon and

northern California coastal communities," when the Corps described the potential *sources* of

upland aggregate for that community it limited its analysis to southwestern Oregon. *See* Pl.'s

Exh. 3 at 55.  There is no discussion or analysis of potential upland quarry sites in northern

California that could address the community's undefined need for aggregate.  *Id*.  Moreover, the

Corps notes that Newport, Oregon does have a hard rock quarry "but it is only accessible during

certain times of the year because of a bald eagle nest nearby."  *Id*.  The Decision Document does

not say what times of year or how many days of the year that the quarry is accessible; nor does

the Corps attempt to explain how limited accessibility to the Newport hard rock quarry due to a bald eagle nest is any different than the limited accessibility (*i.e.*, the in-water work window) to the Chetco River due to the presence of critically imperiled salmon.  In other words, the same justification the Corps used to reject the upland quarry alternative exists for the proposed project---limited accessibility due to the presence of a sensitive species.  At a minimum, for these reasons, the Corps' analysis of the potential for meeting community aggregate needs through the use of upland quarries is inadequate, arbitrary, and does not meet the clear and convincing proof standard necessary to overcome the presumption that non-water dependent alternatives to the proposed project are practicable.

The Corps' "Other Sources" alternative involved two sources:  (1) Freeman Rock's current permit for harvesting aggregate from the Rogue River, and (2) recycling asphalt and concrete.  With regard to the Rogue River gravel, the Corps' analysis consists of pure speculation:  "Removal on the Rogue River without other sources of material *may not provide the aggregate necessary for regional needs*."  *Id*.   It is not surprising that the Corps does not know whether or not the Rogue River gravel will meet regional needs because, as detailed above, the Corps did no analysis as to what the regional needs for aggregate, currently and in the foreseeable future, are.   The Corps' analysis of the recycling alternative consists of one sentence:  "Recycling asphalt and concrete does provide a viable source of aggregate but quantity of such material would be insufficient to meet regional construction needs."  *Id*.  As previously discussed, the Corps did not adequately define what the regional construction needs for aggregate are.  Further, it is not clear from the Corps' one-sentence analysis the geographic scope of recycling options the Corps considered.

Finally, the Corps did not analyze any alternatives that called for meeting aggregate

needs through a combination of sources, including upland quarries, recycling asphalt and concrete, and currently permitted mining on the Rogue River. The alternatives analysis states that hard rock quarries "are hard to find in SW Oregon" but cites some examples of such quarries existing. Decision Document at 55. The analysis also acknowledges that recycling is a viable source of aggregate but the quantity "would be insufficient to meet regional construction needs." *Id*. Finally, the analysis mentions Freeman Rock's permit to mine aggregate on the Rogue River near Gold Beach, but speculates that "[r]emoval on the Rogue River *without other sources of material may not provide the aggregate necessary for regional needs*." *Id*. (emphasis added) The corollary to this statement, of course, is that Rogue River gravel without other sources *may* provide the aggregate needed for regional needs. Clearly, if Rogue River gravel can meet regional needs than there is no reason to mine gravel in the Chetco, and the Corps must conduct a thorough analysis to determine if such a practicable alternative exists. Moreover, the Corps decision that no practicable alternatives to the project exist is arbitrary because it did not analyze whether or not Rogue River material *in combination with* other sources (such as upland quarries and recycling) would meet regional needs.

Finally, the Corps alternatives analysis is inadequate because of the astonishing lack of information accompanying the limited set of alternatives that the Corps considered. See 40 C.F.R. § 230.12(a)(3)(iv) (the Corps must provide "sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with [the 404(b) guidelines"). In its Decision Document, the Corps purports to provide "a detailed discussion of alternatives to the proposed project" that includes for each alternative a discussion of "logistics, technology, cost and environmental consequences and is followed by a statement indicating whether or not [the Corps] consider the alternative to be practicable." Decision Document at 53. The Corps'

"detailed discussion" of all practicable alternatives consists of less than two pages. *See id*. at 53-55. For most of the alternatives there is no discussion of logistics, technology, cost or environmental consequences.

