UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

NORTHWEST ENVIRONMENTAL                                   CV 10-1129-AC
DEFENSE CENTER,

          Plaintiff,                                   OPINION AND ORDER

   v.

UNITED STATES ARMY CORPS OF
ENGINEERS, *et al.*,

          Defendants.

_____

ACOSTA, Magistrate Judge:

      Plaintiff Northwest Environmental Defense Center ("NEDC") brought this action against the

United States Army Corps of Engineers ("Corps") and the National Marine Fisheries Service

("NMFS") (collectively, "Defendants"), challenging the Corps' issuance of a five-year regional

PAGE 1 - OPINION AND ORDER

general permit ("RGP"), which authorizes limited commercial in-stream gravel mining on the Chetco River in southwest Oregon. In its Amended Complaint, NEDC alleges the Corps violated the Federal Advisory Committee Act ("FACA"), the Administrative Procedure Act ("APA"), the Clean Water Act ("CWA"), and the National Environmental Policy Act ("NEPA") in issuing the RGP. NEDC also alleges that NMFS's Biological Opinion ("BiOp") for the RGP and its attendant Incidental Take Statement ("ITS") violate the Endangered Species Act ("ESA").

On August 16, 2011, NEDC filed a Motion for Temporary Restraining Order and/or Preliminary Injunction (doc. #49), seeking to enjoin the Corps' authorization of any in-stream gravel mining activities on the Chetco River until the court resolves the merits of NEDC's claims and Defendants comply with the law.[1]  On August 18, 2011, Defendants filed a Motion to Strike the Declaration of Mr. Carl Page (doc. #58). The court heard oral argument on August 23, 2011. Based on Defendants' representation that no mining activities would occur on the Chetco River before September 2, 2011, the court denied as moot NEDC's motion for an emergency temporary restraining order. For the reasons that follow, the court GRANTS Defendant's Motion to Strike the Declaration of Carl Page, and DENIES NEDC's Motion for a Preliminary Injunction.

*Overview*

The Chetco River, in southwest Oregon, is designated critical habitat for Southern Oregon/Northern California Coasts ("SONCC") coho salmon, which are listed as threatened under the ESA. 70 Fed. Reg. 37,160 (June 28, 2005) (listing SONCC coho as threatened); 70 Fed. Reg. 52,630 (Sept. 2, 2005) (critical habitat). Historically, the Chetco River produced a "fair sized" coho

---

[1]NEDC does not seek injunctive relief based on its FACA claims, and this Opinion and Order does not address those claims.

salmon run.  *See* Biological Opinion for the Regional General Permit for Gravel Mining in the Chetco River in the Chetco River (Corps No.: NWP 2008-00071), at 11 (June 28, 2011) ("BiOp"). Today, it produces only 50 to 100 SONCC coho salmon adult spawners annually.  Although the Chetco River population of SONCC coho salmon has increased in recent years, the current population is extremely low. BiOp at 10-11.

Over the last century, the Chetco River has been severely impacted by timber harvest, road building, rural and urban development, and gravel mining.  Gravel extraction, which began early in the twentieth century, peaked the 1970s and 1980s with as many as fifteen companies operating per year.  These operations extracted millions of cubic yards of gravel.  As a result of many years of unregulated gravel extraction, the geomorphic condition of the lower Chetco River is degraded.

In-stream gravel mining on the Chetco negatively affects ESA-listed salmon in a number of ways, including direct harm to salmonids from the operation of heavy machinery in the river; loss of spawning, rearing, resting, and staging habitat; and migration delays and blockages.  These impacts are a result of changes to the waterways including channel widening, shallowing, or ponding; loss of channel stability; loss of pool/riffle structure; increased turbidity and sediment transport; increased bank erosion and/or stream bed downcutting; and loss or degradation of riparian habitat.  There has been no in-stream gravel mining on the Chetco River for the past two years, which has resulted in improvements in the geomorphic condition of the river.  BiOp at 16.

I. The Regional General Permit

On July 15, 2011, the U.S. Corps of Engineers issued a five-year Regional General Permit ("RGP") under Section 404 of the Clean Water Act, which authorizes limited commercial in-stream gravel mining at three specific project locations within an eight-mile stretch of the lower Chetco

River.  A RGP is an authorization under the CWA that the Corps issues on a regional basis for a category of activities that are substantially similar in nature and cause only minimal individual and cumulative impacts on the aquatic environment.  33 C.F.R. § 322.2(f); EA at 1.  In support of the RGP, the Corps produced an Environmental Assessment and Statement of Findings for Regional General Permit for Commercial Gravel Mining Chetco River, Curry County, Oregon ("EA").  The RGP serves as the NEPA document for the RGP, as well as the CWA Section 404(b)(1) Evaluation and Determination.

The purpose of the Chetco River RGP is "to obtain aggregate for industrial and commercial uses including provision of materials for regional road projects."  EA at 11.  Generally, gravel bar mining is conducted to harvest a specific type of aggregate that meets  "certain standards" for road and other construction projects.  EA at 55.  In contrast to gravel from upland sources, which requires "more processing and sorting to obtain the necessary material for a particular construction job," river gravel is "broken and sorted" through "the natural processes of materials being transported down a stream." EA at 55.

In consultation with NMFS, the Corps included a variety of measures in the RGP to limit impacts to the environment and maintain existing gravel bars, including: (1) requiring a reserve volume of 26,000 cubic yards be met before excavation may occur in any given year; (2) if the 26,000 cubic yard reserve is not met in one year, mining may not occur for that year and the total reserve volume for the following year must exceed 52,000 cubic yards for extraction to occur; (3) an 80% cap on any volume above 26,000 cubic yards with the remaining 20% remaining in-stream to enhance the aquatic environment; (4) guidelines and numerous restrictions to retain gravel bar form and maintain existing aquatic habitats; (5) bar allocations; (6) guidelines on construction, extraction,

PAGE 4 - OPINION AND ORDER

vehicle staging and stormwater management; (7) gravel bar plantings to stabilize the bars; (8) limiting the work window to July 15, through September 30, when fish populations are not found in significant numbers in the Chetco River; (9) adaptive management strategies that retain authority in an annual implementation team to modify the extraction based upon the current physical and biological characteristics of the river and extraction sites; (10) requirements for detailed surveys and reports that monitor gravel bar conditions and volumes before, during, and after extraction, (11) requirements for monitoring annual recruitment volumes, and multi-year evaluations in years four and five of the RGP; and (12) extensive enhancement actions aimed at restoring, enhancing and maintaining summer and winter habitat at Jack Creek and the Social Security Bar. *See* RGP 1-10.

II. The Biological Opinion

On June 28, 2011, NMFS issued a biological opinion ("BiOp") under Section 7 of the Endangered Species Act, addressing the effects of the RGP on listed SONCCO coho salmon. NMFS reviewed the proposed RGP, including the methods and processes used to determine annual extraction amounts. BiOp at 2. NMFS also analyzed the specific restrictions in the RGP, and its monitoring plan. *See e.g.*, BiOp at 5. (pre- and post-harvest surveys, post excavation reports, and multi-year evaluations). After examining the effects of the RGP on listed species and critical habitat, NMFS concluded that the proposed in-stream mining would not jeopardize the continued existence of the SONCC coho salmon or adversely modify its critical habitat. BiOp at 21-25.

NMFS concluded, however, that a "taking" of juvenile coho could occur under the RGP as a result of habitat modification and the twelve heavy equipment crossings allowed per year under the plan. BiOp at 24, 31. With respect to in-water equipment operations, NMFS explained:

At some point during the twelve crossings per year, a few juveniles are likely to be

present.  Furthermore, since no other cover is present, startled juveniles may hide in the interstitial spaces of gravel and cobbles where the equipment is driving, thus increasing their chance of being injured.

