UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

NORTHWEST ENVIRONMENTAL
DEFENSE CENTER,

               Plaintiff,

    v.

UNITED STATES ARMY CORPS OF
ENGINEERS, a United States Government
Agency; NATIONAL MARINE FISHERIES
SERVICE, a part of the National Oceanic and
Atmospheric Administration, a part of the
United States Department of Commerce,

               Defendants,

Case No.  3:10-cv-01129-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

      Plaintiff Northwest Environmental Defense Center ("NEDC") brought this action against

the United States Army Corps of Engineers ("Corps") and the National Marine Fisheries Service

("NMFS") (collectively, "defendants"), challenging the Corps' issuance of a five-year regional

general permit ("RGP"), which authorizes limited commercial in-stream gravel mining on the

Chetco River in southwest Oregon.  In its Amended Complaint, NEDC alleges the Corps violated

the Federal Advisory Committee Act ("FACA"), 5 U.S.C. App. 2 *et seq*., the Federal Water

Pollution Control Act (commonly known as the Clean Water Act ("CWA")), 33 U.S.C. § 1251(a)

PAGE 1 - OPINION AND ORDER

*et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, in issuing the RGP. NEDC also alleges that NMFS's Biological Opinion ("BiOp") for the RGP and its attendant Incidental Take Statement ("ITS") violate the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*. The parties have cross-moved for summary judgment on all claims. Oral argument was heard on January 29, 2013. For the following reasons, NEDC's Motion for Summary Judgment [94] is granted in part and denied in part, and defendants' Cross Motion for Summary Judgment [102] is granted in part and denied in part.

## Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2011). When reviewing an agency's final decision, the court's duty on summary judgment is to determine whether the evidence in the administrative record permitted the agency to make that decision as a matter of law. *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769-70 (9th Cir. 1985). This review is governed by the APA's arbitrary and capricious standard. 5 U.S.C. § 706(2)(A) (2006); *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1235 (9th Cir. 2001).

The court may set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To determine whether an agency decision is arbitrary and capricious, the court should "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989). After considering the relevant factors, the agency must articulate a satisfactory explanation for its action, including a rational connection

between the facts found and the agency's conclusions. *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1193 (9th Cir. 2008); *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1145 (9th Cir. 2007) (citation omitted). Even if an agency decision is based on "admittedly weak best available science," the court is not allowed to "substitute [its] judgment for that of the agency." *ALCOA v. BPA*, 175 F.3d 1156, 1160-61 (9th Cir. 1999). Courts are not to "act as a panel of scientists, instructing the agency, choosing among scientific studies, and ordering the agency to explain every possible scientific uncertainty." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008), *abrogated on other grounds by Winter v. Natural Res. Def. Ctr.*, 555 U.S. 7 (2008) (internal quotation marks and brackets omitted). Under the arbitrary and capricious standard of review, an agency's decision "need only be reasonable, not the best or most reasonable, decision." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010).

*Background*

I.     Overview of FACA

FACA was enacted to provide oversight for the use of "numerous committees, boards, commissions, councils, and similar groups which have been established to advise officers and agencies in the executive branch of the Federal Government." 5 U.S.C. App. 2(a). An "advisory committee" means "any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof . . . (C) established or utilized by one or more (federal) agencies . . . in the interest of obtaining advice or recommendations" for a federal agency. *Id.* at App. 2 § 3(2). Committees comprised entirely of agency employees are not subject to the strictures of FACA. *Id.* However, for advisory committees falling within the purview

PAGE 3 - OPINION AND ORDER

of the Act, FACA imposes numerous public-disclosure, reporting, and balancing requirements. *Id.* at App. 2 §§ 5, 10. Among other requirements, an advisory committee must be fairly balanced with respect to the points of view represented by its members, its meetings must be open to the public, and its records must be available for public inspection. *Id.*

II.      Overview of NEPA

NEPA requires federal agencies "to the fullest extent possible," to prepare a "detailed statement on . . . the environmental impact" of "major Federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)(i); *see also* 40 C.F.R. § 1500.2. The purpose of NEPA is two-fold: (1) to ensure the agency "will have available, and will carefully consider, detailed information concerning significant environmental impacts" of its decisions; and (2) to guarantee that this information will be available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA does not mandate particular results, but simply proscribes the necessary process. *Sierra Club v. Espy*, 38 F.3d 792, 796 (5th Cir. 1994).

III.     Overview of the CWA

The purpose of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Section 301 of the CWA prohibits, subject to certain exceptions, "the discharge of any pollutant by any person" into the Nation's navigable waters. *Id.* at § 1311(a). "Pollutant" is defined to include, among other things, dredged spoil, rock, and sand. *Id.* at § 1362(6). Section 404 of the CWA authorizes the Corps to issue permits, on an individual or general basis, for the discharge of dredged or fill material into navigable waters. *Id.* at § 1344.

IV.     Overview of the ESA

The purposes of the ESA are to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," and "to provide a program for the conservation" of such species.  16 U.S.C. § 1531(b).

Section 7(a)(2) of the ESA requires federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification" of such species' critical habitat.  *Id.* at § 1536(a)(2).  Whenever a federal agency, such as the Corps, determines that a proposed action "may affect listed species or critical habitat," that agency must prepare a biological assessment on the effects of the action and consult with NMFS (or depending on the species, the Fish and Wildlife Service) to determine whether the agency action is likely to result in jeopardy to that species or its critical habitat.  50 C.F.R. § 402.14(a); 16 U.S.C. § 1536(a).  Once consultation is initiated, NMFS is responsible for reviewing all relevant information and formulating a BiOp as to whether the action is likely to result in jeopardy to a listed species.  50 C.F.R. § 402.14(g).  In making this determination, the Corps must provide the Services with a biological assessment, and the Services "shall use the best scientific and commercial data available." 50 C.F.R. § 402.14(a); 16 U.S.C. § 1536(a).

If NMFS determines that an agency's action is likely to jeopardize the continued existence of a listed species, NMFS must suggest reasonable and prudent alternatives to the proposed action, if any exist, that would not result in such jeopardy.  16 U.S.C. § 1536(b)(3).  On the other hand, if NMFS concludes that a proposed action is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat, but determines that the action will nevertheless result in the take of listed species, NMFS must issue an ITS.  *Id.* at §

PAGE 5 - OPINION AND ORDER

1536(b)(4).  An ITS authorizes the limited take of listed species that would otherwise violate § 9's "take" prohibition, establishes the limit of any taking of the species, and specifies measures to minimize take.  *Id.*; 50 C.F.R. § 492.14(i).  If during the course of the subject action, the amount or extent of incidental take is exceeded, the action agency must reinitiate formal consultation pursuant to § 7(a)(2).  50 C.F.R. § 402.16(a).

V.    Factual Overview

The Chetco River, in southwest Oregon, is designated critical habitat for Southern Oregon/Northern California Coasts ("SONCC") coho salmon, which are listed as threatened under the ESA.  70 Fed. Reg. 37,160 (June 28, 2005) (listing SONCC coho as threatened); 70 Fed. Reg. 52,630 (Sept. 2, 2005) (critical habitat).  Historically, the Chetco River produced a "fair sized" coho salmon run.  *See* Biological Opinion for the Regional General Permit for Gravel Mining in the Chetco River (June 28, 2011) (NMFSAR000015[1]).  At present, only 50 to 100 SONCC adult coho salmon return to spawn each year.  NMFSAR000014-15.

Over the last century, the Chetco River has been severely impacted by timber harvest, road building, rural and urban development, and gravel mining.  Gravel extraction, which began early in the twentieth century, peaked in the 1970s and 1980s with as many as fifteen companies operating per year.  These operations extracted millions of cubic yards of gravel.  As a result of many years of unregulated gravel extraction, the geomorphic condition of the lower Chetco River is degraded.

In-stream gravel mining on the Chetco negatively affects ESA-listed salmon in a number of

---

[1] "NMFSAR" refers to the administrative record submitted by NMFS, "NMFSSUP" refers to the supplemental administrative record submitted by NMFS, and "AR" refers to the Corps' administrative record submitted to the court in connection with this litigation.

ways, including direct harm to salmonids from the operation of heavy machinery in the river; loss of spawning, rearing, resting, and staging habitat; and migration delays and blockages. These impacts are a result of changes to the waterways including channel widening, shallowing, or ponding; loss of channel stability; loss of pool/riffle structure; increased turbidity and sediment transport; increased bank erosion and/or stream bed downcutting; and loss or degradation of riparian habitat. There was no in-stream gravel mining on the Chetco River in 2009 and 2010, which resulted in improvements in the geomorphic condition of the river.    NMFSAR000020.

A. *The Regional General Permit*

In 2007, the Corps established two interagency teams (the Gravel Executive Team and Gravel Technical Team (collectively "teams")) to evaluate gravel mining in Oregon on a watershed basis through a process called the regional gravel initiative. AR00698. The teams were headed by the Corps and the Oregon Department of State Lands, and comprised federal, state, and local government representatives as well as mining industry representatives. AR04343. No environmental or watershed groups were placed on the teams and meetings were not open to the public. *Id.* "The overall goal of this regional gravel initiative [was for the Corps] to consider developing [RGPs] and general permits" for gravel mining in Oregon's watersheds. *Id.* An RGP is an authorization under the CWA that the Corps issues on a regional basis for a category of activities that are substantially similar in nature and cause only minimal individual and cumulative impacts on the aquatic environment. 33 C.F.R. § 322.2(f); EA at 1. Ostensibly, regional permits streamline the permitting process and conserve resources. The Executive Team was tasked to "ensure progress continues" while the Technical Team, which appears to have consisted solely or primarily of agency scientists, was "to scope, collect, review, and analyze data and other information

to present recommendations in a coordinated fashion to the Executive Team." *Id.* The Chetco river was chosen as the first river for evaluation. AR04344. The teams met multiple times and produced reports and other documentation regarding an RGP for aggregate mining in the Chetco River. AR00698.