For the all of the reasons above, NEDC is likely to succeed in showing that the Corps' issuance of the RGP is is arbitrary, capricious, and not in accordance with law.

### 3. The Corps Violated NEPA by Issuing an invalid Finding of No Significant Impact and by Failing to Explain its Choice of Alternatives.

The Corps' EA and FONSI violate NEPA by failing to demonstrate that the RGP will have only insignificant impacts, or even that the RGP is needed. In evaluating whether the Corps' EA is sufficient, this Court should consider that "[i]f an agency decides not to prepare an EIS, it must supply a 'convincing statement of reasons' to explain why a project's impacts are insignificant. 'The statement of reasons is crucial to determining whether the agency took a 'hard look' at the potential environmental impact of a project.'" *Center for Biological Diversity v. National Highway Traffic Safety Admin.*, 538 F.3d 1172, 1220 (9th Cir. 2008) (quoting *Blue Mountains*, 161 F.3d at 1212).

### a. The Corps' Finding of No Significant Impact is Arbitrary and Capricious.

Under CEQ's NEPA regulations, agencies must determine whether proposed actions will significantly affect the quality of the human environment. To make that determination, agencies must consider both the context and intensity of those impacts, as well as a series of significance factors. *See* 40 C.F.R. § 1508.27. Among those factors, agencies must consider: both beneficial and adverse impacts; unique characteristics of the geographic area; the degree of uncertainty associated with the impacts; the degree of controversy surrounding the project; cumulative effects; and whether the action "may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the [ESA]." *Id*. Importantly, "[a]ny one of

[these] factors standing alone may be sufficient to require preparation of an environmental impact statement." *Forest Serv. Employees for Environmental Ethics v. U.S. Forest Serv.*, 726 F. Supp. 2d 1195, 1215 (D. Mont. 2010); *Public Citizen v. Dept. of Trans.*, 316 F.3d 1002, 1023 (9th Cir. 2003). And plaintiffs do not bear the burden to demonstrate that an effect is significant. Instead, "[i]t is enough for [plaintiffs] to raise substantial questions whether a project *may* have a significant effect on the environment." *Blue Mountains*, 161 F.3d at 1212 (emphasis added).

Here, section 10.1 of the EA, the FONSI itself, contains the Corps' statement of reasons for why it did not prepare and EIS. *See* Pl.'s Exh. 3 at 75–76. Judged by the "convincing statement" test, the Corps simply has not justified its decision to forego a more detailed analysis.

For example, addressing the impact of gravel mining on SONCC coho salmon, the Corps' explains:

> The degree to which the action may affect threatened or endangered species. See Section 4.3 for full discussion regarding impacts to endangered species. Consultation with the National Marine Fisheries Service resulted in a determination that the proposed action would not jeopardize the continued existence of SONCC coho salmon or result in destruction or adverse modification of critical habitat. Best management practices have been incorporated into the project design to minimize any potential for impacts to listed species and restoration actions are planned to provide for habitat improvements.

Pl.'s Exh. 3 at 76. This single explanation conflates "impacts" with "jeopardy," and contains several violations of NEPA.

First, Section 4.3 of the EA describes a number of negative impacts on SONCC coho salmon. These include alteration of substrate near spawning areas; adverse affects on productivity and feeding; reduced cover for juveniles; changed hydrolics, sediment transport, and stream morphology; bank erosion and increased sedimentation; decreased water quality; and lost functions of side channels, pools, and backwater areas. Pl.'s Exh. 3 at 49. From this, the Corps explains, "the Project may affect, and will likely adversely affect SONCC coho salmon." *Id*. This

alone should trigger the need for an EIS. *See Klamath-Siskiyous Wildlands Center v. U.S. Forest Serv.*, 373 F.Supp.2d 1069, 1080 (E.D. Cal. 2004) ("The EA concludes that the project 'will affect, is likely to adversely affect' the Northern Spotted Owl. Standing alone, this suggests the need for an EIS."). Nowhere, however, does the Corps specifically explain *why* these effects are not significant. Instead, these effects are merely listed. *Neighbors of Cuddy Mt. v. United States Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998) (general statements about "possible" effects and "some risk" do not constitute a "hard look" absent a justification regarding why more definitive information could not be provided).