Considering the amount of habitat affected (500 square feet) per crossing, the low abundance of SONCC coho salmon juveniles, the low value of affected habitat, the number of crossings per year (12), and the probability of juveniles being crushed (low but not discountable), heavy equipment crossings are likely to expose only a small number of SONCC coho salmon juveniles per year to an increase in likelihood of injury, with death of only a few individuals over the term of the permit.

BiOp at 24.  NMFS also determined that the RGP would result in take associated with habitat modification.  In particular, NMFS found that the "effects of gravel removal associated with the proposed action are reasonably certain to slow the rate of improvement of the geomorphic conditions, habitat features, coho salmon limiting factors (such as overwintering habitat), and coho salmon juvenile survival."  BiOp at 25.  The project will result in a "slowing the improvement of SONCC coho salmon carrying capacity and abundance."  BiOp at 31.

Accordingly, NMFS issued an incidental take statement ("ITS") pursuant to Section 7(o) of the ESA, 16 U.S.C. 1635(o), and its implementing regulations.  BiOp at 31.  Due to a lack of data and the impracticalities of monitoring individual takings, NMFS could not accurately establish a numerical take limitation in the ITS.  *See* BiOp at 31 ("Monitoring the actual number of fish killed or injured by equipment is impractical due to the flow in the river size of fish and the difficulty of accomplishing such as task."); *id*. (addressing possible take associated with habitat modification, and concluding "the relationship between gravel influx, geomorphic conditions, carrying capacity, survival, and abundance is not quantifiable due to lack of data").  Instead, NMFS developed an ecological surrogate that provides a trigger for reinitiation of Section 7 consultation:

Because monitoring the number of fish injured or killed is not possible, NMFS uses a causal link established between the activities and the likely effects to the listed

species to describe the extent of take as a numerical level of habitat disturbance. Here, the best available indicator for the extent of take is the area of gravel bar disturbed relative to the amount of gravel removed. By analyzing monitoring reports from Freeman in 2007 and Tidewater in 2008, NMFS roughly estimates that no more than 0.2 acres of gravel bar need to be disturbed for every 1,000 cubic yards of gravel harvested. In addition to being the most practical and feasible indicator to measure, area of gravel bar disturbed per unit of gravel removed is proportional to the adverse effects of this project. A relatively small amount of removal may have a large effect if the depth is minimal and it is spread out over a large area. Also, because extraction occurs in three dimensions (square area plus depth), the area of gravel bar disturbed per unit of gravel removed is closely related to the intensity of activity, yet is distinct from the total amount of gravel removed. Thus, area of gravel bar disturbed per unit of gravel removed will remain proportional to the amount of take, regardless of the level of annual extraction allowed by the proposed action.

In the accompanying Opinion, NMFS determined that this level of anticipated take is not likely to result in jeopardy to the species. *The area of gravel bar disturbed per unit of gravel extracted (0.2 acres per 1,000 cubic yards harvested) is a threshold for reinitiating consultation*.

BiOp at 32 (emphasis added). NMFS also established several terms and conditions required under the ITS, as well as reasonable and prudent measures. BiOp at 32-34. In particular, the BiOp requires the Corps to implement all of the measures identified in the RGP to limit impacts to the environment and maintain existing gravel bars. *See e.g.*, BiOp at 32-33 (requiring reserve volumes, adaptive management strategy, pre- and post-extraction surveys, and enhancement projects).

III. The Current Extraction Plan

Tidewater Contractors, Inc. is the only mining company that submitted an extraction plan under the RGP for the remainder of this calendar year.[2] Tidewater proposes to extract 5,938 cubic

---

[2]Under the RGP, a commercial gravel mining operator must submit a pre-excavation survey and a site-specific extraction "at least 30 days before initiation of gravel excavation to determine the amount of gravel deposited on a specific removal location." RGP at 5. Additionally, the work window for all mining activities under the RGP closes on September 30 of each calendar year to ensure mining activities do not adversely affect listed salmon migrating in the fall. RGP at 9. In light of the required 30-day notice requirement and the close of this year's work window on September 30, 2011, the Tidewater extraction plan is the only one the

yards from a mining area approximately 150 feet wide and 600 feet long near the Second Bridge Gravel Bar. Ex. B to Phippen Decl., at 1, 4. This amounts to approximately 15% of this year's influx of gravel, and less than half the amount available for removal under the RGP. Corrected Decl. of Phippen ¶ 18. After Tidewater's proposed extraction, more than 34,000 cubic yards of gravel recruited into the system this year will remain. *Id*. ¶ 17 The excavation plan includes lateral and head of the gravel bar buffers to preserve the natural flow dynamics of the river. Ex. B to Phippen Decl., at 4. Because of the location and method of the proposed extraction activities, there will be no "incidental fallback" of gravel into the river. *Id*. The proposal also includes restoration plans designed to protect the south bank of the bar and prevent erosion. *Id*. at 5. Additionally, Tidewater's proposal makes clear that "[n]o equipment will enter the river for any reason." *Id*. at 3. "There will be no obstructions to alter the natural flow characteristics of the river at this site." *Id*. at 4.

"Because mining will occur entirely in the dry, no SONCC coho salmon will be harmed at the time of extraction." Phippen Decl. ¶ 16. Although Tidewater's mining activity "will result in minor adverse effects to the geomorphic condition of the Chetco River," it will not appreciably reduce the likelihood of survival and recovery of the SONCC coho salmon. *Id*. ¶¶ 16, 20. Given the small amount of gravel Tidewater plans to remove, the proposal will not delay recovery and will have "extremely limited impacts, if any, on the population's likelihood of survival." *Id*. ¶ 18.

*Discussion*

I. Federal Defendants' Motion to Strike Declaration of Carl Page

As an initial matter, Defendants move to strike the Declaration of Carl Page as impermissible, extra-record opinion attacking the scientific merits of the BiOp. NEDC counters that

_____

Corps may authorize under the RGP for the remainder of this calendar year.

the court may consider the Declaration in determining whether the proposed mining activities under the RGP are likely to result in irreparable harm to the environment. NEDC also suggests the Declaration is admissible because it demonstrates that NMFS failed to consider all relevant factors in preparing a BiOp for the RGP, and helps explain technical matters.

"When a plaintiff challenges a final agency action, judicial review normally is limited to the administrative record in existence at the time of the agency's decision." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000). Generally, extra-record information "may not be advanced as a new rationalization for either sustaining or attacking an agency's decision." *Southwest Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996); *see also Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980) (extra-record evidence "to determine the correctness or wisdom of the agency's decision is not permitted"); *Inland Empire Pub. Lands Council v. Schultz*, 992 F.2d 977, 981 (9th Cir. 1993) ("We are in no position to resolve this dispute because we would have to decide that the views of Council's experts have more merit than those of the [government's] experts.") (citation and quotations omitted).

The court may, however, consider extra-record materials if: (1) the materials are necessary to determine if the agency considered all relevant factors and explained its decision; (2) the agency relied on documents not in the record; (3) the materials are necessary to explain technical or complex subject matter; or (4) the party challenging the agency action makes a showing of agency bad faith. *Id*. Courts may also consider extra-record evidence in determining whether a party will suffer irreparable harm in the absence of injunctive relief. *See Nat'l Parks & Conservation Ass'n v. Babbit*, 241 F.3d 722, 738 (9th Cir. 2001) (considering extra-record evidence in relation to request for injunctive relief), *abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct.

2743 (2010); *Ctr. for Biological Diversity v. Wagner*, No. 08-302-CL, 2009 WL 2176049, at *6-7 (D. Or. June 29, 2009).