On January 28, 2010, agency members of the Technical Team recommended an aggregate harvesting plan that would generally require three years of rest for the Chetco river before extraction, unless a "five-year event" brought a large influx of aggregate into the river. AR02363-4. Extraction under the proposal would be limited to sixty percent of recruited aggregate above the minimum reserve volume. *Id.* On February 2, 2010, the aggregate industry objected to the Technical Team's proposal and suggested a counter-proposal that would result in significantly more extraction. AR02304. Shortly thereafter, the Corps abandoned the regional gravel initiative and instead opted to proceed through proposals subject to public comment, and published the first public notice for an RGP on March 5, 2010. AR02061. Some agency members of the Technical Team expressed disappointment at the dissolution of the regional gravel initiative. *See, e.g.*, NMFSAR001287 (NMFS scientist complaining that "[t]his stinks and I don't like it, but I don't think they are engaging any of your agencies at this point"); NMFSAR001289 (NMFS scientist stating "[l]et's encourage our managers to stay connected with each other and try for keeping science in the lead for decision making, since political pressure has a tendency to leading decisions away from the science"). The Corps formally disbanded the teams effective October 29, 2010, and made all the work product available for public review for the first time. AR00698. After several iterations of proposed RGPs, subject to public comment, the final RGP was proposed on November 8, 2010, with public comment running through December 8, 2010. AR0662-79; *see also*, AR1690-1719, AR1303-

1318.  Because the teams' work product was not available until October 29, 2010, only one iteration of the RGP was subject to public comment with the benefit of all work product.

On July 15, 2011, the Corps issued a five-year RGP under Section 404 of the CWA, which authorizes limited commercial in-stream gravel mining at three specific project locations within an eight-mile stretch of the lower Chetco River.  In support of the RGP, the Corps produced the environmental assessment ("EA").  The RGP serves as the NEPA document for the RGP, as well as the CWA Section 404(b)(1) Evaluation and Determination.

The purpose of the Chetco River RGP is "to obtain aggregate for industrial and commercial uses including provision of materials for regional road projects."  AR00103.  Generally, gravel bar mining is conducted to harvest a specific type of aggregate that meets "certain standards" for road and other construction projects.  AR00147.  In contrast to gravel from upland sources, which requires "more processing and sorting to obtain the necessary material for a particular construction job," river gravel is "broken and sorted" through "the natural processes of materials being transported down a stream."  AR00147.

In consultation with NMFS, the Corps included a variety of measures in the RGP to limit impacts to the environment and maintain existing gravel bars, including: (1) requiring that a reserve volume of 26,000 cubic yards be met before excavation may occur in any given year; (2) if the 26,000 cubic yard reserve is not met in one year, mining may not occur for that year and the total reserve volume for the following year must exceed 52,000 cubic yards for extraction to occur; (3) an 80% cap on any volume above 26,000 cubic yards with the remaining 20% remaining in-stream to enhance the aquatic environment; (4) guidelines and numerous restrictions to retain gravel bar form and maintain existing aquatic habitats; (5) bar allocations; (6) guidelines on construction, extraction,

vehicle staging, and stormwater management; (7) gravel bar plantings to stabilize the bars; (8) limiting the work window to July 15, through September 30, when fish populations are not found in significant numbers in the Chetco River; (9) adaptive management strategies that retain authority in an annual implementation team to modify the extraction based upon the current physical and biological characteristics of the river and extraction sites; (10) requirements for detailed surveys and reports that monitor gravel bar conditions and volumes before, during, and after extraction; (11) requirements for monitoring annual recruitment volumes, and multi-year evaluations in years four and five of the RGP; and (12) extensive enhancement actions aimed at restoring, enhancing, and maintaining summer and winter habitat at Jack Creek and the Social Security Bar. *See* AR00093-102.

In addition to mining authorized under the RGP, Freeman Rock, Inc. (Freeman) a mining company announced in January 2011 that it would opt out of the RGP process in 2011 by removing up to 40,000 cubic yards in a process that does not result in fill or fallback and does not trigger CWA permitting. AR06216, AR06152. The Corps acknowledged that it was possible to remove aggregate without triggering the CWA, but did not confirm that Freeman's proposal did not require a permit. AR06136, AR00253.

B. *The Biological Opinion*

On June 28, 2011, NMFS issued a BiOp under Section 7 of the ESA, addressing the effects of the RGP on SONCC coho. NMFS reviewed the proposed RGP, including the methods and processes used to determine annual extraction amounts. NMFSAR000006. NMFS also analyzed the specific restrictions in the RGP, and its monitoring plan. *See, e.g.*, NMFSAR000009 (pre- and post-harvest surveys, post excavation reports, and multi-year evaluations). After examining the

effects of the RGP on listed species and critical habitat, NMFS concluded that the proposed in-stream mining would not jeopardize the continued existence of SONCC coho or adversely modify its critical habitat.  NMFSAR000024-29.

NMFS concluded, however, that "taking" of juvenile coho could occur under the RGP as a result of habitat modification and the twelve heavy equipment crossings allowed per year under the plan.  NMFSAR000028, 35.  With respect to in-water equipment operations, NMFS explained:

> At some point during the twelve crossings per year, a few juveniles are likely to be present.  Furthermore, since no other cover is present, startled juveniles may hide in the interstitial spaces of gravel and cobbles where the equipment is driving, thus increasing their chance of being injured.

> Considering the amount of habitat affected (500 square feet) per crossing, the low abundance of SONCC coho salmon juveniles, the low value of affected habitat, the number of crossings per year (12), and the probability of juveniles being crushed (low but not discountable), heavy equipment crossings are likely to expose only a small number of SONCC coho salmon juveniles per year to an increase in likelihood of injury, with death of only a few individuals over the term of the permit.

NMFSAR000028.  NMFS also determined that the RGP would result in take associated with habitat modification.  In particular, NMFS found that the "effects of gravel removal associated with the proposed action are reasonably certain to slow the rate of improvement of the geomorphic conditions, habitat features, coho salmon limiting factors (such as overwintering habitat), and coho salmon juvenile survival."  NMFSAR000029.   The project will result in "slowing the improvement of SONCC coho salmon carrying capacity and abundance."  NMFSAR000035.

Accordingly, NMFS issued an ITS pursuant to Section 7(o) of the ESA, 16 U.S.C. 1635(o), and its implementing regulations.  NMFSAR000035.  Due to a lack of data and the impracticalities of monitoring individual takings, NMFS could not accurately establish a numerical take limitation in the ITS.  *See* NMFSAR000035 ("Monitoring the actual number of fish killed or injured by

equipment is impractical due to the flow in the river size of fish and the difficulty of accomplishing such as task."); *id.* (addressing possible take associated with habitat modification, and concluding "the relationship between gravel influx, geomorphic conditions, carrying capacity, survival, and abundance is not quantifiable due to lack of data").  Instead, NMFS developed an ecological surrogate that provides a trigger for reinitiation of Section 7 consultation:

> Because monitoring the number of fish injured or killed is not possible, NMFS uses a causal link established between the activities and the likely effects to the listed species to describe the extent of take as a numerical level of habitat disturbance. Here, the best available indicator for the extent of take is the area of gravel bar disturbed relative to the amount of gravel removed. By analyzing monitoring reports from Freeman in 2007 and Tidewater in 2008, NMFS roughly estimates that no more than 0.2 acres of gravel bar need to be disturbed for every 1,000 cubic yards of gravel harvested.  In addition to being the most practical and feasible indicator to measure, area of gravel bar disturbed per unit of gravel removed is proportional to the adverse effects of this project.  A relatively small amount of removal may have a large effect if the depth is minimal and it is spread out over a large area.  Also, because extraction occurs in three dimensions (square area plus depth), the area of gravel bar disturbed per unit of gravel removed is closely related to the intensity of activity, yet is distinct from the total amount of gravel removed.  Thus, area of gravel bar disturbed per unit of gravel removed will remain proportional to the amount of take, regardless of the level of annual extraction allowed by the proposed action.

> In the accompanying Opinion, NMFS determined that this level of anticipated take is not likely to result in jeopardy to the species.  The area of gravel bar disturbed per unit of gravel extracted (0.2 acres per 1,000 cubic yards harvested) is a threshold for reinitiating consultation.

NMFSAR000036 (emphasis added).  NMFS also established several non-discretionary terms and conditions required under the ITS that became binding conditions under the RGP, as well as mandatory "reasonable and prudent measures."  NMFSAR000036-38.  In particular, the BiOp requires the Corps to implement all of the measures identified in the RGP to limit impacts to the environment and maintain existing gravel bars.  *See e.g.*, NMFSAR000036-37 (requiring reserve volumes, adaptive management strategy, pre- and post-extraction surveys, and enhancement

PAGE 12 - OPINION AND ORDER

projects).

*Discussion*

NEDC moves for summary judgment on all nine claims in the Second Amended Complaint [110]. NEDC first argues that the Corps violated FACA by using advisory committees (the Teams) without complying with FACA's strictures. Second, NEDC argues that the Corps violated NEPA by failing to adequately explain its finding of no significant impact, and by failing to consider a reasonable range of alternatives. Third, NEDC argues that the Corps violated the CWA by issuing the RGP without required impacts determinations and by failing to conduct an adequate alternatives analysis. Fourth, NEDC argues that NMFS violated the ESA by conducting inadequate jeopardy and adverse modification analyses and by issuing an ITS that fails to address all of the stressors that may result in take. Federal defendants cross move for summary judgment and assert that NEDC does not have standing to assert its FACA claim, and that the remainder of federal defendants' actions were not arbitrary or capricious.