Second, even those facts asserted by the Corps about SONCC coho are highly uncertain, also triggering the need for an EIS. For example, the Corps states that there is no significant population of SONCC coho salmon near the proposed gravel mines because "[d]uring the summer months, fish move out of the mainstem Chetco River because of increased temperature, and inhabit the tributaries." Pl.'s Exh. at 48. However, the EA also acknowledges this issue is ultimately "unsettled" and that "others in the scientific community believe that they remain in this area year round." *Id.* Here, the Corps *acknowledges* that uncertainty exists, but provides no analysis of the *degree* of uncertainty as required by 40 C.F.R. § 1508.27(b).

Nor does the Corps provide any analysis of whether there might be a significant impact if coho are present, one of the very purposes of an EIS. *See* 40 C.F.R. § 40 C.F.R. § 1502.22(b) (agency should summarize available information and state its relevance to the evaluation of significant impacts). This requirement is especially relevant because "[l]ittle information is available for juvenile SONCC coho salmon in the Chetco River." BiOp at 12. Here, the Corps was on notice that snorkel surveys performed during the summer of 2008 documented many juvenile coho near the Freeman mine. *See* Pl.'s Exh. 9 at 5 (NEDC, Comments on Army Corps

of Engineers Permit No. NWP-2008-00071 (July 7, 2011) (attaching summary of snorkel survey data collected on the lower Chetco during the summer of 2008 identified many juvenile coho in the Freeman Gravel bar-scalping reaches). Yet, the Corps' does not even acknowledge this new information in its EA.

Third, NMFS' no-jeopardy determination does not obviate the need for an EIS. In particular, the level of confidence necessary for a jeopardy determination is higher than the level required for an EIS. While the ESA requires NMFS to determine whether jeopardy is "likely," 16 U.S.C. § 1536(a)(2), NEPA requires an EIS whenever a project "may" have significant impacts, 40 C.F.R. § 1508.18. *Nat'l Wildlife Fed'n v. Babbitt*, 128 F.Supp.2d 1274, 1302 (E.D. Cal. 2000) ("While the uncertain success of the Plan's mitigation measures does not. . . render the Service's findings under the ESA arbitrary, NEPA's approach to such uncertainty is to require an EIS."). For example, the RGP includes several provisions to retain bar form, thereby maintaining natural improvement to SONCC habitat. *See* Pl.'s Exh. 2 at 3. NMFS relies on these provisions in its no-jeopardy determination. *See* BiOp at 28. However, methods to retain bar form while mining are "experimental," Pl.'s Exh. 6 at 56, a fact highly relevant under NEPA.

Last, the Corps states that impacts to SONCC will not be significant because "restoration actions are planned to provide for habitat improvements." Pl,'s Exh. 3 at 76 (Decision Document). These projects are "necessary to avoid or reduce the project's potential negative effects on ESA-listed species." *Id.* at 74. Yet, like NMFS, the Corps simply ignores the fact that the party responsible for one of these projects, Freeman Rock, Inc., does not intend to comply with the Permit's conditions. The Corps failed to disclose this risk and its analysis cannot be relied upon until the issue is resolved.  In all, NEDC is likely to succeed on the merits and show that the Corps' FONSI is arbitrary and capricious under the APA.

**b.    The Corps Failed to Consider a Reasonable Range of Alternatives.**

In addition to evaluating the level of impacts, NEPA also requires the Corps' to justify its

proposed RGP by "study[ing], develop[ing], and describe[ing]" a reasonable range of

alternatives. 42 U.S.C. § 4332(2)(E). This is the "heart" of the NEPA process. 40 C.F.R. §

1502.14. Under this rule, the Ninth Circuit has stated that an agency's EA must "rigorously

explore and objectively evaluate all reasonable alternatives." *Center for Biological Diversity v.*

*National Highway Traffic Safety Admin*, 538 F.3d 1172, 1217 (9th Cir. 2008) (quoting 40 C.F.R.