Here, Page's Declaration improperly provides his own "interpretation, opinion and argument of what ultimate conclusions the Record can and cannot support." *Alsea Valley Alliance v. Evans*, 143 F. Supp. 2d 1214, 1216 (D. Or. 2001). Indeed, the Declaration is replete with scientific opinion and argument challenging NMFS's scientific analyses and conclusions. *See e.g.*, Page Decl. ¶ 5 ("In my opinion, the science is being ignored …."); *id.* ¶¶ 6-7 ("Based on my experience, NMFS' Biological Opinion . . . ignores [instream gravel mining] effects and is contrary to the observable condition of the river."); *id.* ¶ 7 (BiOp's "conclusion is directly contradicted by the condition of the various gravel bars" and NMFS' own research); *id.* ¶ 9 (Defendants' previous guidance documents "cast serious doubt on NMFS' most recent statement . . . ."); *id.* ¶ 10 ("NMFS's assessment of the status of the SONCC coho salmon in the Chetco River is also dubious. . . . I also disagree that surveys conducted over the past 18 years, . . . demonstrate that the Chetco population of coho has 'likely' increased over the past two years. In my experience, this is too little information to make such a definitive statement."); *id.* ¶ 11 (This statement is unsupported."); *id.* ¶ 12 ("snorkel survey data . . . cast serious doubt on the Corps' conclusion . . . ."); *id.* ¶ 13 ("analysis of mitigation measures … is also questionable."); *id.* ¶ 15 (No jeopardy conclusion is "dubious"). In sum, the Declaration plainly challenges the "correctness or wisdom" of NMFS's scientific analyses and ultimate conclusions. *Asarco*, 616 F.2d at 1160. Consequently, it is inadmissible extra-record evidence and must be stricken.

The court is not persuaded that the Page Declaration is admissible evidence of the irreparable harm that will flow from Defendants' alleged failure to comply with the law. Although Page asserts

that in-stream gravel mining causes irreparable harm to listed coho salmon generally, he does not specifically address the likelihood of harm resulting from Tidewater's extraction plan.  Under that plan, which is the only plan that has actually been approved under the RGP, Tidewater's relatively limited mining activities will occur entirely in the dry part of the Chetco.  There will be no *in-stream* gravel mining on the Chetco River until July 2012, at the earliest.  Because Page does address the harm likely to occur as a result of Tidewater's narrow mining proposal, the court declines to consider it as evidence of irreparable harm.  *See Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22-23 (2008) (vacating injunction based on irreparable harm from "sonar-training exercises generally," and remanding for reconsideration in light of specific restrictions).

Finally, the court is not persuaded that Page's extra-record opinion is necessary to determine whether the agency considered all of the relevant factors, or to explain technical or complex subject matter.  Much of the information provided by Page "can either be extracted from the record or is not necessary to this court's review" of the merits of the BiOp.  *Southwest Ctr. for Biological Diversity*, 100 F.3d at 1451.  Moreover, Page does not consider any impacts to listed salmon that NMFS failed to consider or address.  Nor does he "explain" complex or technical material.  Instead, he critiques NMFS's conclusions regarding impacts to listed salmon.  The Declaration is plainly extra-record scientific opinion and argument submitted to undermine NMFS's analyses and conclusions.  Accordingly, I grant Defendants' Motion to Strike.

II. Motion for Preliminary Injunction

NEDC moves for an order temporarily enjoining Defendants from authorizing or allowing any in-stream gravel mining activities on the Chetco River pending the court's resolution of the merits of their ESA, CWA, and NEPA claims.  NEDC first argues that NMFS's ITS violates the

ESA because it fails to address all of the stressors that may result in take, and is so vague that it does not provide an appropriate trigger for reinitiation of consultation under Section 7 of the Act. NEDC also contends the Corps violated the CWA by failing to conduct an adequate analysis of the practicable alternatives to project that would have less effect on the aquatic ecosystem. Finally, NEDC argues that the Corps violated NEPA by failing to adequately explain its finding of no significant impact, and failing to consider a reasonable range of alternatives. Because NEDC has failed to demonstrate a likelihood of success on the merits of those claims or a likelihood of irreparable harm in the absence of the requested relief, the court denies the motion for preliminary injunction.

A. Preliminary Injunction Standard

A preliminary injunction is an "extraordinary remedy." *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2761 (2010). Ordinarily, to prevail on a motion for preliminary injunction, a party "must establish" (1) either a likelihood of success on the merits, or the existence of "serious questions going to the merits," (2) a likelihood that the party will suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in the party's favor, and (4) that an injunction is in the public interest. *Winter v. NRDC*, 129 S. Ct. 365, 374 (2008); *see also Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (holding that the "'serious questions' version of the sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision in Winter"). Stated somewhat differently, a preliminary injunction is appropriate when the plaintiff demonstrates "serious questions going to the merits and a balance of hardships that tips sharply toward the plaintiff . . . , so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the*

*Wild Rockies*, 632 F.3d at 1135.  "Serious questions" are those that are "substantial, difficult and doubtful, requiring a more thorough investigation."  *Rep.of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988).  Additionally, where injury to the environment is at stake, " the balance of harms will usually favor the issuance of an injunction to protect the environment."  *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

The traditional preliminary injunction analysis, however, does not apply to injunctions issued under the ESA.  *Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*, 23 F.3d 1508, 1510 (9th Cir. 1994). "In cases involving the ESA, Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests."  *Id.* at 1511 (citing *Friends of the Earth v. United States Navy*, 841 F.2d 927, 933 (9th Cir. 1988)).  "In Congress's view, projects that jeopardize the continued existence of endangered species threaten incalculable harm; accordingly, it decided that the balance of hardships and the public interest tip heavily in favor of endangered species."  *Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987).  The court "may not use equity's scales to strike a different balance."  *Id.*  Accordingly, when a plaintiff establishes a violation of the ESA, together with irreparable harm, an injunction is generally required to effectuate the purposes of the ESA. *Id.* at 1384.  Given a substantial procedural violation of the ESA in connection with a federal project, the remedy must be an injunction pending compliance with the ESA.  *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985).

B. Standard of Review Under the Administrative Procedure Act

The Administrative Procedure Act ("APA"), 5 U.S.C. § 706, governs the court's review of the merits of NEDC's claims.  *Bennett v. Spear*, 520 U.S. 154, 174-77 (1997); *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008), *abrogated on other grounds by Winter v. Natural Res.*

*Def. Ctr.,* 555 U.S. 7 (2008).  Under the APA, an agency's final action must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  This standard is "highly deferential, presuming the agency action to be valid and [requires] affirming the agency action if a reasonable basis exists for its decision." *Kern County Farm Bureau v. Allen*, 450 F.3d 1072 (9th Cir. 2006).

A decision is arbitrary and capricious "only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council*, 537 F.3d at 987 (citations omitted).  Review under the arbitrary and capricious standard is "narrow" and the court may not substitute its judgment for that of the agency.  *Lands Council*, 537 F.3d at 987.  An agency action will be upheld so long as it correctly applied the law and "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *PCFFA v. NMFS*, 265 F.3d 1028, 1034 (9th Cir. 2001) (citations omitted).

Even if an agency decision is based on "admittedly weak best available science," the court is not allowed "substitute [its] judgment for that of the agency."  *ALCOA v. BPA*, 175 F.3d 1156, 1160-61 (9th Cir. 1999).  Courts are not to "act as a panel of scientists, instructing the agency, choosing among scientific studies, and ordering the agency to explain every possible scientific uncertainty." *Lands Council*, 537 F.3d at 988 (internal quotation marks and brackets omitted). "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Id*. at 1000.  The question is not whether the court would have

come to a different conclusion, but whether the agency's conclusion is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Southwest Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1448 (9th Cir. 1996). Under the arbitrary and capricious standard of review, an agency's decision "need only be reasonable, not the best or most reasonable, decision." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010).