I.    FACA Claim

Though federal defendants have not explicitly acknowledged that the Corps violated FACA through the use of the Executive and Technical teams, it does not appear that federal defendants contest the issue. Instead, they argue that NEDC lacks standing to assert its FACA claim. Because federal defendants limit their arguments to justiciability, they have waived their arguments on the merits of the FACA claim. *O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1063 (9th Cir. 2007) (arguments not raised before district court are waived). Because the evidence in the record strongly indicates that the industry membership on the Teams made them advisory committees for the purposes of FACA, and because it does not appear there was balanced membership or timely public-

disclosure of Team activities, there is no reasonable argument that the Corps did not violate FACA.

The jurisdiction of federal courts is limited and extends only to live cases and controversies. U.S. CONST. art. III, § 2, cl. 1.  To satisfy the standing requirements of Article III, a plaintiff must show that:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000).  "[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation – a procedural right in *vacuo* – is insufficient to create Article III standing.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

Federal defendants argue that because the Teams were disbanded on October 29, 2010, and that the final decision regarding the RGP did not take place until after a new 30-day public comment period during which the public had access to the Team documents, NEDC lacks standing to bring this suit.  In short, federal defendants argue that NEDC alleges a procedural violation that was cured by the disbandment of the Teams followed by a public comment period.  *See* Second Easley Decl. at ¶ 9 (alleging that declarant would have participated in committee process, would have worked to ensure that the Corps followed advice of agency scientists, and would have used information created for and by the Teams).  In support of their argument, federal defendants point to the fact that the First Amended Complaint was not filed until August 15, 2012, long after the Teams were disbanded. *Jackson v. Cal. Dept. of Mental Health*, 399 F.3d 1069, 1072-73 (9th Cir. 2005) *amended on other grounds*, 417 F.3d 1029 (9th Cir. 2005) (explaining differences between mootness, which arises after

a federal court is involved, and standing, and noting that courts recognize exceptions to mootness that do not apply to standing).

While federal defendants are correct that the Second Amended Complaint was not filed until long after the Teams were disbanded, NEDC properly notes that the original Complaint [1] alleging FACA violations was filed on September 20, 2010, before the Teams were disbanded. By October 29, 2010, this court was already involved in this suit making the inquiry one of mootness, rather than standing. *Id*. Although the First and Second Amended Complaints superseded the original Complaint, the FACA claim has remained more or less static. The FACA claim alleged in the Second Amended Complaint is nearly identical to that in the original Complaint except that it has been supplemented by an additional paragraph (¶ 151) alleging that the Corps has established and utilized advisory committees to consider instream gravel mining on other rivers including the Umpqua. The addition of this paragraph does little, if anything, to change the contours of NEDC's FACA claim and does not deprive this court of jurisdiction on the basis of standing.

"The Constitution's case-or-controversy limitation on federal judicial authority . . . underpins both our standing and our mootness jurisprudence, but the two inquiries differ" in important respects. *Laidlaw*, 528 U.S. at 180. Although "the doctrine of mootness can be described as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)," there are important exceptions to the mootness doctrine not applicable to standing. *Id*. at 189 (citations and quotation omitted). Relevant to this case is the principle that a "defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Id*. (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)).

PAGE 15 - OPINION AND ORDER

Accordingly, the voluntary cessation of a defendant's conduct moots a claim only if "subsequent events [make] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quoting *United States v. Concentrated Phosphate Export Assn.*, 393 U.S. 199, 203 (1968)).  This is a heavy burden and must be carried by the party asserting mootness.  *Id.*

In support of their argument regarding mootness, federal defendants point to the fact that the Teams were disbanded, no other such advisory committees are in operation in Oregon, and in a letter the Corps stated that "[p]rivate individuals will not participate as members of [future] teams, and any future team will be created in compliance with all applicable laws including [FACA]."  AR000796. The Corps argues that this statement, coupled with a presumption of regularity, is sufficient to show that the wrongful behavior cannot be reasonably expected to recur.  However, this statement regarding future compliance is self-serving and, on this record, does not convince this court that the FACA violations will not recur.  *Concentrated Phosphate Export Assn.*, 393 U.S. at 203 (finding that statement from defendant that wrongful behavior was uneconomical and would not recur was insufficient, standing alone, to satisfy burden of persuasion).

The Corps is not entitled to a presumption of regularity or to the court's deference from its assurance that it will not create future teams in compliance with all laws because the Corps' violations here were obvious and blatant.  FACA's requirements for forming advisory committees are clear and well known, a fact that the Corps did not dispute it its briefs or at oral argument. Nonetheless, the Corps has offered no explanation of any kind to explain why or how the Gravel Executive Team and the Gravel Technical Team consisted entirely of government representatives and mining industry representatives, and included no representatives environmental groups and other

PAGE 16 - OPINION AND ORDER

interested organizations, in direct contravention of FACA's mandate that such teams represent all viewpoints.  The record shows no evidence of mistake or oversight that caused other groups to be excluded, no suggestion that other groups were invited to participate on the Teams but failed to do so, and no indication that the Corps believed in good faith – despite FACA's clear directive – that FACA's requirements did not apply to the Teams.  Even after the court's repeated questioning at oral argument, the Corps' counsel provided no explanation for the one-sided composition of these two teams, but offered only thin assurance that it would not happen again.  It should not have happened this time – the law is clear on that point – and on such a record the court concludes such behavior can be reasonably expected to recur.

As a secondary argument, federal defendants assert that NEDC has failed to identify a final agency action that would allow it to invoke the limited waiver of sovereign immunity provided under the APA.  5 U.S.C. § 702 ("[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof").  Federal defendants contend that if the final agency action was the formation or use of the Teams, then the Corps' decision to disband the Teams provided all the relief available under the APA and if the final agency action was the issuance of the RGP, then the disbandment of the Teams, the release of their documents, and the final iteration of public comment cured the FACA violations.  *Seattle Audobon Soc'y v. Lyons*, 871 F. Supp. 1291, 1309-10 (W.D. Wa. 1994), *aff'd*, 80 F.3d 1401 (9th Cir. 1996) (APA "rulemaking procedures afford ample opportunity to correct infirmities resulting from improper advisory committee action prior to the [action]").  Federal defendants argue persuasively that at this stage, injunctive relief is inappropriate.

However, the Corps took numerous agency actions that were, or arguably were, violative of

PAGE 17 - OPINION AND ORDER

FACA (forming the teams, deciding not to allow public access to team meetings or materials, issuing an RGP based in part on team materials), and federal defendants have not persuaded the court that declaratory relief is unwarranted.  Declaratory relief is particularly important in this case where the violations were blatant, are unexplained, and because it is possible that the team materials will be used during deliberations regarding future RGPs on the Chetco river, or another Oregon river.  *Byrd v. U.S. EPA*, 174 F.3d 239, 244 (D.C. Cir. 1999) (noting that in FACA case, declaration from court that EPA acted in violation of FACA would redress injury as it would provide plaintiff with ammunition to attack the advisory committee's findings in future agency proceedings).  Plaintiffs are entitled to a declaration that the Corps violated FACA and to have the ability to challenge future actions, if appropriate, where the Corps is utilizing materials produced during the defective team proceedings.  Accordingly, summary judgment is granted to NEDC on the FACA claim.

II.    <u>NEPA Claims</u>

Because NEPA is essentially a procedural statute, judicial "review of agency decision-making under NEPA is limited to the question of whether the agency took a 'hard look' at the proposed action as required by a strict reading of NEPA's procedural requirements." *Bering Strait Citizens for Resp. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 935, 947 (9th Cir. 2008); *Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 665 (9th Cir. 1998).

1. Timing of the Environmental Assessment

An agency must "integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values."  40 C.F.R. § 1501.2; *Andrus v. Sierra Club*, 442 U.S. 347, 351 (1979).  An agency must prepare a detailed environmental impact statement ("EIS"), "[i]f there is a substantial question whether an action may have a

significant effect on the environment." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008) (quotation marks omitted).  To determine whether to prepare an EIS, the action agency may prepare an EA.  40 C.F.R. § 1501.4(b).  An EA is a concise public document that briefly describes the need for the proposal, and examines the environmental impacts of the proposed action and the alternatives.  40 C.F.R. § 1508.9.  If the agency makes a finding of no significant impact ("FONSI") after adequately analyzing the proposed action in an EA, then an EIS is not required.  *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994).

NEDC argues that the Corps failed to integrate NEPA into the decision-making process sufficiently early, and engaged only in *pro forma* compliance.  *Ctr. for Biological Diversity v. U.S. Forest Service*, 349 F.3d 1157 (9th Cir. 2003) (procedures described in NEPA and its regulations are to be strictly interpreted and *pro forma* compliance will not do) (citations and quotations omitted).  It is critical that the NEPA analysis take place at or before the "go-no go" stage in a proposed action.  *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000) (citation and quotation omitted).

In support of their argument, NEDC cites to select portions of the record indicating that the Corps may have made a predetermination not to conduct an EIS.  *See*, *e.g.*, AR01856 ("Corps made a preliminary call early on that the development of the RGP for Chetco gravel would not require an eis.  Nothing in writing - the [EA] we complete for the project documents whether or not an [EIS] is necessary."); AR01816 (email from May 26, 2010 (final RGP/EA was not submitted for public comment until November 8, 2010) indicating that the Corps had developed "final conditions" for RGP and was in process of finalizing EA).