§ 1502.14(a)). And, before settling on any one alternative, an agency must give "full and

meaningful consideration" to the others. *Id*. "Conclusory statements" will not support an

agency's choice of alternatives. *Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664, 670

(7th Cir. 1997); *see also* 40 C.F.R. § 1500.1(b) (NEPA requires information of "high quality.").

Without this analysis, the agency cannot make an informed decision.

As a first step in its analysis, an agency must consider the "no action" alternative. 40

C.F.R. § 1502.14(d). Yet, the Corps' discussion of alternatives is so superficial and conclusory

that it does not even explore that option.  The Corps' entire discussion and analysis of the so-

called "No Action" alternative is here:

> The no action alternative is no RGP.  The projects will require a Department of
> the Army Individual Permit review, thus increasing the burden on limited Corps
> resources, which may result in delayed and backlogged permit decision [sic] for
> the project applicant.  Evaluation by means of Individual Permits may also reduce
> opportunities to manage aggregate removal comprehensively.

Pl.'s Exh. 3 at 53-54.  In addition to it not being a true "no action" alternative in violation of

NE—a true "no action" alternative would be no gravel mining in the Chetco River—the two

justifications the Corps gives for rejecting it are internally inconsistent with its own description

of the RGP elsewhere in the Decision Document.  Specifically, the Corps states that "[w]ith

regard to the Corps review procedures, because the geographical scope is very narrowly defined (Chetco River mile 0 to 11) development of this RGP is really synonymous with that of an individual permit." Pl.'s Exh. 3 at 24. Accordingly, by the Corps' own logic, developing individual permits for gravel miners on the Chetco should not increase the Corps' burden or cause permitting delays and backlogs, nor should it reduce opportunities for comprehensive management. More fundamentally, however, the Corps engaged in no analysis as to whether individual permits were practicable and may be designed to have less of an effect on the aquatic environment, resorting simply to citing a contrived agency burden for rejecting the alternative. The Corps' analysis of this alternative is flawed and inadequate on many levels. *See Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008) (no action alternative may not "assume[] the existence of the very plan being proposed.") (internal quotation omitted); *see also Ocean Mammal Institute v. Gates*, 546 F. Supp. 2d 960, 976 (D. Haw. 2008) (no-action alternative may not contain the same actions under a different name).

In part, the Corps' failure to consider a true no-action alternative is likely due to another violation of NEPA. An EA is inadequate when it rejects several alternatives simply because "*standing alone*, they would not meet the purpose and need of the project." *Davis v. Mineta*, 302 F.3d 1104, 1121 (10th Cir. 2002) (emphasis in original). Instead, an agency must consider alternatives both "separately [and] in combination." *Id*. Here, the Corps rejects several other sources of gravel because they would not *alone* be sufficient for regional needs. These include upland quarries, recycled asphalt and concrete, and gravel from the Rogue River. Whether or not these sources can meet regional needs independently, the Corps had a duty to consider at least *one* alternative employing a combination of sources. This is an obvious alternative to the proposed gravel mines and its absence renders the EA invalid.

Finally, several federal and state agency commenters, including the U.S. Environmental

Protection Agency, the U.S. Fish and Wildlife Service, and the Oregon Department of

Environmental Quality, raised serious about the impacts the proposed RGP would have on the

river and the coho salmon.  Specifically, the agencies raised issues surrounding the need for a

cap on the total volume of gravel that may be extracted from the three mines. *See* Pl.'s Exh. 3 at

14, 15, & 19. The Corps' sole response to these comments is that "[a]n upper limit of gravel

removal over the life of the RGP is not provided as removal *is based* on recruitment volumes

which cannot be predicted." *Id*. at 14 (emphasis added). This conclusory statement merely

restates the Corps' decision, providing no explanation for *why* a flat cap is not feasible. *See*

*Thomas v. Peterson*, 753 F.2d 754, 759 (9th Cir. 1985).  Any justification that the Corps did have

for rejecting a flat cap is undermined by its failure to consider alternate sources of gravel.  NEDC

is likely to show that the Corps' alternatives analysis is arbitrary and capricious under the APA.