C. The Incidental Take Statement ("ITS")

Section 9 of the ESA prohibits the "take" of listed species. 16 U.S.C. § 1538(a)(1)(B). The term "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id*. § 1532(19). Where, as here, NMFS issues a "no jeopardy" opinion for a proposed action that nevertheless may result in a "take" under the ESA, NMFS must include an ITS specifying the amount or extent of anticipated take, reasonable and prudent measures to minimize the impact of the take, and mandatory terms and conditions to implement the reasonable and prudent measures. 50 C.F.R. § 402.14(i). The ITS provides an exemption from takings liability under the ESA; any take that is in compliance with the terms and conditions of the ITS "shall not be considered a prohibited taking of the species concerned." 16 U.S.C. § 1536(o)(7). Additionally, an ITS must "set forth a 'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision [of the ESA], and requiring the parties to re-initiate consultation." *Ariz. Cattle Growers' Ass'n v. United States Fish & Wildlife,* 273 F.3d 1229, 1249 (9th Cir. 2001); 50 C.F.R. § 402.16(a).

Although Congress expressed a preference for quantifying take numerically, NMFS may use a surrogate if no number may be practicably obtained. *Arizona Cattle Growers v. FWS*, 273 F.3d

1229, 1249-50 (9th Cir. 2001); *Oregon Natural Resources Council ("ONRC") v. Allen,* 476 F.3d

1031, 1038 (9th Cir. 2007); 50 C.F.R. § 402.16(a). Where NMFS uses a non-numerical surrogate,

it must "articulate a rational connection between the surrogate and the taking of the species." *Wild*

*Fish Conservancy*, 628 F.3d at 531. The surrogate must "contain measurable guidelines to determine

when incidental take would be exceeded," and "must not be so general that the applicant or the

action agency cannot gauge its level of compliance." *ORNC v. Allen*, 476 F.3d at 1038–39.

Additionally, the ITS may violate the ESA if the threshold for triggering reinitiation is coextensive

with the project's own scope and "cannot be reached until the project itself is complete." *Id*. In

fulfilling its obligations under Section 7, NMFS must use the "best scientific and commercial data

available." 16 U.S.C. § 1536(a)(2).

     As noted, NMFS found that take of juvenile coho could occur as a result of heavy equipment

crossings, and limited the number of crossings per year to twelve. BiOp at 24. NMFS also

determined that take would occur as a result of habitat modification. BiOp at 31-32. Because NMFS

was unable to accurately quantify the number individual fish likely to be killed or injured as a result

of those impacts, the agency developed a "surrogate" to measure the extent of take. Under the ITS,

the threshold for reinitiating Section 7 consultation is "[t]he area of gravel bar disturbed per unit of

gravel extracted (0.2 acres per 1,000 cubic yards harvested)." BiOp at 32. In other words, if mining

disturbs more than .02 acres of the gravel bar per 1,000 cubic yards harvested, the Corps must

reinitiate consultation. BiOp at 32. NMFS concluded that this ratio (*i.e.*, area to be disturbed per

amount harvested) was the "best available indicator for the extent of take":

> In addition to being the most practical and feasible indicator to measure, area of
> gravel bar disturbed per unit of gravel removed is proportional to the adverse effects
> of this project. A relatively small amount of removal may have a large effect if the

depth is minimal and it is spread out over a large area. Also, because extraction occurs in three dimensions (square area plus depth), the area of gravel bar disturbed per unit of gravel removed is closely related to the intensity of activity, yet is distinct from the total amount of gravel removed. Thus, area of gravel bar disturbed per unit of gravel removed will remain proportional to the amount of take, regardless of the level of annual extraction allowed by the proposed action.

BiOp at 32.

NEDC does not dispute NMFS's determination that it could not provide a numerical limitation on take due to the lack of data and impracticalities of monitoring. Instead, NEDC argues that the surrogate is flawed because NMFS: (1) "fail[ed] to address *all* of the stressors that may cause take, and therefore does not 'reflect the take actually caused by the project.'" Pl.'s Mem. in Supp., at 16 (emphasis in original) (citing *S. Yuba Citizen's League v. NMFS*, 723 F. Supp. 2d 1247, 1280 (E.D. Cal. 2010)); (2) ignored the direct harm caused by heavy machinery and the amount of gravel ultimately removed from the stream, which has a direct relationship to the availability of habitat; (3) failed to rationally explain why a simple ratio of surface disturbance to volume is an indicator of take; (4) failed to define the scope of the action as well as crucial terms like "area of gravel bar disturbed," or "disturbed," making it impossible to determine when reinitiation is triggered; and (5) failed to provide sufficient measurement, recordkeeping, and reporting requirements because the disturbance ratio is not evaluated until after the project is completed, and therefore the ITS serves no meaningful purpose. The court disagrees.

First, nothing in the ESA, its implementing regulations, or the case law requires NMFS to develop a surrogate that must address *all* of the stressors that may cause take. Indeed, the term "stressors" does not even appear in the regulatory or statutory language. Requiring NMFS to develop a surrogate that addresses all forms of "stressors" would run afoul of the Ninth Circuit's

admonition against "impos[ing] 'procedural requirements [not] explicitly enumerated in the pertinent statutes.'" *See Lands Council v. McNair,* 537 F.3d at 993-94; *see also League of Wilderness Defenders v. Forest Service*, 549 F.3d 1211 (9th Cir. 2008).

NEDC's reliance on dicta in *South Yuba River v. NMFS*, 723 F. Supp. 2d 1247 (E.D. Cal. 2010) and *Miccosuke Tribe v. FWS*, 566 F.3d 1257 (11th Cir. 2009) is misplaced. In *South Yuba*, the proposed action was a complex set of interrelated activities—the operation of two dams on the Yuba River, fish ladders at a separate dam, issuance of permits and licenses to non-Federal entities for the operation of water diversions and hydroelectric facilities. *Id.* at 1253. When reviewing the ITS, the Court noted that with a proposed actions as complex as the one under consultation there would be a myriad of effects on listed species and various forms of take occurring. *Id.* at 1280. Because there were multiple and significant sources of take (a term the court referred to as "stressors"), it found the surrogate lacking. In contrast to the complex set of interrelated actions in *South Yuba*, the RGP is uncomplicated and take is confined to relatively discrete activities associated with the proposed action.

Second, the ITS does not fail to limit the amount of gravel extracted under the RGP. NEDC's argument ignores the required terms and conditions in the BiOp. Each year, the Corps must estimate the amount of gravel recruited from the previous year. Provided that at least 26,000 cubic yards is recruited as a maintenance reserve, the Corps will allow a limited amount of gravel extraction. BiOp at 2. In addition to the surrogate, the BiOp includes binding limitations on the amount of annual extraction in the form of bar form retention, individual bar allocations, volume caps, and additional restrictions. *Id.* at 3-4. NEDC's concern with "unlimited" heavy machinery river crossings is equally unfounded. The BiOp makes clear that the number of crossing is limited

to 12 per year.  BiOp at 24.  Contrary to NEDC's argument, the BiOp includes meaningful and binding restrictions on the amount of gravel extracted and the number of crossings allowed per year.

Third, the court finds that NMFS adequately explained the link between the surrogate and take.  NMFS found that take was primarily possible from in-water stream crossing and the slowing of improvement in carrying capacity. BiOp at 31. The agency also explained that monitoring the possibility of juveniles being killed by heavy machinery was impractical and that "the relationship between gravel influx, geomorphic, carrying capacity, survival and abundance is not quantifiable due to lack of data." BiOp at 31.  The surrogate it created (0.2 acres of disturbance per 1000 cubic yards harvested) is specifically related to both forms of possible take, as well other forms of take because the "area of gravel bar disturbed per unit of gravel removed is proportional to the adverse effects of this project." BiOp at 32.  NMFS also found that a simple limitation on the amount of gravel being removed would not adequately address take because "a relatively small amount of removal may have a large effect if the depth is minimal."  BiOp at 32.  Instead, NMFS developed a surrogate bar disturbance correlated with volume removed to accurately capture all forms of take associated with mining.  On this limited record, the court finds that the surrogate complies with the Ninth Circuit's instruction that NMFS "must establish a link between the activity and the taking of species." *Arizona Cattle*, 273 F.3d at 1250; *Wild Fish Conservancy*, 628 F.3d at 532.