PAGE 19 - OPINION AND ORDER

The question the court must decide is whether the Corps completed their NEPA analysis before the go-no go stage of the RGP; that is, before they made an "irreversible and irretrievable commitment of resources." *Ctr. for Envt'l Law and Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1006 (9th Cir. 2011) (quoting *Metcalf*, 214 F.3d at 1142). The Corps' *preliminary* decision not to issue an EIS did not constitute an irreversible and irretrievable commitment of resources. That commitment did not occur until the RGP and EA were released simultaneously. *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 893 (9th Cir. 2002) (agency is free not to take action up until decision notice was issued and it was acceptable for agency to release EA with the decision notice); 33 C.F.R. Part 325, App. B., 7(a) (Corps must "complete EA as soon as practicable after all relevant information is available (i.e., after the comment period for public notice" has expired)); *Metcalf*, 214 F.3d at 1142 (an agency can begin preliminary consideration of an action without preparing an EA and nothing prevents an agency from lending support to a proposal before issuing an EA). Additionally, though the record contains evidence of bias on the part of the Corps not to complete an EIS, NEPA does not prohibit such subjectivity. *Metcalf*, 214 F.3d at 1142; *Surfrider Found. v. Dalton*, 989 F. Supp. 1309, 1320 (S.D. Cal. 1998) ("[A]n agency's intention or predisposition in drafting an EA is irrelevant if the EA itself ultimately satisfies requirements of NEPA."), *aff'd*, 196 F.3d 1057 (9th Cir. 1999). Although the Corps' preliminary statements are troubling and do not evince the sort of decision-making that plaintiffs might want, they were preliminary, and the Corps did not make any irreversible and irretrievable commitments of resources that would cause it to run afoul of NEPA's requirements.

2. Need for EIS

NEDC contends the Corps' EA/FONSI is arbitrary and capricious, and that an EIS was

required because the RGP may have a significant impact. In particular, NEDC argues the Corps should have evaluated the impacts on SONNC coho in the site-specific context of the Chetco, rather than on their overall population, and that the RGP is significant because it sets precedent for future RGPs in other Oregon rivers.

Whether a proposed action "may have a significant effect on the environment," and therefore requires the preparation of an EIS, depends on the "context and intensity" of the environmental impacts. *Ctr. for Biological Diversity*, 538 F.3d at 1220 (citing *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 731). A number of factors should be considered, including: the beneficial and adverse impacts of the action; unique characteristics of the geographic area; the degree of uncertainty associated with the impacts; the degree of controversy surrounding the project; cumulative effects; and whether the action "may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the [ESA]." 40 C.F.R. § 1508.27. An EIS may be required if one of those factors is met. *Ctr. for Biological Diversity*, 538 F.3d at 1220; *see also Nat'l Parks & Conservation Ass'n*, 241 F.3d at 731 (the degree of uncertainty or controversy "may be sufficient to require preparation of an EIS.").

"If an agency decides not to prepare an [EIS], it must supply a convincing statement of reasons to explain why a project's impacts are insignificant. The statement of reasons is crucial to determining whether the agency took a 'hard look' at the potential environmental impact of a project." *Ctr. for Biological Diversity*, 538 F.3d at 1220 (quotation marks and citation omitted). In evaluating the sufficiency of an EA, courts determine whether the agency "adequately considered and elaborated the possible consequences of the proposed agency action when concluding that it will have no significant impact on the environment, and whether its determination that no EIS is required

is a reasonable conclusion." *Id.* at 1215.  An EA "need not conform to all the requirements of an EIS," but it must be "sufficient to establish the reasonableness" of the agency's decision not to prepare an EIS.  *Id.* (citing *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1178 (9th Cir. 1982) (quotation marks omitted)).

Additionally, the Corps' conclusions in the EA must be supported by the EA itself or in an attached appendix.  *Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998) (support for EA cannot be found in administrative record when EA contained virtually no references to any material in support of its conclusions).  However, an EA is "a concise public document" that need only "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]."  40 C.F.R. § 1508.9(a).  In this case, the BiOp was incorporated by reference into the EA.  AR00121.

NEDC contends that the Corps' finding that the RGP would adversely affect SONCC coho should have resulted in the preparation of an EIS and that the Corps should have evaluated the significance of the effect on SONCC coho in the limited context of the Chetco River rather than on the entire species.  *Anderson v. Evans*, 371 F.3d 475, 490-91 (9th Cir. 2004) (local impact to whale population would be a significant environmental impact even where unaffected migrating whales and whales populating other areas are genetically identical).

Although the Corps determined that the RGP "will likely adversely affect" SONCC coho salmon, AR00139-40, the "loss of some members of a threatened species does not automatically lead to the requirement to prepare a full EIS."  *Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1276 (10th Cir. 2004); *see also Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005) ("We decline to interpret NEPA as requiring the preparation of an EIS any time that

PAGE 22 - OPINION AND ORDER

a federal agency discloses adverse impacts on wildlife species or their habitat . . . .").  The Corps reasonably concluded that although the project may have adverse effects to individual coho salmon and elements of their habitat, the RGP would not result in significant impacts to the species.  This finding is aligned with Ninth Circuit precedent.  *See Envntl. Prot. Info. Serv. v. Forest Serv.*, 451 F.3d 1005, 1012 (9th Cir. 2006) ("*EPIC*") ("Although [plaintiff] seems to urge that *any* impact to a listed species requires an EIS, [the agency] correctly argues that the regulation's 'intensity' factor focuses on the '*degree* to which an action may adversely affect' a threatened species or critical habitat."); *Native Ecosystems,* 428 F.3d at 1240 (rejecting need for EIS despite FONSI's acknowledgment of project's impact on individual goshawks and their habitat, where USFS concluded impact on the species was not significant).  As long as the EA took a reasonable approach in addressing the relevant NEPA intensity factors, it must be upheld.  *Bering Strait*, 524 F.3d at 956–57.

Although there are some uncertainties regarding the migratory habits of fish during the summer months, NEDC fails to demonstrate how this uncertainty warrants the preparation of an EIS. Courts must defer to the agency's scientific reasoning.  *Friends of Endangered Species v. Jantzen*, 760 F.2d 976, 986 (9th Cir. 1985).  Here, the Corps sought out information from the state and federal agencies best equipped to evaluate potential impacts to coho salmon:  NMFS and the Oregon Department of Fish and Wildlife ("ODFW").  Both agencies determined that while certain information was unknown, sufficient data existed to conclude that the mining activities as permitted would not jeopardize the coho salmon species in the Chetco. NMFSAR000030.  Courts are not to "act as a panel of scientists, instructing the agency, choosing among scientific studies, and ordering the agency to explain every possible scientific uncertainty."  *Lands Council*, 537 F.3d at 988

(internal quotation marks and brackets omitted).  "When specialists express conflicting views, an

agency must have discretion to rely on the reasonable opinions of its own qualified experts even if,

as an original matter, a court might find contrary views more persuasive."  *Id*. at 1000 (quoting

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)).

In *Anderson v. Evans*, where the EA was nearly bereft of any analysis to the local species

population, the Ninth Circuit found the agency's analysis lacking.  371 F.3d at 492.  The EA here,

however, contains sufficient analysis to demonstrate that the Corps considered local impacts to

SONCC coho.  *See, e.g.*, AR00140 (noting that there has never been a significant population of

SONCC coho in the Chetco and that coho are unlikely to be present in the mainstem Chetco during

the summer when mining takes place); AR00140-141 (describing habitat impacts to SONCC coho

in the Chetco River); NMFSAR000014-22 (BiOp discussing Chetco River SONCC coho and habitat

conditions at length).

NEDC also contends that the RGP establishes a precedent for how gravel mining will be

researched, permitted, and carried out in Oregon rivers and as a result may have a significant

impacts within the meaning of NEPA regulations.  40 C.F.R. § 1508.27(b)(6)*; Anderson*, 371 F.3d

at 493 ("[i]f approval of a single action will establish a precedent for other actions which may

cumulatively have a negative impact on the environment, an EIS may be required").  NEDC argues

that the Chetco RGP will serve as a template for a series of gravel mining RGPs in Oregon's rivers.

AR03060 (the "study process used on the Chetco River will serve as a model for evaluating other

river systems").      However, the record demonstrates that the Corps conducted site-specific

analyses for the EA and any new RGP in the Chetco or any other river system would require

consideration of the RGP's impacts on an individual basis taking into account the project's scope,

location, and other attributes. *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1162-63 (9th Cir. 1998) (purpose of 40 C.F.R. § 1508.27(b)(6) "is to avoid the thoughtless setting in motion of a 'chain of bureaucratic commitment that will become progressively harder to undo the longer it continues'") (quoting *Sierra Club v. Marsh* 769 F.2d 868, 879 (1st Cir. 1985)). The issuance of this RGP does not set in motion any other future projects. Because any future RGP for gravel mining in Oregon will require independent consideration and approval and must stand on its own merits, no precedent has been set within the meaning of 40 C.F.R. § 1508.27(b)(6).

       3.  Cumulative Impacts

NEDC argues that the Corps failed to consider the cumulative impacts of the RGP. The Corps was required to consider the cumulative impacts of the RGP, which include "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. The Corps discussed, among other things, cumulative impacts from historic gravel mining, gold mining, maintenance dredging, and a proposed boardwalk in the Port of Brookings. AR00160-62. NEDC faults the Corps for failing to consider logging (though NEDC points to no specific projects) and for failing to provide quantified information and analysis regarding historic mining. *Ocean Advocates v. U.S. Army Corps of Engineers,* 402 F.3d 846, 868 (9th Cir. 2005) (Corps must provide some detailed or quantified information to take a hard look at past, present, and future cumulative impacts); *but see, Bering Strait Citizens for Responsible Resource Dev. v. U.S. Army Corps of Engineers*, 524 F.3d 938, 954 -55 (9th Cir. 2008) (holding that succinct discussion of cumulative impacts of placer mine that did not discuss other projects at length was sufficient).

PAGE 25 - OPINION AND ORDER

The cumulative impacts analysis here discussed the problems created by historic mining by noting among other things, the destruction of backwaters that provide refuge to juvenile salmonids, the destablization of river banks, and loss of riparian vegetation.  AR000161.  The Corps goes on to analyze these impacts and notes that a 26,000 cubic yard average annual surplus of aggregate will maintain existing conditions and by retaining twenty percent of the excess, the system should rebuild.  This analysis meaningfully addresses the problems caused by cumulative impacts and discusses how the river's geomorphic conditions will be restored under the RGP.  This analysis is more that sufficient under the standards set forth in *Bering Strait,*524 F.3d at 954 -955.