**B.     The Gravel Mines Are Likely to Cause Irreparable Harm in the Absence of
         Preliminary Relief.**

The Supreme Court has explained that injury to the environment is often irreparable

because, "by its nature, [it] can seldom be adequately remedied by money damages and is often

permanent or at least of long duration, i.e., irreparable.'" *Amoco Prod. Co. v. Vill. of Gambell*,

480 U.S. 531, 545 (1987). The Court has also recently stated that "[p]art of the harm NEPA

attempts to prevent in requiring and EIS is that, without one, there may be little if any

information about prospective environmental harms and potential mitigating measures." *Winter*,

129 S.Ct. at 376. The NEPA process is especially crucial when an agency is considering an

activity with unknown or uncertain effects on the environment. *See Monsanto v. Geertson*

*Farms*, --- U.S. ---, 130 S.Ct. 2743, 2768 (2010) (Stevens, J. dissenting). And, reflecting the

importance of NEPA review, the Ninth Circuit has explained "in the NEPA context, irreparable

injury flows from the failure to evaluate the environmental impact of major federal action." *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 642 (9th Cir. 2004); *accord Sierra Club v. U.S. Army Corps of Engineers*, --- F.3d ---, 2011 WL 2718144 at *13–14 (8th Cir. 2011); *San Luis Valley Ecosystem Council v. U.S. Fish and Wildlife Serv*., 657 F.Supp.2d 1233, 1241 (D. Colo. 2009). The same is true under the ESA. In fact:

> the strict substantive provisions of the ESA justify *more* stringent enforcement of its procedural requirements. . . . The ESA's procedural requirements call for a systematic determination of the effects of a federal project on endangered species. If a project is allowed to proceed without substantial compliance with those procedural requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result. The latter, of course, is impermissible.

*Thomas v. Peterson*, 753 F.2d at 764 (emphasis in original).

Here, in addition to the procedural harms discussed in the preceding sections, NEDC has attached the declaration of Carl Page, a biologist with more than fifteen years of experience performing habitat assessments for threatened aquatic species. *See* Page Decl. ¶¶ 2-3. Mr. Page explains that the proposed gravel mines will likely irreparably harm the environment in ways that "may take years to cure." *Id*. ¶ 8.  In particular, past "bar scalping" has led to the loss of littoral cover and shelter and degraded water quality. *Id*. ¶ 6. This practice has removed boulder and cobble essential for fish habitat. *Id*. And current "coho rearing habitat[] remains poor at best." *Id*.

The proposed gravel mining will exacerbate these effects. By removing the protective layer of cobble, gravel mining exposes the underlying fine sediment, which is not suitable habitat. *Id*. ¶ 7. This leads, in turn, to sedimentation downstream, further degrading coho rearing habitat. *Id*. ¶ 8. This difference in habitat quality is readily observable: "comparison of the scalped bars on the river to the natural Social Security gravel bar reveals the obvious differences in the number of boulders and large cobbles necessary to shelter juvenile coho." *Id*. And NMFS itself has acknowledged that this loss of habitat may take years to reverse through natural

sediment transport. *Id*. ¶ 9.

The ultimate effects of the proposed action are also highly speculative, heightening the need to prevent this irreparable harm. For example, NMFS itself admits that "[l]ittle information is available for juvenile SONCC coho salmon in the Chetco River." BiOp at 12. And neither NMFS nor the Corps has acknowledged recent data indicating that SONCC coho use the areas surrounding the proposed gravel mines. *See* Page Decl. ¶ 11. Mr. Page himself has documented such use. *Id*. And no subsequent distribution or abundance data have been gathered. *Id*.

In addition to this harm to the environment, the proposed gravel mines will also irreparably harm NEDC members' personal and aesthetic interests in the health of the Chetco River. For example, NEDC member Harvey Young is a fishing guide who moved to Brookings 30 years ago specifically to observe and be close to the Chetco River. Young Decl. ¶¶ 1, 4. Mr. Young's home lies within plain view of the river. *Id.* ¶ 2. He camps on Forest Service land where gravel mining takes place. *Id*. ¶ 3. He frequently brings his family to the River and teaches others the joy of catching and releasing wild fish. *Id*. ¶¶ 5, 11, 27. And Mr. Young states that he experiences a sense of "awe" when viewing the River and its surrounding habitat, including the gravel bars at issue here. *Id*. ¶ 5, 6. In all, Mr. Young has a deep aesthetic, spiritual, and economic interest in the health of the Chetco River.