Given the deferential standard of review under the APA, the court cannot conclude that NMFS's surrogate is arbitrary and capricious.  As noted, NMFS must use the "best scientific and commercial data *available*." 16 U.S.C. § 1536(a)(2) (emphasis added).  Even if a biological opinion is based on "admittedly weak best available science," the court is not allowed "substitute [its] judgment for that of the agency."  *ALCOA v. BPA*, 175 F.3d 1156, 1160-61 (9th Cir. 1999).

Moreover, the court must be "most deferential" to an agency's determinations "within its [area of] special expertise." Lands Council, 537 F.3d at 993. The court acknowledges NEDC's concern that additional or different surrogates might be useful in measuring take, but NEDC has not presented any evidence that the agency ignored available data, or that there is a better methodology for measuring take. Accordingly, the court defers to NMFS's surrogate. *See NRDC v. Gutierrez*, No. 07-04771 EDL, 2008 WL 360852 at *27-30 (N.D. Cal. 2008) (deferring to NMFS's surrogate in the absence of data and when plaintiffs had not produced "any practicable alternative.").

Fourth, NEDC's argument that NMFS failed to define the scope of the action as well as crucial terms like "area of gravel bar disturbed," or "disturbed," is not persuasive. The phrase "area of gravel bar disturbed" is defined as "0.2 acres per 1,000 cubic yards harvested." BiOp at 32. NEDC's argument that "disturb" could mean any number of things ignores the ITS's definition of cubic yards harvested. The term "disturb" is plainly limited to the extraction point where harvesting occurs, not mitigation action areas. Similarly, the notion that there is imprecision of whether this applies to one bar or "averaged across multiple bars" ignores the plain language. The singular "bar" makes clear that it applies to each individual bar not to multiple *bars*.

Finally, the court finds on this record that the BiOp provides sufficient measurement, record-keeping, and reporting requirements to allow the Corps to determine whether reinitiation is required. The BiOp requires the Corps to implement the extensive monitoring and evaluation requirements contained in the RGP. BiOp at 5-6; EA at 7-9. For example, the Corps must collect annual recruitment data, conduct pre- and post-extraction surveys and reports. During any extraction activities, mining operators must take pictures of the mining activities once a week from established photo points. If, at the end of the mining season, those surveys and reports indicate that BiOp's

reasonable and prudent alternatives are not being implemented or that the surrogate has been triggered, the Corps must reinitiate consultation.

The court shares NEDC's concern that the BiOp does not require these surveys and reports to be submitted to the Corps until 30 days after each mining season, but the court finds that the BiOp's numerous mandatory terms and conditions and post-excavation review provide reasonable assurance the ITS is sufficient to determine whether reinitiation is required. Nothing in the ESA, its implementing regulations, or the case law requires the agency to evaluate whether the ITS has been triggered at a specific interval. In the absence of such regulatory or statutory requirements, the court must defer to the agency's reasonable monitoring plan, and while the court agrees with NEDC that more frequent reporting requirements during the mining season would be helpful in determining whether the ITS has been triggered, the court is not allowed "substitute [its] judgment for that of the agency." *ALCOA v. BPA*, 175 F.3d 1156, 1160-61 (9th Cir. 1999). In light of the BiOp's monitoring requirements, the numerous and binding terms and conditions in the BiOp, and the "presumption of regularity" afforded federal agencies, the court cannot say the ITS monitoring plan is arbitrary and capricious. *See Brown v. Plata*, 131 S. Ct. 1910, 1965 (2011) (in the absence of "clear evidence to the contrary, courts presume that [public officers] have properly discharged their official duties.") (citation and quotation marks omitted).

D. Analysis of Practicable Alternatives under the CWA.

NEDC contends that the RGP violates Section 404 of the CWA because the Corps failed to conduct an adequate analysis of practicable alternatives that would have less effect on the aquatic ecosystem. NEDC maintains that the proposed gravel mining activities are not "water dependant" and therefore, the Corps bears the burden of proving that an alternative with less adverse impact is

impracticable.  NEDC also argues Corps' failed to adequately explain why a smaller project, or a no action alternative could not fulfill the needs of the project.  The court finds, however, that NEDC is not likely to succeed in showing that the Corps' issuance of the RGP violated the CWA, or was not arbitrary and capricious under the APA.

The Clean Water Act prohibits the discharge of dredged or fill material into navigable waters of the United States without a permit.  Section 404(e)(1) of the CWA authorizes the Corps to issue general permits on a State, regional, or nationwide basis for categories of activities involving discharges of dredged or fill material that the Corps determines "are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1).  The issuance of such permits are governed by the so called "Section 404(b) Guidelines," which the Environmental Protection Agency and the Corps developed to implement Section 404(b)(1) of the CWA, 33 U.S.C. § 1344(b)(1).  Under those guidelines, the Corps must generally avoid adverse water quality impacts where practicable alternatives exist, mitigate those impacts, and the minimize the adverse effects of the proposed discharge to the maximum extent practicable. *See* 33 U.S.C. § 1344(b)(1); 33 C.F.R. § 320.4(r); 40 C.F.R. § 230.10(d) and pt. 230, subpart H.

The guidelines establish dual regulatory presumptions.  First, a practicable alternative is available "where the activity associated with a discharge which is proposed for a special aquatic site . . . does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose," unless clearly demonstrated otherwise.  40 C.F.R. § 230.10(a)(3). Second, "where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge to a special aquatic site are presumed to have less

adverse impact on the aquatic ecosystem," also unless clearly demonstrated otherwise. *Id.* If one of these presumptions applies, the Corps bears the burden of providing "detailed, clear and convincing information proving that an alternative with less impact is impracticable." *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 58, 69 (D.D.C. 2010).

Given the deferential standard under which this court must review agency decisions made within its area of expertise, the Corps' determination that gravel bar mining is "water dependant" was not arbitrary and capricious. *Lands Council*, 537 F.3d at 987. Contrary to NEDC's conclusory assertion, the purpose of the proposed projects covered by the RGP is not simply "gravel mining." The mining at issue is conducted to procure a specific type of high-quality gravel, which is sold at a higher price than other types of gravel and also used for different applications. The Corps' Environmental Assessment explains that in contrast to gravel obtained from in-stream sources, upland gravel material:

> requires more processing and sorting to obtain the necessary material for a particular construction job. Depending on the geology of the quarry site, some of the material may not be useable at all. The Oregon Department of Transportation (ODOT) requires aggregate to meet certain standards for road projects. Through the natural processes of materials being transported down a stream, however, gravels are broken and sorted with the desired hard material deposited on gravel bars.

EA at 55. Based on this record, the Corps' determination that gravel bar mining is "water dependant" (*i.e.*, requires access or proximity to or siting within a special aquatic site) is adequately supported by the record. As a result, there is no presumption under the Section 404(b) Guidelines that practicable alternative not involving a discharge exist.

Furthermore, the "practicable alternatives" evaluation process is "not directly applicable to General permits." 40 C.F.R. § 230.7(b)(1); *see also Sierra Club v. U.S. Army Corps of Engineers*,

464 F. Supp. 2d 1171, 1220 (M.D. Fla. 2006).  This is because a general permit such as the RGP authorizes discharges associated with a category of activities rather than a particular project, and only for those activities deemed to "cause only minimal adverse environmental effects." 40 C.F.R. § 230.7(a)(2).