### 4. Alternatives Analysis

NEDC also argues the EA is arbitrary and capricious because the Corps failed to consider reasonable range of viable alternatives.  In particular, NEDC contends the Corps failed to adequately consider an alternative with mandatory rest years, and a true no action alternative (*i.e.*, no in-stream mining).  NEDC also argues the Corps failed to consider at least one alternative that involved obtaining gravel from a combination of sources, such as upland quarries, recycled asphalt, and/or gravel from the Rogue River.

NEPA requires the Corps to "study, develop, and describe" a reasonable range of alternatives, including a "no action" alternative. 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1502.14(d). The "touchstone" for the court's review of a challenge under NEPA is whether the agency's "selection and discussion of alternatives fosters informed decision-making and informed public participation." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 872 (9th Cir. 2004) (citing *Calif. v. Block*, 690 F.2d 753, 767 (9th Cir. 1982)).  "Although an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS, . . . NEPA requires that

alternatives . . . be given full and meaningful consideration, whether the agency prepares an EA or an EIS." *Ctr. for Biological Diversity*, 538 F.3d at 1217 (quotation and citation omitted). The agency must "provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]." 40 C.F.R. § 1508.9.

As this court previously held when denying NEDC's Motion for Preliminary Injunction, the Corps considered a range of alternatives, including the so-called "no-action" alternative. The Corps described the no-action alternative as follows:

> The no action alternative is no RGP. The projects will require a Department of the Army Individual Permit review, thus increasing the burden on limited Corps resources, which may result in delayed and backlogged permit decision [sic] for the project applicant. Evaluation by means of Individual Permits may also reduce opportunities to manage aggregate removal comprehensively.

AR00146-47. NEDC contends that a true no-action alternative would be no gravel mining in the Chetco River. However, the Ninth Circuit has affirmed NEPA analyses that evaluate the no-action alternative in the context of the historical uses of the action area. *Natural Resources Defense Council v. Hodel*, 624 F. Supp. 1045, 1054 (D. Nev. 1985), *aff'd*, 819 F.2d 927 (9th Cir. 1987). Indeed, "CEQ regulations allow the status quo to properly be the no action alternative. 'The 'no action' alternative may be thought of in terms of continuing with the present course of action until that action is changed.'" *Ass'n of Public Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1188 (9th Cir. 1997) (citing 46 Fed. Reg. 18026, 18027); *see also Westlands Water Dist. v. United States Dept. of Interior*, 376 F.3d 853, 869 (9th Cir. 2004) (noting that the no action alternative maintains the status quo).

It is undisputed that aggregate has been mined regularly since the 1900s. AR00095. Commercial gravel mining peaked in the 1970s and 1980s, when there were at least fifteen operators

PAGE 27 - OPINION AND ORDER

in the study area extracting an average of 183,000 cubic yards of aggregate per year. *Id.* The State of Oregon began regulating gravel extraction on the Chetco in 1994, and has limited extraction activities to three companies on four sites. While the average volume extracted per annum has declined, the amount of aggregate removed hovered around 77,000 cubic yards annually from 2000 to 2008. In sum, commercial mining has occurred on the Chetco for over a century, creating jobs for the local community and producing high-quality aggregate gravel for construction purposes. *See* AR00095-96, 112. The mere fact the Corps may have entertained a no-mining alternative at some early stage in the project does not mean the Corps was not required to develop a no-action alternative, in which it completely reverses or abandons a historical pattern of the use over 100 years old. *Hodel*, 624 F. Supp. at 1054.

Under the specific circumstances of this case, no action does not mean "no mining," it is the status quo. Without the RGP, mining would still occur in the Chetco, but under the permit-by-permit regime that occurred in the past. The Corps reasonably decided that the no-action alternative meant no RGP, not no gravel mining.

The Corps provided a sufficient explanation for rejecting the "no action" alternative. The purpose of an RGP is to regulate a category of activities that are "substantially similar in nature." 33 C.F.R. § 323.2(h)(1). Because of the considerable resources associated with individual permitting, the Corps determined that continuing on that course would "reduce the opportunity to manage aggregate removal comprehensively." AR00146. Accordingly, the Corps rejected continuation of the status quo in favor of a comprehensive, regional approach that would meet the purpose and need of the project. That the 'no action' proposal "is given a brief discussion does not suggest that it has been insufficiently addressed." *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1181

PAGE 28 - OPINION AND ORDER

(9th Cir. 1990); *Or. Natural Res.Council v. Lyng*, 882 F.2d 1417, 1423 n.5 (9th Cir. 1989).

NEDC next argues that the Corps should have provided additional evaluation of an alternative with mandatory rest years. As discussed above, the Technical Team recommended a mining scheme under which there would be mandatory rest years. In the EA, the Corps explained that it "did not carry this alternative forward in its entirety because of the three-year cycle with mandatory rest years and the 60% cap above reserve." AR00146. The Corps believed that those two features were "overly restrictive in that they would not provide a balance between allowing a sufficient amount of aggregate to be harvested to support the needs of the community and providing protections for the aquatic environment." *Id*. The Corps then noted that the remainder of the "Technical Team alternative was incorporated into the RGP," with the exception of additional environmental protections not recommended by the Technical Team. *Id*. This analysis was sufficient to meet NEPA's demand that an agency make a reasoned choice among alternatives. *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1180-81 (9th Cir. 1990).

Finally, NEDC challenges the Corps' failure to address a combination of alternative sources of aggregate. NEDC argues that this court should follow a Tenth Circuit decision in which the court rejected the alternatives analysis conducted in an EIS by the Transportation Management System (TSM). *Minteta v. Davis*, 302 F.3d 1104, 1118-22 (10th Cir. 2002). The TSM had rejected, without a hard look, alternatives to a highway project such as mass transit and alternative build scenarios because each, by itself, would not meet the purpose and need of the project. *Id*. The Tenth Circuit held that the TSM was required to consider whether a combination of those alternatives would meet the purpose and need of the project. *Id*. NEDC argues that the corps should have considered whether alternative sources of aggregate in combination could meet the need for aggregate in the

area.  However, "[a]n agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." *EPIC*, 451 F.3d at 1016.  NEDC does not cite any binding authority for the proposition that a lawful EA must consider some combination of alternatives.  Moreover, as discussed, the Corps need not evaluate alternatives, such as upland quarry sources, that fail to meet the project purpose.   "So long as 'all reasonable alternatives' have been considered and an appropriate explanation is provided as to why an alternative was eliminated, the regulatory requirement is satisfied." *Native Ecosystems*, 428 F.3d at 1246.  Summary judgment is granted to federal defendants on NEDC's NEPA claims.

III.    <u>CWA Claims</u>

NEDC contends that the Corps violated the CWA by issuing the RGP without required impacts determinations and by failing to conduct an adequate guidelines alternatives analysis.

1.  Impacts determinations

NEDC contends that the Corps issued the RGP without conducting an adequate analysis of the impacts caused by the proposed activities.  Section 404(e)(1) of the CWA authorizes the Corps to issue general permits on a state, regional, or nationwide basis for categories of activities involving discharges of dredged or fill material that the Corps determines "are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1); 40 C.F.R. § 230.7(a)(2).  The purpose of general permits is to reduce delay and the use of administrative resources.  *Oh. Valley Envtl. Coalition v. Hurst*, 604 F. Supp. 2d 860, 869 (S.D. W. Va. 2009).  The issuance of such permits is governed by the "Section 404(b) Guidelines," which the Environmental Protection Agency and the Corps developed to implement Section 404(b)(1) of the CWA, 33 U.S.C. §

1344(b)(1); 40 C.F.R. § 230.7.  Before issuing a general permit, the Corps must determine that the activities authorized are similar in nature, will have only minimal adverse impacts, both separately and cumulatively, and the Corps must  "set forth in writing an evaluation of the potential individual and cumulative impacts of the category of activities to be regulated under the General permit." 40 C.F.R. § 230.7(a),(b).  "While some of the information necessary for this evaluation can be obtained from potential permittees and others through the proposal of General permits for public review, the evaluation must be completed before any General permit is issued, and the results must be published with the final permit."  *Id.* at § 230.7(b).  The Corps must provide a "precise description" of the permitted activities and explain why the activities are similar in nature and impact.  *Id.*

NEDC asserts that the Corps failed to comply with § 230.7 by failing to set forth in the decision document its determinations regarding the propriety of a general permit in this case.  The decision document in this case is the RGP (AR00093-170), which contains the FONSI EA (AR00167-69).  Upon review of the RGP/EA, it is clear that the document does not contain the required § 230.7(b)(2) explanation.

Federal defendants argue however, that the Corps considered whether the impacts were similar in nature and minimally adverse and that the Corps endeavored to utilize special permit conditions to further ensure that the impacts would be such.  *See, e.g.,* AR00095-97 (imposing conditions on bar extraction that ensure some uniformity).  Federal defendants argue that it may rely on the use of these special conditions to satisfy § 404(e)'s requirements.  That proposition is well established; the Corps may impose special permit conditions to ensure that the activities authorized are in fact similar in nature and of minimal adverse impact.  *Ak. Ctr. for the Env't v. West*, 157 F.3d 680, 681-83 (9th Cir. 1998); *Sierra Club v. U.S. Army Corps of Eng'rs*, 508 F.3d 1332 (11th Cir.

PAGE 31 - OPINION AND ORDER

2007).  However, these cases do not stand for the proposition that the Corps may rely on those special conditions in lieu of the explanation required by § 230.7(b)(2).

Federal defendants contend that its failure to explicitly explain in the EA how it complied with  § 230.7(b)(2) is, at most, harmless error.  *Sierra Club v. U.S. Army Corps of Eng'rs*, 464 F. Supp. 2d 1171, 1219 (M.D. Fla. 2006) (holding that failure to explain why activities were similar in nature and environmental impact was harmless error where Corps had otherwise complied with the CWA and remanding on that basis would result in easy cure through insertion of language) *aff'd per curiam*, 508 F.3d 1332 (11th Cir. 2007).  In the Ninth Circuit, however, a court cannot so easily conclude that an administrative agency's error is harmless.  *Cal. Wilderness Coal. v. U.S. Dept. of Energy*, 631 F.3d 1072, 1090 (9th Cir. 2011) ("a court must exercise great caution in applying the harmless error rule in the administrative rulemaking context" and only do so where the error "clearly had no bearing on the procedure used or the substance of decision reached") (citations and quotations omitted)).