Over the past 40 years, NEDC member Stanley Ray Easley also often fishes, canoes, and floats on the Chetco River, often as much as 100 times a year. Easley Decl. ¶¶4, 6. He also lives within a quarter mile of the River, and can often hear the machinery at the mines "rattling around and making loud noises" at 5:00 AM. *Id*. ¶ 7. Mr. Easley similarly has strong aesthetic and personal interests in the River and its fish. *See Id*. ¶¶ 3–9. He has seen salmon in the River near the mines. *Id*. ¶ 8. He has observed the negative impacts caused by gravel mining. *Id*. ¶ 7.

Like harm to the environment itself, these personal, aesthetic, and economic interests will be irreparably harmed unless the mines are enjoined. As the District of Colorado has recently held out, while harm to aesthetic harm may be temporary, it is not compensable by money damages. *San Luis*, 657 F.Supp. at 1241 (issuing preliminary injunction to stop exploratory drilling). And the Eighth Circuit has recently enjoined the construction of a power plant based, in part, on harm to the plaintiffs' interest studying and enjoying the area that would be degraded. *See Sierra Club*, 2011 WL 2718144 at *13–14; *see also See Humane Soc'y of United States v. Hodel*, 840 F.2d 45, 52 (D.C. Cir. 1988) (recognizing that "depleting the supply of animals and birds that [] visitors seek to view" is a harm to their "classic aesthetic interests").

Here too, based on direct impacts of gravel mining on the Chetco, the highly-speculative long-term impacts on the health of the coho, and NEDC members' significant personal interests in the action area, preliminary relief is necessary to forestall irreparable injury.

**C.     The Balance of Hardships and Public Interest Tip in Favor of Preliminary Relief.**

Where injury to the environment is at stake, "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco*, 480 U.S. at 545. For that reason, the Ninth Circuit has explained that issuing an injunction even over defendant's pecuniary loss is a "classic, and quite proper, examination of the relative hardships in an environmental case." *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1125 (9th Cir. 2005). Moreover, in the ESA context, Congress has already struck the balance, taking away the courts' traditional equitable discretion. *See TVA*, 437 U.S. at 174.

Preserving the "precious, unreplenishable resources" of our natural environment promotes the public interest. *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1125 (9th Cir. 2002), *overruled on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th

Cir. 2011). As such, the public is served by enjoining federal action undertaken without "careful consideration" of environmental impacts. *Cottrell*, 632 F.3d at 1138; *see also Sierra Club v. Bosworth*, 510 F.3d 1016, 1033 (9th Cir. 2007) ("the public interest favor[s] issuance of an injunction because allowing a potentially environmentally damaging program to proceed without an adequate record of decision runs contrary to the mandate of NEPA"). As discussed above, Defendants' review of the proposed gravel mines falls far short of the detail required by law, and the long-term impact to the Chetco coho and the greater SONCC population remains highly speculative at best. For these reasons, preliminary relief is also in the public interest.

**D.      No Bond Should be Required and, if One is, It Should be Nominal.**

This Court should not require Plaintiffs to post a bond to obtain a Temporary Restraining Order.  The Ninth Circuit has ruled that because requiring a bond has a chilling effect on public interest litigants seeking to protect the environment, the bond requirement in FRCP 65 should be waived, or only a nominal bond should be required.  *People ex rel. Van de Kamp v. Tahoe Regional Plan*, 766 F.2d 1319 (9th Cir. 1985)) (no bond).  "The court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review."  *Id.* at 1325.

**CONCLUSION**

For the above-mentioned reasons, the Plaintiffs respectfully request that this Court enter Temporary Restraining Order and a Preliminary Injunction against the implementation of the proposed action until it has an opportunity to enter a final decision.

Dated this 16th day of August, 2011.                    Respectfully submitted,

                                                                         ___/s/ Andrew Hawley_____
                                                                         ANDREW HAWLEY, OSB No. 09113

                                                                         Attorney for Plaintiff