Even if the practicable alternatives evaluation process applied to general permits, the court finds that the Corps' analysis was adequate under the circumstances.  There is no requirement that the agency consider every conceivable alternative, only that it consider a reasonable range of "practicable" alternatives.  Here, the Corps first analyzed the alternative of not issuing the RGP, and concluded that issuing a general permit would reduce administrative delays and allow the agency regulate gravel bar mining in the Chetco River "comprehensively."  EA at 54. The Corps also considered a three-year cycle alternative with two mandatory rest years (i.e., years in which no mining would be permitted to occur), and an alternative capping the extraction of gravel at 60% of the reserve volume.  EA at 54.  The Corps rejected these alternatives as "overly restrictive in that they would not provide a balance between allowing a sufficient amount of aggregate to be harvested to support the needs of the community and providing protections for the aquatic environment." EA at 54.

NEDC's argument that the Corps failed to adequately analyze the community's need for aggregate is unpersuasive.  In public comments submitted to the Corps, several organizations and individuals expressed concern that a no action alternative would negatively impact the community and noted the community's need for aggregate from the Chetco River. EA at 35, 41, 45, 46; *see also* EA at 20 (Comments of Curry County Board of Commissioners that "[t]here need and demand for high quality material for construction of commercial buildings" and that "[t]he proposal for rest years

appears to be problematic as far as maintaining viable businesses for gravel extraction."). These concerns reflect a rational assessment of the community's need for aggregate. NEDC cites no authority for the proposition that something more is required.

The Corps also assessed the possibility of obtaining gravel from alternative upland quarries and "off-site" alternative sources in the region, but determined those options impracticable. As noted, gravel from upland quarry sites "requires more processing and sorting" than river gravel and in some instances "may not be usable at all" for certain types of construction applications that river gravel may be used. The Corps found that unlike river gravel, which is "broken and sorted" through the "natural processes of materials being transported down a stream," coastal quarries contain "sandstones and siltstones," which are "not desirable materials" for construction. The Corps concluded that other off-site sources, such as aggregate from the Rogue River and recycled asphalt, were either insufficient to meet regional needs or ill-suited for construction purposes. EA at 55. Because these alternatives did not provide suitable aggregate rock to satisfy the RGP's purpose, the Corps reasonably rejected them as impracticable. *See National Wildlife Federation v. Adams*, 629 F.2d 587, 591-92 (9th Cir. 1980) (An alternative is practicable only if "it is capable of attainment within relevant, existing constraints."); *Sylvester v. U.S. Army Corps of Engineers*, 882 F.2d 407, 409 (9th Cir. 1989) ("[I]t would be bizarre if the Corps were to ignore the purpose for which the applicant seeks a permit and to substitute a purpose it deems more suitable." (citation omitted)). The Corps considered a reasonable range of alternatives, and NEDC cites no authority to support its contention that the Corps' analysis was arbitrary and capricious because the agency failed to consider some combination of alternatives. Given the narrow scope of review and the fact that the practicable alternatives analysis is "not directly applicable" in the general permitting context, the Corps'

assessment of alternatives was sufficient. *Lands Council*, 537 F.3d at 987 ; 40 C.F.R. § 230.10.

E. "Hard Look" under NEPA

NEPA requires federal agencies "to the fullest extent possible," to prepare a "detailed statement on . . . the environmental impact" of "major Federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)(i); *see also* 40 C.F.R. § 1500.2.  The purpose of NEPA is two-fold: (1) to ensure the agency "will have available, and will carefully consider, detailed information concerning significant environmental impacts" of its decisions; and (2) to guarantee that this information will be available to the public.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  NEPA does not mandate particular results, but simply proscribes the necessary process.  *Sierra Club v. Espy*, 38 F.3d 792, 796 (5th Cir. 1994).  Because NEPA is essentially a procedural statute, judicial "review of agency decision-making under NEPA is limited to the question of whether the agency took a 'hard look' at the proposed action as required by a strict reading of NEPA's procedural requirements." *Bering Strait Citizens for Resp. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 935, 947 (9th Cir. 2008); *Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 665 (9th Cir. 1998).

*1. Sufficiency of the Environmental Assessment*

NEDC contends the Corps' Environmental Assessment/Finding of No Significant Impact is arbitrary and capricious.  In particular, NEDC argues the Corps' finding that the project would adversely affect listed coho salmon should automatically trigger an EIS.  NEDC also argues the uncertainty of the RGP's effects on listed salmon and the experimental nature of the proposed mitigation measures should trigger an EIS.

An agency must prepare a detailed EIS "[i]f there is a substantial question whether an action

may have a significant effect on the environment." *Center for Biological Diversity v. National Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008) (quotation marks omitted).  To determine whether to prepare an EIS, the action agency may prepare an Environmental Assessment ("EA").  40 C.F.R. § 1501.4(b).  An EA is a concise public document that briefly describes the need for the proposal, and examines the environmental impacts of the proposed action and the alternatives.  40 C.F.R. § 1508.9.  If the agency makes a finding of no significant impact ("FONSI") after adequately analyzing the proposed action in an EA, then an EIS is not required.  *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994).

Whether a proposed action "may have a significant effect on the environment," and therefore requires the preparation of an EIS, depends on the "context and intensity" of the environmental impacts.  *Ctr. for Biological Diversity,* 538 F.3d at 1220 (citing *Nat'l Parks & Conservation Ass'n,* 241 F.3d at 731).  A number of factors should be considered, including:  the beneficial and adverse impacts of the action; unique characteristics of the geographic area; the degree of uncertainty associated with the impacts; the degree of controversy surrounding the project; cumulative effects; and whether the action "may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the [ESA]." 40 C.F.R. § 1508.27.  An EIS may be required if one of those factors is met.  *Ctr. for Biological Diversity*, 538 F.3d at 1220; *see also Nat'l Parks & Conservation Ass'n*, 241 F.3d at 731 (the degree of uncertainty or controversy "may be sufficient to require preparation of an EIS.").

"If an agency decides not to prepare an Environmental Impact Statement, it must supply a convincing statement of reasons to explain why a project's impacts are insignificant. The statement of reasons is crucial to determining whether the agency took a 'hard look' at the potential

environmental impact of a project." *Center for Biological Diversity*, 538 F.3d at 1220 (quotation marks and citation omitted). In evaluating the sufficiency of an EA, courts determine whether the agency "adequately considered and elaborated the possible consequences of the proposed agency action when concluding that it will have no significant impact on the environment, and whether its determination that no EIS is required is a reasonable conclusion." *Id*. at 1215. An EA "need not conform to all the requirements of an EIS," but it must be "sufficient to establish the reasonableness" of the agency's decision not to prepare an EIS. *Id*. (citing *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1178 (9th Cir. 1982) (quotation marks omitted).

Although the RGP "will likely adversely affect" SONCC coho salmon, EA at 47-48, the "loss of some members of a threatened species does not automatically lead to the requirement to prepare a full EIS." *Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1276 (10th Cir. 2004); *see also Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005) ("We decline to interpret NEPA as requiring the preparation of an EIS any time that a federal agency discloses adverse impacts on wildlife species or their habitat . . . ."). As long as the EA took a reasonable approach in addressing the relevant NEPA intensity factors, it must be upheld. *Bering Strait*, 524 F.3d at 956–57.

Here, the Corps reasonably concluded that although the project may have adverse effects to individual coho salmon and elements of their habitat, the RGP would not result in significant impacts to the species. This finding is aligned with Ninth Circuit precedent. *See Environmental Prot. Info. Serv. v. Forest Serv.*, 451 F.3d 1005, 1012 (9th Cir. 2006) ("*EPIC*") ("Although [plaintiff] seems to urge that *any* impact to a listed species requires an EIS, [the agency] correctly argues that the regulation's 'intensity' factor focuses on the '*degree* to which an action may adversely affect'

a threatened species or critical habitat."); *Native Ecosystems,* 428 F.3d at 1240 (rejecting need for EIS despite FONSI's acknowledgment of project's impact on individual goshawks and their habitat, where USFS concluded impact on the species was not significant).