Here, it is not obvious that the error was harmless and that the outcome would have remained the same in all respects had the Corps complied with the law.  The Corps violated the law, as they were required to set forth in writing an explanation of why the use of a general permit was appropriate.  40 C.F.R. § 230.7(b)(2).  This court cannot provide that explanation for the Corps and the Corps cannot do it *ex post facto*.  Though the Corps might have analyzed the proper factors, the record is not clear.  Finding harmless error here would obliterate § 230.7(b)'s written findings requirement, and concluding that the Corps' determination was sufficient, when it did not explicitly make a determination, would deprive NEDC of any sort of meaningful judicial review.  Though an agency remand on this issue may simply result in the insertion of a paragraph or two, the law

PAGE 32 - OPINION AND ORDER

requires the agency to provide that additional language.  Summary judgment is awarded to NEDC on Claim Two.

2.  Guidelines Alternatives Analysis

NEDC contends that the Corps failed to make a determination that the gravel mining is water dependent, that the Corps failed to verify information received from the mining industry regarding practicable alternatives, and that the Corps' analysis of practicable alternatives was not based on sufficient information, all in violation of § 404(b)(1) of the CWA .

NEDC contends that the RGP violates § 404(b)(1) of the CWA because the Corps failed to conduct an adequate analysis of practicable alternatives that would have less effect on the aquatic ecosystem.  NEDC maintains that the proposed gravel mining activities are not "water dependent" and therefore, the Corps bears the burden of proving that an alternative with less adverse impact is impracticable.  NEDC also argues that the Corps failed to adequately explain why a smaller project, or a no action alternative could not fulfill the needs of the project.  In addition to impact determinations, the § 404(b) Guidelines require the Corps to generally avoid adverse water quality impacts where practicable alternatives exist, mitigate those impacts, and minimize the adverse effects of the proposed discharge to the maximum extent practicable.  *See* 33 U.S.C. § 1344(b)(1); 33 C.F.R. § 320.4(r); 40 C.F.R. § 230.10(d) and pt. 230, subpart H.

The guidelines establish dual regulatory presumptions.  First, a practicable alternative is available "where the activity associated with a discharge which is proposed for a special aquatic site . . . does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose," unless clearly demonstrated otherwise.  40 C.F.R. § 230.10(a)(3). Second, "where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed

discharge which do not involve a discharge to a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem," also unless clearly demonstrated otherwise. *Id.* If one of these presumptions applies, the Corps bears the burden of providing "detailed, clear and convincing information proving that an alternative with less impact is impracticable." *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 58, 69 (D.D.C. 2010).

NEDC argues that the Corps failed to make a water dependency determination. The RGP states that the purpose of the RGP "is to obtain aggregate for industrial and commercial uses including provision of materials for regional road projects." AR00103. NEDC contends that gravel mining is not water dependent and the Corps failed to demonstrate that it is. However, the purpose of the proposed projects covered by the RGP is not simply "gravel mining." The mining at issue is conducted to procure a specific type of high-quality gravel, which is sold at a higher price than other types of gravel and also used for different applications. The Corps' EA fails to explicitly find that the authorized gravel mining is water dependent, but instead makes the finding implicitly. The EA explains that in contrast to gravel obtained from in-stream sources, upland gravel material:

> requires more processing and sorting to obtain the necessary material for a particular construction job. Depending on the geology of the quarry site, some of the material may not be useable at all. The Oregon Department of Transportation (ODOT) requires aggregate to meet certain standards for road projects. Through the natural processes of materials being transported down a stream, however, gravels are broken and sorted with the desired hard material deposited on gravel bars.

AR00147. Based on the record, the Corps' implicit determination that gravel bar mining is "water dependent" (*i.e.*, requires access or proximity to or siting within a special aquatic site) is adequately supported by the record. 40 C.F.R. § 230.10(a). As a result, there is no presumption under the Section 404(b) Guidelines that a practicable alternative not involving a discharge exists. Given the deferential standard under which this court must review agency decisions made within the agency's

area of expertise, the Corps' determination that gravel bar mining is "water dependent" was not arbitrary and capricious. *Lands Council*, 537 F.3d at 987.

Furthermore, the "practicable alternatives" evaluation process in 40 C.F.R. § 230.10(a) is "not directly applicable to General permits" because general permits are only available for activities deemed to cause minimal adverse environmental impacts. 40 C.F.R. § 230.7(b)(1); *see also Sierra Club,* 464 F. Supp. 2d at 1220.

Even if the practicable alternatives evaluation process applied to general permits, the Corps' analysis was adequate under the circumstances. There is no requirement that the agency consider every conceivable alternative, only that it consider a reasonable range of "practicable" alternatives. Here, the Corps first analyzed the alternative of not issuing the RGP, and concluded that issuing a general permit would reduce administrative delays and allow the agency to regulate gravel bar mining in the Chetco River "comprehensively." AR00147. The Corps also considered a three-year cycle alternative with two mandatory rest years (i.e., years in which no mining would be permitted to occur), and an alternative capping the extraction of gravel at 60% of the reserve volume. *Id*. The Corps rejected these alternatives as "overly restrictive in that they would not provide a balance between allowing a sufficient amount of aggregate to be harvested to support the needs of the community and providing protections for the aquatic environment." *Id*.

NEDC's argument that the Corps failed to adequately analyze the community's need for aggregate is unpersuasive. In public comments submitted to the Corps, several organizations and individuals expressed concern that a no action alternative would negatively impact the community and noted the community's need for aggregate from the Chetco River. EA at 35, 41, 45, 46; *see also* EA at 20 (Comments of Curry County Board of Commissioners that "[t]here need and demand for

PAGE 35 - OPINION AND ORDER

high quality material for construction of commercial buildings" and that "[t]he proposal for rest years appears to be problematic as far as maintaining viable businesses for gravel extraction."). These concerns reflect a rational assessment of the community's need for aggregate. NEDC cites no authority for the proposition that something more is required.

The Corps also assessed the possibility of obtaining gravel from alternative upland quarries and "off-site" alternative sources in the region, but determined that those options were impracticable. As noted above, gravel from upland quarry sites "requires more processing and sorting" than river gravel and in some instances "may not be usable at all" for certain types of construction applications. AR00147. The Corps concluded that other off-site sources, such as aggregate from the Rogue River and recycled asphalt, were either insufficient to meet regional needs or ill-suited for construction purposes. *Id.* Because these alternatives did not provide suitable aggregate rock to satisfy the RGP's purpose, the Corps reasonably rejected them as impracticable. *See National Wildlife Federation v. Adams*, 629 F.2d 587, 591-92 (9th Cir. 1980) (An alternative is practicable only if "it is capable of attainment within relevant, existing constraints."); *Sylvester v. U.S. Army Corps of Engineers*, 882 F.2d 407, 409 (9th Cir. 1989) ("[I]t would be bizarre if the Corps were to ignore the purpose for which the applicant seeks a permit and to substitute a purpose it deems more suitable.") (citation omitted). The Corps considered a reasonable range of alternatives, and there is no authority that would cause this court to find that the consideration of alternatives was arbitrary and capricious because the agency failed to consider some combination of alternatives. Given the narrow scope of review and the fact that the practicable alternatives analysis is "not directly applicable" in the general permitting context, the Corps' assessment of alternatives was sufficient. *Lands Council*, 537 F.3d at 987; 40 C.F.R. § 230.10.

PAGE 36 - OPINION AND ORDER

NEDC also faults the Corps for failing to independently verify the mining industry's claims regarding the use of alternative sources of aggregate and the community's need for that aggregate. *Friends of the Earth v. Hintz*, 800 F.2d 822, 835 (9th Cir. 1986) (the Corps need not undertake an independent investigation and may base its decision on information provided by the applicant, but it must independently verify information provided) (citing NEPA regulations codified at 33 C.F.R. Part 230); *Utahns for Better Transp. v. U.S. Dept. of Transp.*, 305 F.3d 1152, 1187 (10th Cir. 2002) (finding the Corps violated CWA when issuing § 404(b) permit by failing to verify cost estimates provided by permit applicant where the Corps had also violated NEPA). However, as discussed above the practicable alternatives analysis in 40 C.F.R. § 230.10(a) is "not directly applicable to General permits." 40 C.F.R. § 230.7(b)(1). The cases cited by NEDC did not require independent verification in the less structured context of a general permit. Additionally, the Corps did conduct some verification by reviewing input from the Oregon Department of State Lands (AR01473), the Oregon Department of Transportation (AR01162), and consulting firms (AR02481-85, AR02430-52). This review is sufficient to meet the reduced strictures of a § 404(e) permit. Accordingly, federal defendants are granted summary judgment on Claims Three and Four of the Second Amended Complaint.

IV.    ESA Claims

NEDC claims that NMFS violated the ESA by failing to consider the impact of the aggregate mining on the recovery of SONCC coho, by improperly analyzing the RGP's impact on critical habitat, by improperly concluding that the RGP would not result in jeopardy to SONNC coho, by failing to consider the cumulative impacts of mining in the Chetco River, and by issuing an arbitrary and capricious ITS.