Although there are some uncertainties in terms of the migratory habits of fish during the summer months, NEDC fails to demonstrate how this uncertainty warrants the preparation of an EIS. Courts must defer to the agency's scientific reasoning. *Friends of Endangered Species v. Jantzen*, 760 F.2d 976, 986 (9th Cir. 1985). Here, the Corps sought out information from the state and federal agencies best equipped to evaluate potential impacts to coho salmon: NMFS and the Oregon Department of Fish and Wildlife. Both agencies determined that while certain information was unknown, sufficient data existed to conclude that the mining activities as permitted would not jeopardize the coho salmon species. NMFS BiOp 27. According to ODFW, "there is no significant population of SONCC coho salmon in this portion of the Chetco River either currently or historically." Pl.'s Exh. 3 at 60. In fact, "during the summer months, fish move out of the main stem Chetco River because of increased temperature, and inhabit the tributaries." Pl.'s Exh. 3 at 60. Courts are not to "act as a panel of scientists, instructing the agency, choosing among scientific studies, and ordering the agency to explain every possible scientific uncertainty." *Lands Council*, 537 F.3d at 988 (internal quotation marks and brackets omitted). "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Id*. At 1000 (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)).

NEDC's challenge to the Corps' "experimental" and uncertain mitigation measures is similarly unpersuasive. In consultation with federal and state agencies, the Corps concluded a

variety of mitigation measures would limit impacts to the environment.  NEDC disagrees with some

of those methods.  The court, however, must be "most deferential" to an agency's determinations

"when the agency is making predictions, within its [area of] special expertise, at the frontiers of

science." *Lands Council*, 537 F.3d at 993 (quotations omitted).

### 2. Alternatives Analysis

NEDC also argues the EA is arbitrary and capricious because the Corps failed to consider

reasonable range of alternatives.  In particular, NEDC contends the Corps failed to adequately

analyze a true no action alternative (*i.e.*, no in-stream mining).  NEDC also argues the Corps failed

to consider at least one alternative that involved obtaining gravel from a combination of sources,

such as upland quarries, recycled asphalt, and/or gravel from the Rouge River.

NEPA requires the Corps' to "study, develop, and describe" a reasonable range of

alternatives, including a "no action" alternative. 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1502.14(d).

The "touchstone" for the court's review of a challenges under NEPA is whether the agency's

"selection and discussion of alternatives fosters informed decision-making and informed public

participation." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 872 (9th Cir. 2004)

(citing *Calif. v. Block*, 690 F.2d 753, 767 (9th Cir. 1982)).  "Although an agency's obligation to

consider alternatives under an EA is a lesser one than under an EIS, . . . NEPA requires that

alternatives . . . be given full and meaningful consideration, whether the agency prepares an EA or

an EIS." *Ctr. for Biological Diversity*, 538 F.3d at 1217 (quotation and citation omitted).  The

agency must "provide sufficient evidence and analysis for determining whether to prepare an

environmental impact statement or a finding of no significant impact."  40 C.F.R. § 1508.9.

On this record, the court find that the Corps' consideration of alternatives, including the so-called "no-action" alternative, was reasonable.  The Corps described the no-action alternative as follows:

> The no action alternative is no RGP. The projects will require a Department of the Army Individual Permit review, thus increasing the burden on limited Corps resources, which may result in delayed and backlogged permit decision [sic] for the project applicant. Evaluation by means of Individual Permits may also reduce opportunities to manage aggregate removal comprehensively.

EA at 53-54. NEDC contends that a true no-action alternative would be no gravel mining in the Chetco River, but the Ninth Circuit has affirmed NEPA analyses that evaluate the no-action alternative in the context of the historical uses of the action area.  *Natural Resources Defense Council v. Hodel*, 624 F. Supp. 1045, 1054 (D. Nev. 1985), *aff'd*, 819 F.2d 927 (9th Cir. 1987). Indeed, "CEQ regulations allow the status quo to properly be the no action alternative. 'The 'no action' alternative may be thought of in terms of continuing with the present course of action until that action is changed.'" *Association of Public Agency Customers, Inc. v. Bonneville Power Administration*, 126 F.3d 1158, 1188 (9th Cir. 1997) (citing 46 Fed. Reg. 18026, 18027); *see also Westlands Water Dist. v. United States Dept. of Interior*, 376 F.3d 853, 869 (9th Cir. 2004) (noting that the no action alternative maintains the status quo).

Here, it is undisputed that sand and gravel has been mined regularly since the 1900s.  EA at 3; Amend. Compl. ¶ 100.  Commercial gravel mining peaked in the 1970s and 1980s, when there were at least 15 known operators in the study area extracting an average of 183,000 cubic yards per year. EA at 3; Amend. Compl. ¶ 100.  The State of Oregon began regulating gravel extraction on the Chetco in 1994, and has limited extraction activities to three companies on four sites.  While the average volume extracted per annum has declined, the amount of aggregate removed hovered around

77,000 cubic yards annually from 2000 to 2008. In sum, commercial mining has occurred on the Chetco for over a century, creating jobs for the local community and producing high-quality aggregate gravel for construction purposes. *See* EA at 2-3, 20. The Corps was not required to develop a no-action alternative, in which it completely reverses or abandons an historical pattern of the use over 100 years old. *Natural Resources Defense Council v. Hodel*, 624 F. Supp. 1045, 1054 (D. Nev. 1985), *aff'd*, 819 F.2d 927 (9th Cir. 1987)

Under the specific circumstances of this case, no action does not mean "no mining." The proposed action in this case is the RGP, which seeks to manage aggregate gravel removal comprehensively, and mitigate cumulative impacts. EA at 54-55. Without a regional permit, mining would still occur in the Chetco, but under the permit-by-permit regime that occurred in the past. EA at 2-3. The Corps' reasonably decided that the no-action alternative meant no RGP, not no gravel mining.

The Corps provided a sufficient explanation for rejecting of the "no action" alternative. The purpose of an RGP is to regulate a category of activities that are "substantially similar in nature." 33 C.F.R. § 323.2(h)(1). Because of the considerable resources associated with individual permitting, the Corps determined that continuing on that course would "reduce the opportunity to manage aggregate removal comprehensively." EA at 54. Accordingly, the Corps rejected continuation of the status quo issuance of individual permits in favor of a comprehensive, regional approach that would meet the purpose and need of the project. That the 'no action' proposal "is given a brief discussion does not suggest that it has been insufficiently addressed." *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1181 (9th Cir. 1990); *see also Or. Natural Res.Council v. Lyng*, 882 F.2d 1417, 1423 n. 5 (9th Cir. 1989) ("The fact that the description of the no-action alternative is shorter than those of the other

PAGE 32 - OPINION AND ORDER

proposals does not necessarily indicate that the no-action alternative was not considered seriously. It may only reveal that the [agency] believed that the concept of a no-action plan was self-evident while the [other alternatives] needed explanation.").

Finally, to the extent NEDC challenges the Corps' failure to address a combination of alternatives, "[a]n agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." *EPIC,* 451 F.3d at 1016. NEDC does not cite any binding authority for the proposition that a lawful EA must consider some combination of alternatives. Moreover, as discussed, the Corps need not evaluate alternatives, such as upland quarry sources, that fail to meet the project purpose. "So long as 'all reasonable alternatives' have been considered and an appropriate explanation is provided as to why an alternative was eliminated, the regulatory requirement is satisfied." *Native Ecosystems*, 428 F.3d at 1246.

F. Likelihood of Irreparable Harm

NEDC alleges that it will suffer irreparable harm in the absence of an injunction because: (1) the proposed gravel mining will degrade coho salmon rearing habitat; (2) the proposed project will impact the aesthetic and personal interests of two members of NEDC; and (3) the agency's actions suffer from procedural errors. None of these allegations are sufficient, however, to demonstrate that irreparable harm is *likely* to occur in the absence of an order enjoining Tidewater's proposed mining activities, which are the only proposed mining operations for the remainder of the calendar year.