PAGE 37 - OPINION AND ORDER

1.  Consideration of Recovery and Critical Habitat

Pursuant to NMFS' regulations, a proposed action will jeopardize the continued existence of a species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.  Adverse modification is defined to mean "a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species."  *Id.*  Recovery is defined as "improvement in the status of the listed species to the point at which listing is no longer appropriate."  *Id.*

The intended goals of the ESA include preventing the extinction of a species and allowing a species to recover.  *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004) (citations omitted).  Accordingly, recovery is an essential component of the ESA that must be considered when an agency carves out critical habitat for a species or makes a jeopardy determination.  *Id.*; *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 933 (9th Cir. 2008) (noting that the "highly precarious status of the listed fishes at issue raises a substantial possibility that considering recovery impacts could change the jeopardy analysis").  An agency's failure to adequately consider recovery needs in its adverse modification or jeopardy analysis renders the agency's determination arbitrary and capricious.  *Gifford Pinchot Task Force*, 378 F.3d at 1070; *Nat'l Wildlife Fed'n*, 524 F.3d at 933-34 (explaining that although recovery impacts alone may not necessarily require a jeopardy finding, an agency must consider recovery).

An agency should "know roughly at what point survival and recovery will be placed at risk before it may conclude that no harm will result from 'significant' impairments to habitat that is

already severely degraded." *Nat'l Wildlife Fed'n*, 524 F.3d at 936.  Additionally, NMFS must consider "critical habitat," which includes "specific areas within the geographical area occupied by the species . . . (I) essential to the conservation of the species and (II) which may require special management considerations or protection."  16 U.S.C. §1532(5)(A)(I).  "Conservation" is defined as "the use of all methods and procedures which are necessary to bring any [listed species] to the point" at which listing is no longer necessary.  *Id*. at §1532(3).  Not surprisingly, considerations of critical habitat and conservation are closely tied to considerations of species recovery, which is defined in much the same terms. 50 C.F.R. § 402.02.

Here, NMFS did consider recovery of SONCC coho and critical habitat (NMFSAR000031-35) and noted that the proposed action would result in "only a slight delay in the recovery of the Chetco River population."  NMFSAR000032.  Because protective measures were "built into the proposed action, such as maintenance and recovery reserves," NMFS concluded that river conditions would continue to improve and would "ensure that the population will continue to trend toward recovering viability objectives." *Id*.  NMFS believed that even small improvements in the carrying capacity of the river would translate into improved population viability because fecundity rates are high and the depensation[2] threshold is low.  *Id*.  Additionally, NMFS found that included enhancement projects would have long-term beneficial effects on the population and critical habitat and that river conditions under the project would allow continued improvements in population viability.  NMFSAR000032-35.  However, NEDC contends the consideration of recovery was inadequate because NMFS failed to consider recovery under the proper standard as defined in

---

[2] "Depensation occurs when populations are so low that per capita growth rates decrease due to density dependent factors such as failure to find mates.  Depensation results in a negative feedback loop that accelerates a population towards extinction."  NMFSAR000065.

NMFS' own policies: whether the action would "appreciably delay recovery."   NFMSAR002372. Additionally, NEDC argues that because NMFS fails to identify when SONCC coho will have recovered, and how long it will take to reach recovery, it cannot adequately analyze the action's impact on recovery.

NEDC places too much import on NMFS' choice of words.  While NMFS determined that there would only be a "slight delay" in recovery caused by the proposed action, it preceded that statement, and followed it by referring to the "appreciable reduction" standard and noted that the delay would not be an "appreciable reduction in the likelihood of survival and recovery." *See, e.g.*, NMFSAR000032-33.  The solitary reference to "slight delay," especially when immediately preceded by the "appreciable reduction" standard does not constitute error or signify that NMFS utilized an  inappropriate standard.

NMFS' failure to explicitly state the Chetco SONCC coho population goal[3] and to set forth the timeframe for achieving recovery is likewise not arbitrary or capricious.  The BiOp explicitly recognized which river conditions are beneficial to SONCC coho (stream features such as pools, riffles, eddies, stable stream banks, and sinuous channels), and noted that river conditions would improve over the course of the action period in response to protective measures such as the maintenance and recovery reserves.  NMFSAR000032.  Additonally, NMFS discussed and analyzed the action's impact on critical habitat and noted how the habitat will continue to improve, albeit not as quickly as if no mining were to take place.   NMFSAR000033-34.   NMFS was required to determine if jeopardy would result from the RGP with jeopardy defined as whether the action "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both

---

[3] NMFS did describe a population generation size of 2,500 fish as having a low risk of extinction, but did not explicitly provide a goal for population recovery.  NMFSAR000018.

the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02; 16 U.S.C. § 1536(a)(2). By identifying river conditions and habitat features necessary for population recovery, analyzing the impact of the RGP on those conditions, and determining that improved habitat conditions under the RGP would facilitate population growth, NMFS satisfied its burden under this section of the ESA. To require more, would "improperly import ESA's separate recovery planning provisions into the section 7 consultation process." *Nat'l Wildlife Fed'n*, 524 F.3d at 936.

### 2. Determinations in BiOp

NEDC contends that NMFS' no jeopardy conclusion was based on unsupported and faulty premises. Under the ESA, NMFS "shall use the best scientific and commercial data available." 50 C.F.R. § 402.14(a); 16 U.S.C. § 1536(a); *Sierra Club v. U.S. E.P.A.*, 346 F.3d 955 (9th Cir. 2003) (while deference to administrative agencies is significant a court "may not defer to an agency decision that is without substantial basis in fact") (citations and quotations omitted). NEDC asserts that NMFS relied on an unsubstantiated assumption that there has been a recent positive trend in habitat conditions and population numbers, that NMFS relied on protective measures in the RGP that are unlikely to promote habitat improvement, and that NMFS impermissibly assumed that there will be no gravel mining when the RGP expires when the Corps considers mining in the river to be the status quo.

Many of the conclusions in the BiOp appear to be premised on the assumption that the SONCC coho population is trending upward in response to improved habitat conditions. *See, e.g.*, NMFSAR000032-33 ("population has demonstrated overall growth over the last two decades" . . . . protective measures in RGP "will maintain the recent improvement in habitat conditions").

However, NMFS acknowledges that there is not quantitative evidence demonstrating habitat improvements or population growth. Mem. in Supp. of Fed. Def.'s Cross-Mot. for Sum. J. at 43. Additionally, the evidence in the administrative record does not demonstrate the obvious fact that population levels have increased in recent years. NMFS000065 (table listing number of Coho spawners in the Chetco observed by ODFW from 1991 through 2009 does not provide evidence of any significant trend). The only population data is from ODFW fish counts which document 121 spawning coho between 1991 and 2009. NMFSAR000065. The counts document 36 fish between 1991 and 1999 and 85 between 2000 and 2009. *Id.* However, 36 fish were counted in 2001 alone, while zero fish were counted in 2002, 2003, 2005, and 2009. *Id.*

Federal defendants respond that the evidence relied upon was qualitative, rather than quantitative, and was the "best scientific and commercial data *available*." 50 C.F.R. § 402.14(a) (emphasis added); *Nw. Ecosystem Alliance v. U.S. FWS*, 475 F.3d 1136, 1147 (9th Cir. 2007) (agency may use less than conclusive evidence where it is the best evidence available). NMFS appears to have relied on observations of gravel bars in the river and the assumption that habitat conditions and population numbers improved in response to the lack of mining over the previous three years. NMFSAR000024. While it is possible that NMFS could have made its no jeopardy finding absent any assumptions regarding population trends, it is clear from the record that NMFS assumed fish populations had increased in recent years, and that this assumption provided support for the no jeopardy finding. It is also possible that educated fish biologists could provide an adequate explanation for why it is assumed that the population has improved in recent years. However, a reasonable explanation is lacking and the population growth is taken as fact. The only evidence in the record demonstrates that zero fish were counted in 2002, 2003, 2005, and 2009 and

only one fish was counted in 2008.  This does not demonstrate unequivocal population growth.

Additionally, because the estimated population numbers, as well as the documented population

numbers, are below the depensation threshold, it is entirely possible that the population has

collapsed in recent years rather than improved.  "[W]hile [an agency] can draw conclusions based

on less than conclusive scientific evidence . . . it cannot base its conclusions on no evidence." *Nat'l*

*Assoc. of Home Builders v. Norton*, 340 F.3d 835, 847 (9th Cir. 2003) (citations omitted).  The

unsupported assumptions made by NMFS in concluding that the SONCC coho population had

grown were arbitrary and capricious.

Second, NEDC argues that the conservation measures contemplated by the BiOp will not

occur or will not be implemented to the benefit of the river due to evidence in the record suggesting

that certain measures will be ineffectual and evidence that others will not be implemented.  *See, e.g*,

NMFSSUP0910, (NMFS biologist stating that the default design for the bar form retention "likely

won't work"); NMFSSUP1055 (mining company representative stating that "[w]hen we are finally

able to mine there again, we will <u>not</u> leave the lateral buffer in place!"); NMFSSUP0966 (noting that

there may be adverse affects at upstream end of Social Security Bar).

NMFS may rely on conservation measures in issuing a no jeopardy BiOp and clearly did so

here.  *See, e.g.*, NMFS000032 (protective measures built into RGP will ensure positive trend in

habitat conditions); NMFS000008-10 (describing protective measures such as gravel plantings,

"social security bar," and the "Jack Creek high flow channel").  However, those measures must be

"reasonably specific, certain to occur, and capable of implementation; they must be subject to

deadlines or otherwise-enforceable obligations; and most important, they must address the threats

to the species in a way that satisfies the jeopardy and adverse modification standards." *Ctr. for Biol.*

*Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002) (citing *Sierra Club v. Marsh*, 816

F.2d 1376, 1379-80 (9th Cir. 1987)); *see also Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 936 (9th

Cir. 2008) ("even a sincere general commitment to" implement conservation measures is insufficient

"absent specific and binding plans").