Environmental injury, by its nature, is often irreparable because it "can seldom be adequately remedied by money damages and is often permanent or at least of long duration." *Amoco*, 480 U.S.

at 545.  This does not mean, however, that "*any* potential environmental injury *automatically* merits an injunction any potential environmental injury warrants an injunction."  *See Lands Council*, 537 F.3d at 1004 (emphasis in original).  To obtain a preliminary injunction, a plaintiff "must establish that irreparable harm is likely, not just possible."  *Winter*, 129 S. Ct. at 374.  "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id*. at 375-76; *see also Earth Island Inst.*, 351 F.3d at 1211 ("The moving party must demonstrate a significant threat of irreparable injury, . . .").

As an initial matter, NEDC's allegations of harm resulting from unauthorized, future mining plans under the RGP are speculative.  Aside from Tidewater's proposed extraction plan, which is the only plan that may take place under this RGP for the remainder of this mining season, there are no imminent plans for mining on the Chetco River.  It remains to be seen which, if any, future commercial mining plans will be approved by the Corps under the RGP.  Speculative harm resulting from undefined future plans does not amount to irreparable harm. *See Winter*, 555 U.S. at 22 ("[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury.") (quoting 11A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2948.1, at 155(2d ed. 1995); *Mullis v. United States Bankruptcy Court*, 828 F.2d 1385, 1391 n.12 (9th Cir. 1987).

Although the BiOp acknowledges that gravel mining may harm listed species, NEDC has not produced any evidence that Tidewater's specific proposal will likely cause *irreparable* harm to the environment or ESA-listed salmon in the absence of preliminary relief.  The Supreme Court has

PAGE 34 - OPINION AND ORDER

instructed the lower courts to evaluate the likelihood of irreparable harm in the context of specific and imminent proposals. *See Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22-23 (2008) (vacating injunction based on irreparable harm from "sonar-training exercises generally," and remanding for reconsideration in light of specific plans at issue). Notably, Tidewater's extraction plan is much narrower in scope than generalized mining that may be authorized under the RGP in the future. Indeed, Tidewater proposes to remove less than half of the of this year's allotment of gravel under the RGP from an area only "150 feet wide by 600 feet long" in the dry portion of the river. Ex. B to Phippen Decl., at 4. Plaintiff has proffered no evidence of what effect Tidewater's limited proposal will have, much less clear evidence of irreparable harm.

In contrast, NMFS fisheries biologist Kenneth W. Phippen explains, "the removal of 5,938 cubic yards by Tidewater will result in minor effects to the geomorphic condition of the Chetco River." Phippend Decl. ¶ 16. "Because Tidewater's mining will occur entirely in the dry, *no SONCC coho salmon will be harmed* at the time of extraction." *Id.* ¶ 16 (emphasis added). "Given the relatively small amount being removed by Tidewater there will be even less of a delay, if any, in the recovery of the Chetco River population and extremely limited impacts, if any, on the population's likelihood of survival." *Id.* ¶ 18. Despite NEDC's conflicting views regarding the potential for irreparable harm from in-stream gravel mining activities generally, the court must defer to "the reasonable opinions of [the agency's] own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Lands Council*, 537 F.3d at 993.[3] On this record,

---

[3]NEDC suggests that Phippen's Declaration is impermissible, extra-record evidence. The court disagrees. Unlike the Page's Declaration, which improperly attacks the merits of NMFS's BiOp and fails to address the specific mining plans at issue, Phippen's Declaration provides relevant evidence regarding the lack of irreparable harm resulting from Tidewater's proposal.

NEDC has failed to demonstrate that Tidewater's limited extraction plan will result in irreparable harm to ESA-listed coho salmon.

Even if Page's proffered opinion testimony were relevant and admissible to show harm flowing from Tidewater's proposal (which it is not), NEDC has failed to demonstrate that Tidewater's extraction plan will irreparably harm the species as a whole. Irreparable harm to ESA-listed species must be measured at the *species* level. *See NWF v. NMFS*, 422 F.3d 782, 796 (9th Cir. 2005) (holding that preliminary injunction is appropriate upon a showing of "irreparable harm to a threatened species"). This makes sense because the ESA explicitly permits the taking of individual members of a species in some circumstances. 16 U.S.C. §§ 1536(b)(4), 1536(o)(2), 1539(a) & (b). *See also Defenders of Wildife v. Salazar*, No. 09-cv-00077-DWM, 2009 WL 8162144, at *4 (Sept. 8, 2009, D. Mont.) (denying injunctive relief where plaintiffs offered no proof that harm would be significant for the species as a whole); *Humane Soc'y v. Gutierrez*, 523 F.3d 990, 991 (9th Cir. 2008) (finding death of over 2,000 listed salmon would not constitute irreparable harm to the species); *Animal Welfare Institute v. Martin*, 623 F.3d 19, 29 (1st Cir. 2010) (upholding denial of an injunction when harm would have "only a negligible impact on the species as a whole") (quotations omitted). Accordingly, a plaintiff must present a "concrete showing of probable deaths during the interim period and of how these deaths may impact the species." *Water Keeper Alliance v. U.S. Dep't of Defense*, 271 F.3d 21, 34 (1st Cir. 2001).

As noted, Tidewater will not conduct any mining activities in the water, so there will be no direct impacts to salmon. Moreover, there are extremely few coho salmon in or around the area where the activity proposed by Tidewater would take place during the in-water work window. BiOp at 16-17; Phippen Decl. ¶ 16. Finally, the Chetco River population of SONCC coho salmon is one

PAGE 36 - OPINION AND ORDER

of 50 populations that comprise the listed Evolutionary Significant Unit.  Corrected Phippen Decl. ¶ 3.  Although the Chetco River population is an "important link" to other populations, NEDC has not demonstrated that Tidewater's mining activities will result in imminent, likely irreparable harm to the Chetco population, or the species as a whole.  As a result, NEDC's motion for preliminary injunctive relief fails.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983) ("likelihood of substantial and immediate irreparable injury" required); *Chemical Weapons Working Group, Inc. v. United States Dep't of the Army*, 963 F. Supp. 1083, 1095 (D. Utah 1997) ("To constitute irreparable harm . . . 'the injury complained of must be of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm.'") (quoting *Wisconsin Gas Co. v. Federal Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

NEDC has not shown that any alleged harm to its members' "personal and aesthetic interests in the health of the Chetco River" warrants the extraordinary remedy of a preliminary injunction. Pl.'s Memo. at 33.  Notably, this alleged harm is essentially identical to NEDC's asserted harm relating to coho salmon.  NEDC has failed to demonstrate that this harm is irreparable.  NEDC also fails to demonstrate that this alleged harm stems from Tidewater's specific proposal.

Finally, even if NEDC demonstrated a likelihood of success on the merits of its procedural claims, mere procedural harm is not an appropriate basis for emergency relief.  The Supreme Court has made clear that a procedural right "in vacuo" is insufficient to support standing and, therefore, any entitlement to court relief.  *Summers v. Earth Island Institute*, 129 S.Ct. 1142, 1151 (2009). Indeed, "a mere 'interest in a problem,' no matter how long-standing the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved[.]'" *Sierra Club v. Morton*, 405 U.S. 727, 739

PAGE 37 - OPINION AND ORDER

(1972).  Accordingly, a court "may recognize a 'procedural injury' when a procedural requirement

has not been met, so long as the plaintiff also asserts a 'concrete interest' that is threatened by the

failure to comply with that requirement. *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir.

2004) (emphasis added).  A stand-alone "procedural injury" does not entitle NEDC to injunctive

relief.

*Conclusion*

For the reasons discussed, Defendant's Motion to Strike the Declaration of Carl Page (doc.

# 58) is GRANTED, and NEDC's Motion for a Preliminary Injunction (doc. # 49) is DENIED.

IT IS SO ORDERED.

DATED this 19th day of September, 2011.

_____/s/ John V. Acosta_____

John Acosta

United States Magistrate Judge