  Here, the record indicates that the conservation measures are reasonably certain to occur and

the sole statement from one industry representative in a letter to the Corps is insufficient to cast

doubt on that premise.   The conditions of the BiOp provide concrete expectations for the

enhancement projects conducted by gravel miners and, as permit conditions, impose restrictions on

how mining may be conducted.  NMFS000010 (requiring Freeman mining to submit a plan for the

Jack Creek high flow channel within one year and to construct project within three; requiring

operators to submit design drawings for Social Security Bar to annual implementation team prior

to the end of year three and to complete construction before the end of the final year).   Additionally,

though some members of NMFS expressed concern regarding the efficacy of various conservation

measures, there is evidence in the record that the conservation measures will in fact result in habitat

improvement.  NMFSSUP0966.  Given the conflicts in the evidence, this court is not in a position

to find that NMFS acted capriciously in their area of expertise.  *Lands Council*, 537 F.3d at 993.

  Third, NEDC contends that the no jeopardy determination was based in part on an

assumption that mining will cease following the permit term.  In the BiOp, NMFS notes that the

"natural processes each winter after the permit term ends will provide large influxes of gravel, with

corresponding benefits to the species and rapid positive impacts to the recovery rate trajectory."

NMFSAR000032.  Because of that, NMFS stated that "it is reasonably certain that when extraction

ends, natural recruitment will begin depositing gravel at an average of 66,000 cubic yards per year."

PAGE 44 - OPINION AND ORDER

*Id.* As the Corps has previously stated (as discussed above) that mining through individual permits is the status quo on the Chetco, NEDC argues that NMFS could not assume that mining would cease after the RGP term, offsetting the negative impacts of the action. Federal defendants contend that because the permit term is only five years, and any future mining would require renewed consultation, it was appropriate for NMFS to analyze the project in light of its temporal duration. While it is certainly appropriate for NMFS to analyze the RGP in light of its temporal duration, it is arbitrary and capricious to make findings based on an assumption that no mining will take place after the RGP term when all evidence in the record suggests just the opposite.

3. Cumulative Effects Analysis

NEDC contends that NMFS did not adequately evaluate the cumulative effects of mining by Freeman outside the scope of the RGP. As of July 12, 2011, the Corps "officially told Freeman Rock that it is possible to removal [sic] aggregate with incidental fallback and that they will monitor the 2011 Freeman operations before making a final decision." *Id.* That final decision was never made and final approval was not given.

In formulating a BiOp, the Services must "[e]valuate the effects of the action and cumulative effects on the listed species or critical habitat." 50 C.F.R. § 402.14(g)(3). "Effects of the action" include "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline." *Id.* at § 402.02. Cumulative effects "are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.* Once the cumulative effects are identified, the agency must determine "whether the action, taken together with cumulative

effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id.* at § 402.14(g)(4).

Regarding cumulative effects, NMFS stated that "after examination of the biological assessment and additional queries to the applicant and Corps, NMFS was unable to identify any future non-Federal activities in the action area." NMFSAR000031. Accordingly, NMFS was "not aware of any cumulative effects." *Id*. Federal defendants argue that they were not required to review the proposed mining by Freeman because it was not reasonably certain to occur. Rather, the Corps viewed the proposal to mine outside the RGP as a threat that resulted from skepticism that the RGP would not issue. Mining outside the RGP would only have occurred if the RGP was not approved and therefore, could not be cumulative to it. This court agrees. Freeman never received final approval to conduct the mining, and based on the record, it appears to have been raised as an alterative to mining under the RGP. Summary judgment is granted to federal defendants on Claim Eight. Because NMFS' jeopardy determination was based on arbitrary and capricious assumptions regarding population growth and the cessation of mining, summary judgment is granted to NEDC on Claim Seven.

### 4. Incidental Take Statement

Section 9 of the ESA prohibits the "take" of listed species. 16 U.S.C. § 1538(a)(1)(B). The term "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id*. § 1532(19). Where, as here, NMFS issues a "no jeopardy" opinion for a proposed action that nevertheless may result in a "take" under the ESA, NMFS must include an ITS specifying the amount or extent of anticipated take, reasonable and prudent measures to minimize the impact of the take, and mandatory terms and conditions to

implement the reasonable and prudent measures. 50 C.F.R. § 402.14(i).  The ITS provides an exemption from takings liability under the ESA; any take that is in compliance with the terms and conditions of the ITS "shall not be considered a prohibited taking of the species concerned."  16 U.S.C. § 1536(o)(7).  Additionally, an ITS must "set forth a 'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision [of the ESA], and requiring the parties to re-initiate consultation." *Ariz. Cattle Growers' Ass'n v. FWS*, 273 F.3d 1229, 1249 (9th Cir. 2001); 50 C.F.R. § 402.16(a).

Although Congress expressed a preference for quantifying take numerically, NMFS may use a surrogate if no number may be practicably obtained. *Ariz. Cattle Growers*, 273 F.3d at 1249-50; *Oregon Natural Resources Council ("ONRC") v. Allen,* 476 F.3d 1031, 1038 (9th Cir. 2007); 50 C.F.R. § 402.16(a).  Where NMFS uses a non-numerical surrogate, it must "articulate a rational connection between the surrogate and the taking of the species." *Wild Fish Conservancy*, 628 F.3d at 531.  The surrogate must "contain measurable guidelines to determine when incidental take would be exceeded," and "must not be so general that the applicant or the action agency cannot gauge its level of compliance." *ORNC*, 476 F.3d at 1038–39.  Additionally, the ITS may violate the ESA if the threshold for triggering reinitiation is coextensive with the project's own scope and "cannot be reached until the project itself is complete." *Id*.  In fulfilling its obligations under Section 7, NMFS must use the "best scientific and commercial data available."  16 U.S.C. § 1536(a)(2).

As noted, NMFS found that take of juvenile coho could occur as a result of heavy equipment crossings, and limited the number of crossings per year to twelve.  NMFSAR000028.  NMFS also determined that take would occur as a result of habitat modification.  NMFSAR000035-36. Because NMFS was unable to accurately quantify the number individual fish likely to be killed or

injured as a result of those impacts, the agency developed a "surrogate" to measure the extent of take.  Under the ITS, if mining disturbs more than 0.2 acres of the gravel bar per 1,000 cubic yards harvested, the Corps must reinitiate consultation.   NMFSAR000036.  NMFS concluded that this ratio was the "best available indicator for the extent of take":

> In addition to being the most practical and feasible indicator to measure, area of gravel bar disturbed per unit of gravel removed is proportional to the adverse effects of this project. A relatively small amount of removal may have a large effect if the depth is minimal and it is spread out over a large area. Also, because extraction occurs in three dimensions (square area plus depth), the area of gravel bar disturbed per unit of gravel removed is closely related to the intensity of activity, yet is distinct from the total amount of gravel removed. Thus, area of gravel bar disturbed per unit of gravel removed will remain proportional to the amount of take, regardless of the level of annual extraction allowed by the proposed action.

 NMFSAR000036.

At the preliminary injunction stage of this litigation, NEDC argued that the surrogate was flawed because NMFS failed to address all of the stressors that may cause take, ignored the direct harm caused by heavy machinery and the amount of gravel ultimately removed from the stream, failed to rationally explain why the ratio is an indicator of take, failed to define the scope of the action as well as crucial terms required to determine when reintiation is required, and failed to require sufficient measurement, recordkeeping, and reporting requirements.  At summary judgment, NEDC has narrowed its argument somewhat and focuses primarily on heavy equipment crossing the river.   As discussed above, the BiOp limits the number of crossings to twelve per year. NMFSAR000028.  However, this limit is not incorporated into the ITS and its violation does not trigger reinitiation of consultation.  Accordingly, NEDC argues that the ITS fails to address a distinct form of take.  This slightly narrowed argument is largely identical to the one previously advanced and seeks to require NMFS to develop a surrogate for each form of take anticipated by the

PAGE 48 - OPINION AND ORDER

action.

As this court previously held, nothing in the ESA, its implementing regulations, or the case law requires NMFS to develop a surrogate that must address *all* of the stressors that may cause take. Requiring NMFS to develop a surrogate that addresses all forms of "stressors" would run afoul of the Ninth Circuit's admonition against "impos[ing] 'procedural requirements [not] explicitly enumerated in the pertinent statutes.'" *Lands Council v. McNair,* 537 F.3d at 993-94; *League of Wilderness Defenders v. Forest Service*, 549 F.3d 1211 (9th Cir. 2008). As previously held, NMFS adequately explained the link between the surrogate and take. NMFS found that take was primarily possible from in-water stream crossing and the slowing of improvement in carrying capacity. NMFSAR000035. The agency also explained that monitoring the possibility of juveniles being killed by heavy machinery was impractical and that "the relationship between gravel influx, geomorphic, carrying capacity, survival and abundance is not quantifiable due to lack of data." *Id.* The surrogate it created relates to both forms of possible take, as well other forms of take because the "area of gravel bar disturbed per unit of gravel removed is proportional to the adverse effects of this project." NFMSAR000036.

Additionally, NEDC's argument ignores the required terms and conditions in the BiOp. The BiOp makes clear that the number of crossing is limited to twelve per year. NMFSAR000028. Contrary to NEDC's argument, the BiOp includes meaningful and binding restrictions on the amount of gravel extracted and the number of crossings allowed per year and it has been incorporated by reference into the RGP. AR00121.

Given the deferential standard of review under the APA, the court cannot conclude that NMFS's surrogate is arbitrary and capricious. NMFS was required to "establish a link between the

activity and the taking of species" and it has done so.  *Arizona Cattle*, 273 F.3d at 1250.

Accordingly, summary judgment is granted to federal defendants on Claim Nine.

*Conclusion*

For the reasons discussed,  NEDC's Motion for Summary Judgment [94] is granted in part and denied in part, and defendants' Cross Motion for Summary Judgment [102] is granted in part and denied in part.  The parties shall confer regarding remedies in this matter and must submit a joint status report by April 12, 2013.

IT IS SO ORDERED.

DATED this 27th day of March, 2013.

_____/s/ John V. Acosta_____<br>
John Acosta<br>
United States Magistrate Judge

PAGE 50 - OPINION AND ORDER